United States District Court
Northern District of California

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11

12

13  GARY HESTERBERG,                         Case No.: C-13-01265 JSC

14            Plaintiff,                      **ORDER DENYING PLAINTIFF'S**
                                             **MOTION FOR PARTIAL SUMMARY**
15       v.                                  **JUDGMENT (Dkt. No. 27)**

16  UNITED STATES OF AMERICA, et al.,

17

18            Defendants.

19

20       This civil rights action arises from National Park Service Ranger Sarah Cavallaro's tasing of

21  Plaintiff Gary Hesterberg after she stopped him for running his dog off leash.  Now before the Court

22  is Plaintiff's Motion for Partial Summary Judgment.  (Dkt. No. 27.)  After carefully considering the

23  parties' briefing on the motion, and having had the benefit of oral argument on November 7, 2013,

24  the Court concludes that Plaintiff has not demonstrated that he is entitled to judgment as a matter of

25  law and therefore DENIES his motion.

26  //

27  //

28  //

United States District Court
Northern District of California

## SUMMARY JUDGMENT EVIDENCE

In late January of 2012, Plaintiff Gary Hesterberg ("Hesterberg") took an afternoon jog with his two dogs in Rancho Corral de Tierra, an open space area in San Mateo County.  One month earlier, this space was incorporated into the Golden Gate National Recreation Area ("GGNRA"), which is managed by the National Park Service ("NPS").  The NPS had recently enacted a rule requiring dogs to be on leash while in Rancho Corral de Tierra.   Hesterberg, then 50 years old, was jogging with his two small dogs, a leashed Beagle and an unleashed Rat Terrier.

As Hesterberg was jogging, he saw NPS Park Ranger Sarah Cavallaro ("Cavallaro"), who was wearing a green uniform, boots, and a utility belt, which contained, among other things, a gun and a taser.  On her jacket was a "patch badge" that said "Park Ranger" in capital letters.  Hesterberg stopped running and leashed his Rat Terrier "as soon as" he saw Cavallaro.  (Dkt. No. 28-1 (Hesterberg Depo.) at 36:17-19.)  He did so because he recognized Cavallaro as a "park ranger" and had heard "talk circulating the community that this particular open space land was going to become jurisdiction of another entity and the leash laws might change."  (*Id.* at 34:19-35:2.)

Cavallaro noticed the leash law violation, and "decided that [she] was going to stop him to talk to him about his dog off leash."  (Dkt. No. 28-2 (Cavallaro Depo.) at 116:21-22.)  Cavallaro's "plan" was to give Hesterberg a verbal warning, rather than a ticket.  (*Id.* at 116:23-25.)  Cavallaro understood that there was a "phase-in period" for enforcing leash law violations with citations; that is, the focus was on informing the public of the new NPS rules and issuing warnings rather than citations.  (*Id.* at 62:3-17.)

Cavallaro informed Hesterberg that his dog needed to be leashed and that she was going to give him a warning, not a citation.  She then asked for Hesterberg's identifying information: name, address, and date of birth.  As Hesterberg had been jogging, he did not have any photo identification with him; however, he orally provided Cavallaro with the requested information.  Cavallaro requested this information for two purposes: 1) to include in the "local database" or "local file" that catalogues records of leash-law contacts for future reference (*see* Dkt. No. 28-2 at 115:10-15; *see also* Dkt. No.

United States District Court
Northern District of California

45 ¶ 7);[1] and 2) to check for any outstanding warrants.  Although Hesterberg provided Cavallaro with his accurate address and date of birth, he lied to Cavallaro about his name—he said his name was "Gary Jones."  He gave a false name because "[he] didn't want [his] real name to be put on some offending, or offender list of people that had been walking their dogs without a leash."  (Dkt. No. 28-1 at 44:2-6.)  Upon receiving the information from Hesterberg, Cavallaro radioed dispatch for verification.  (Dkt. No. 28-2 at 123:17-124:12.)  While Cavallaro was waiting for a "return" from dispatch, she "verbally warned" Hesterberg about the leash law violation; however, "[she] still ha[d] to identify [him] in order to appropriately warn [him]."  (*Id.* at 124:2-12.)

Hesterberg did not overhear Cavallaro's communication to dispatch because he became "distracted" by James and Michelle Babcock who were out walking their dogs, approached Hesterberg and Cavallaro, and began speaking with Hesterberg.  (Dkt. No. 28-1 at 47:25-48:11.)  The Babcocks engaged or attempted to engage Cavallaro in conversation, but Cavallaro eventually told them something to the effect of "I don't have any business with you right now" and that they must "leave the area" or else Cavallaro "would have business with them."  (Dkt. No. 128-2 at 132:8-19.)  The Babcocks moved away, but stayed close by and continued to observe.

Hesterberg asked Cavallaro what her authority was to detain him, and asserts that Cavallaro did not respond.  He then notified Cavallaro that he was going to leave.  Cavallaro responded that he was not free to do so.  Hesterberg nevertheless tried to leave.  According to Cavallaro, Hesterberg ran 15 to 20 feet before he heeded her verbal commands to stop.  (*Id.* at 134:14-135:21.)  She ran after Hesterberg and once they both stopped she told him again that "[she] was still waiting for information back from his dispatch and that he was not free to go until [she] got that information."  (*Id.* at 136:1-10.)  Hesterberg disputes that he ran away or made any movement and he does not recall whether Cavallaro told him she was waiting for a dispatch response.  (Dkt. No. 128-1 at 51:25-52:4.)

---

[1]  Cavallaro asserts that the database is useful because "[o]ften, dog-walkers at GGNRA claim ignorance about the requirements of the applicable leash laws. The local database is a useful and important tool for Park Rangers because it creates a record of prior contacts and warnings that have been given.  As a result, on future encounters, Park Rangers are able to identify persons who have previously violated the leash requirements and can take appropriate steps to impose additional sanctions, such as issuing citations and imposing an escalating schedule of monetary penalties, for persons who repeatedly violate the law."  (Dkt. No. 45 ¶ 7.)

United States District Court
Northern District of California

1    Hesterberg testified that, after being told he was not free to leave, "some tense moments

2    [passed] during which I believe [Cavallaro] was communicating with whoever it was she was

3    communicating with on the radio" and everybody was "essentially standing around waiting."  (Dkt.

4    No. 128-1 at 52:15-23.)  Around this time, dispatch informed Cavallaro that it had "several returns"

5    and asked for a city or residence, which Cavallaro provided.  (Dkt. No. 46, Ex. A, File G.)  Several

6    seconds later, dispatch completed its check of Hesterberg's identifying information and relayed its

7    conclusion to Cavallaro: "10-74 not on file for name and D.O.B." (*id.*), meaning that "there is not

8    valid California driver's license associated with the information given and that there are no

9    outstanding warrants for a person with that identifying information."  (Dkt. No. 45 ¶ 5).  In addition,

10   after Hesterberg's first attempt to leave, Cavallaro asked dispatch for a "second unit headed this way"

11   and to "repeat that information."  (*Id.*)

12   Hesterberg then "took it upon [him]self to advise [Cavallaro] that [he] was going to leave, and

13   [he] made an effort to do so."  (Dkt. No. 128-1 at 53:15-21.)  According to Hesterberg, he only

14   traveled "one step" before Cavallaro grabbed him on or around his arm or shoulder.  (*Id.* at 56:8-10.)

15   Cavallaro contends, however, that Hesterberg ran 50 feet or more before she was able to grab hold of

16   his arm and force him to stop.  Both parties agree that Hesterberg "pulled away" when she tried to

17   hold him.  (*See* Dkt. Nos. 128-1 at 57:3-4 & 128-2 at 140:20-22.)

18   As the confrontation escalated, Hesterberg asked Cavallaro questions regarding her authority,

19   what agency she worked for, and whether he was under arrest.  Hesterberg asserts that those

20   questions were ignored and that Cavallaro continued to communicate with her radio dispatch.

21   Although the record is not clear on the exact sequence of the events, the parties appear to agree that

22   Cavallaro then ordered Hesterberg to turn around and put his hands behind his back; however,

23   Hesterberg refused to do so and told Cavallaro that she "hadn't given [him] [her] proper authority"

24   and he was going to leave.  (Dkt. No. 128-1 at 57:21-58:1.)  During this time, Cavallaro also asked

25   dispatch for an update on her request for backup and she was told that a unit was "en route."  (Dkt.

26   No. 46, Ex. A (audio file H).)

27   Following Hesterberg's failure to obey her orders and his statement that he was going to leave

28   for a third time, Cavallaro upholstered her taser and aimed it at Hesterberg.  Hesterberg recognized

the weapon as a taser and told Cavallaro something to the effect of "you're going to Tase me now? Don't Tase me, because I have a heart condition." (Dkt. No. 128-1 at 62:23-64:3.) Cavallaro recalls that she again ordered Hesterberg to turn around and put his hands behind his back. (Dkt. No. 128-2 at 147:16-17.) Mrs. Babcock states that she saw Cavallaro "pull out her Taser, point it at Mr. Hesterberg and threaten that she would Tase him if he took another step." (Dkt. No. 29 ¶ 9.) Hesterberg testified that he again asked Cavallaro the basis for her authority to detain him, and she responded "the Constitution." (Dkt. No. 128-1 at 66:14-16.) Cavallaro acknowledges that Hesterberg "may have been talking or asking questions" at this time, but she was focused on communicating with dispatch to relay her location information to the incoming officers. (Dkt. No. 128-2 at 147:21-25.) In any event, rather than put his hands behind his back as Cavallaro had ordered, Hesterberg decided again to leave.

According to Cavallaro, Hesterberg turned and started to run away from her and she ran after him in pursuit. Hesterberg, Mrs. Babcock, and another witness, John Bartlett, all assert that Hesterberg walked away from Cavallaro and did not run. Within moments of Hesterberg's attempt to leave, Cavallaro deployed her taser in dart mode,[2] striking Hesterberg with the taser probes in his lower back and buttock. Hesterberg fell forward on the pavement, causing abrasions to his arm and leg. Hesterberg was tased for one five-second cycle. He describes the experience of being tased as "extremely violent," "very, very frightening," and a "ten" on a pain scale of one to ten. (Dkt. No. 128-1 at 81:2-8, 168:22-169:3.)

Deputies from the San Mateo County Sheriff's Department arrived minutes later and handcuffed Hesterberg. An ambulance also arrived, but Hesterberg told the paramedics that he "felt that [he] didn't need to go to the hospital." (Dkt. No. 128-1 at 103:11-15.) He was eventually

---

[2] In "dart mode," a taser:

> uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the [Taser] by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the [Taser] delivers a 1200 volt, low ampere electrical charge . . . The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.

*Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010)).

transported to San Mateo County jail in Redwood City, where he was released later that night. Hesterberg was cited for two misdemeanor crimes: California Penal Code § 148(a)(1) (resisting, delaying, or obstructing a peace officer who is engaged in the lawful performance of duties) and California Penal Code § 148.9(a) (giving a false identity to a peace officer for the purpose of avoiding proper identification).  Cavallaro also cited Hesterberg for violation of San Mateo County Ordinance § 6.04.070(a) (the leash rule), an infraction.  The San Mateo County District Attorney declined to pursue any charges against Hesterberg.  This lawsuit followed.

Hesterberg's lawsuit includes five causes of action.  The first claim, against Cavallaro, is a *Bivens* claim for violation of Hesterberg's rights secured by the First and Fourth Amendments to the United States Constitution.  The second through fifth causes of action, against Defendant United States of America, are pled under the Federal Tort Claims Act ("FTCA").  Those four claims, respectively, are based on: 1) assault; 2) battery; 3) false arrest and imprisonment; 4) negligence.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When, as here, "the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks and citation omitted).  "In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."  *Id.*

If the "moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).   If the nonmoving party fails to do so, "the moving party wins the motion for summary judgment."  *Id.*  "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion."  *Id.*  In deciding

whether there exist genuine issues of material fact, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

The Ninth Circuit has cautioned that even when, as here, the court will be the ultimate trier of fact, *see* 28 U.S.C. § 2402, "courts must not rush to dispose summarily of cases—especially novel, complex, or otherwise difficult cases of public importance—unless it is clear that more complete factual development could not possibly alter the outcome and that the credibility of the witnesses' statements or testimony is not at issue." *TransWorld Airlines, Inc. v. Am. Coupon Exchange, Inc.*, 913 F.2d 676, 684-85 (9th Cir. 1990) ("Even when the expense of further proceedings is great and the moving party's case seems to the court quite likely to succeed, speculation about the facts must not take the place of investigation, proof, and direct observation."). "Accordingly, under *Trans[W]orld* and *Chevron*, although a court that will ultimately act as the trier of fact may weigh evidence in deciding a summary judgment motion, it should not do so if more complete factual development could alter the outcome or if the credibility of witness statements or testimony at issue." *Brohmer v. United States*, 2006 WL 3300398, at *27 (E.D. Cal. Nov. 14, 2006) (FTCA case).

## DISCUSSION

Hesterberg moves for summary judgment on his FTCA false arrest/imprisonment and battery claims. As the moving party and the party with the ultimate burden at trial, he must show that drawing all inferences in Defendant's favor, he would be entitled to a directed verdict on the claims.

### A.    False Arrest/Imprisonment

#### 1.    Legal standard

For a claim to be cognizable under the FTCA, liability must be based on the "law of the State." *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (2004). "Under California law, the elements of a claim for false imprisonment are: '(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief.'" *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011) (quoting *Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000)). The parties agree, however, that the Court should look to federal cases interpreting the Fourth Amendment of the United State Constitution in determining whether a false imprisonment occurred. *See Katzberg v. Regents of the University of Cal.*, 29 Cal. 4th 300, 303 n.1 (2002) (noting

that under "established common law tort principles," claims such as false arrest and false

imprisonment "may be established by demonstrating a violation of a constitutional provision").

### 2. Whether Cavallaro falsely imprisoned Hesterberg

Cavallaro's initial seizure of Hesterberg for having his dog off leash was based on probable

cause and concededly lawful.  "It is nevertheless clear that a seizure that is lawful at its inception can

violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected

by the Constitution."  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  Further, "[a] seizure that is

justified solely by the interest in issuing a warning ticket . . . can become unlawful if it is prolonged

beyond the time reasonably required to complete that mission."  *Id.*; *see also United States v. Luckett*,

484 F.2d 89, 90 (9th Cir. 1973) (per curium) ("[T]he Fourth Amendment require[s] that the length

and scope of the detention be strictly tied to and justified by the circumstances which rendered its

initiation permissible." (internal quotation marks omitted)).

In *Caballes*, the Supreme Court accepted the state court's determination that an officer's

traffic stop to issue a warning was not extended by a dog sniff for illegal drugs.  In so doing, the

Court indicated that an officer's actions that prolong a detention and are unrelated to the stop's

purpose violate the Fourth Amendment, even if the initial detention is based on probable cause.

*Caballes*, 543 U.S. at 407.  In *Muehler v. Mena*, 544 U.S. 93, 101 (2005), the Court applied *Caballes*

in analyzing Mena's claim that her Fourth Amendment rights were violated when she was questioned

about her immigration status while detained for a lawful search unrelated to her immigration status.

Citing *Caballes*, the Court held that Mena had to establish that the immigration questioning

prolonged the detention, since "mere police questioning does not constitute a seizure."  *Id.* (internal

quotation marks omitted).  Because "the Court of Appeals did not find that the questioning extended

the time Mena was detained[,] . . . no additional Fourth Amendment justification for inquiring about

Mena's immigration status was required."  *Id.*  These cases suggest that if a traffic stop or a similar

detention is prolonged for reasons unrelated to the grounds for the original detention, there must be a

Fourth Amendment justification to continue the detention.  *See Luckett*, 484 F.2d at 90 (finding

Fourth Amendment violation where pedestrian stopped for jaywalking continued to be detained for a

warrants check after pedestrian was issued a citation, and where no reasonable suspicion supported

United States District Court
Northern District of California

United States District Court
Northern District of California

1  seizure for check of outstanding warrants); *see also United States v. Figueroa-Espana*, 511 F.3d 696,

2  702-03 (7th Cir. 2007) (applying *Caballes* and holding that "subsequent questions" and continued

3  detention of driver after officer issued warning ticket and told him he was "free to go" was justified

4  by reasonable suspicion separate from the traffic violation).

5       Hesterberg's false imprisonment theory is that once Cavallaro verbally warned him, her

6  "mission" was complete and she had no right to detain him further.  There is no dispute that after

7  Cavallaro verbally warned Hesterberg she ordered him not to leave.  The summary judgment

8  evidence supports a finding that she detained him to verify his identity and determine if there were

9  any outstanding warrants for his arrest. The question, then, is whether doing so was part of her

10  investigation of the dog leash violation or whether such verification was unrelated to the initial

11  mission of the stop and thus required some additional and independent reasonable suspicion.  *See*

12  *Caballes*, 543 U.S. at 407; *Luckett*, 484 F.2d at 90; *Figueroa-Espana,* 511 F.3d at 702-03.

13  Accordingly, Hesterberg is entitled to summary judgment on his false imprisonment claim only if the

14  Court concludes as a matter of law that verifying Hesterberg's identification was not part of the

15  investigation of the initial violation.

16       A reasonable trier of fact could find that Cavallaro's verification of Hesterberg's identity was

17  part of her initial investigation of the leash law violation; that is, that it was related to the original

18  justification for the detention.  Cavallaro testified that one of the reasons she requested Hesterberg's

19  name, address and date of birth was to include the information in the "local database" or "local file"

20  that records leash-law contacts for future reference.  (*See* Dkt. No. 28-2 at 115:10-15; *see also* Dkt.

21  No. 45 ¶ 7.)  The goal of the database is to catalogue leash-law violators who have received an oral

22  warning so that if they violate the same law in the future the officer will be aware of the prior

23  warning. Although Cavallaro "verbally warned him" while she was waiting for a "return" from

24  dispatch, "[she] still ha[d] to identify [him] in order to appropriately warn [him]."  (Dkt. No. 28-2 at

25  124:2-12.)  Since a reasonable trier of fact could find that the "mission" of Cavallaro's stop was not

26  complete until Hesterberg's identity was verified with dispatch, Hesterberg has not established that

27  Cavallaro's continued detention of him pending verification of his identity violated the Fourth

28

United States District Court
Northern District of California

1  Amendment.  In other words, a trier of fact could find that Cavallaro did not prolong the detention

2  "beyond the time reasonably required to complete [Cavallaro's] mission."  *Caballes*, 543 U.S. at 407.

3          Even apart from Cavallaro's asserted intent to place Hesterberg's identifying information in a

4  database of leash-law violators, the Ninth Circuit has stated that when an officer detains a pedestrian

5  for a minor infraction it is permissible to detain the pedestrian long enough to obtain "satisfactory

6  identification."  *Luckett*, 484 F.2d at 91 (holding that the Fourth Amendment "permits a police officer

7  to detain an individual stopped for jaywalking only the time necessary to obtain satisfactory

8  identification from the violator and to execute a traffic citation.").  Given that Hesterberg did not

9  have any identification with him, let alone photo identification, the Court cannot conclude as a matter

10 of law that his oral disclosure of his identification was "satisfactory" such that Cavallaro had no right

11 to verify the information with dispatch.  To accept Hesterberg's argument to the contrary would mean

12 that any time an officer decides to give an oral warning rather than issue a citation for an infraction

13 committed in the officer's presence, the officer cannot verify the offender's identity without a

14 reasonable suspicion that the offender has provided false information.  The Court is not aware of, and

15 Plaintiff has not identified, any case that even remotely suggests that such a statement reflects the

16 controlling law.

17         Hesterberg insists that it was unlawful for Cavallaro to detain him to perform a warrants

18 check.  The Ninth Circuit has held that in certain circumstances an officer may not prolong an

19 initially lawful detention to check for outstanding warrants without reasonable suspicion that such

20 warrants exist.  *Luckett,* 484 F.2d at 91.  Hesterberg's argument, however, ignores that the record

21 supports a finding that Cavallaro also detained Hesterberg to verify his identity and place his

22 information in the database separate and apart from any warrants check.  In other words, the record

23 does not compel a finding that Cavallaro continued Hesterberg's detention solely to run a warrants

24 check.  As a result, the Court need not resolve the parties' dispute as to whether it would have been

25 lawful for Cavallaro to prolong Hesterberg's detention solely to run a warrants check.

26         Hesterberg's reliance on *People v. Bouser*, 26 Cal. App. 4th 1280 (1994) is misplaced.  In

27 *Bouser*, the officer had no probable cause—or even reasonable suspicion—to detain Bouser in the

28 first instance.  *Id.* at 1283 ("The Attorney General impliedly concedes that [the officer] lacked

reasonable suspicion."). The court noted that "*detaining* a person without cause until a warrant check is completed is illegal." *Id.* at 1286. The court nonetheless held that there was no unlawful detention because Bouser had been free to leave at any time, even while the officer was performing the warrants check. *Id.* at 1287-88. The issue here is different. It is undisputed that Cavallaro had probable cause to initially detain Hesterberg for the leash law infraction committed in her presence; the question is whether she unlawfully prolonged that detention to verify Hesterberg's identification. For the reasons explained above, Hesterberg has not conclusively demonstrated that she did so.

### 3. Whether Hesterberg was falsely arrested

Hesterberg also argues that the custodial arrest for providing a false name and failing to comply with Cavallaro's orders was an unlawful arrest. Because Hesterberg's argument relies largely on whether he was unlawfully detained prior to Cavallaro either obtaining reasonable suspicion that he had provided a false name or his refusal to comply with her orders, his failure to establish the detention as unlawful also means that he has not shown as a matter of law that the custodial arrest was unlawful. In addition, Hesterberg argues that he could not have violated California Penal Code § 148(a)(1)—disobeying an order—because he did not know Cavallaro was a law enforcement officer. However, given the evidence in the record indicating that Cavallaro was in her full Park Ranger uniform—with a "patch badge" and utility belt, among other things—and that Hesterberg immediately leashed his dog when he saw Cavallaro approaching him, there is at least a question of fact as to whether Hesterberg knew or should have known that Cavallaro was a law enforcement officer. The Court accordingly DENIES Hesterberg's motion for summary judgment on his false arrest claim.

### B. Battery

#### 1. Legal standard

A plaintiff alleging a common law battery cause of action must prove unreasonable force as an element of the tort. *See Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008); *see also Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-73 (1998); *see also* BAJI § 7.54 ("A peace officer who uses unreasonable or excessive force in making [an arrest] [or] [a detention] commits a battery upon the person being [arrested] [or] [detained] as to the excessive force[.]"). "In California,

'[c]laims that police officers used excessive force in the course of an arrest, investigatory stop or other seizure of a free citizen are analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution.'" *Avina v. United States*, 681 F.3d 1127, 1131 (9th Cir. 2012) (quoting *Munoz v. City of Union City*, 120 Cal. App. 4th 1077 (2004)).

The test for whether force was excessive in violation of the Fourth Amendment is "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 398 (1989); *see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1090 (9th Cir. 2013) ("The Fourth Amendment, which protects against excessive force in the course of an arrest, requires that we examine the objective reasonableness of a particular use of force to determine whether it was indeed excessive."). To assess objective reasonableness, the court weighs "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted).

In the Ninth Circuit, the discharge of a taser in dart mode—which is what happened in this case—is an intrusion on the individual's Fourth Amendment interests that "involve[s] an intermediate level of force with 'physiological effects, [ ] high levels of pain, and foreseeable risk of physical injury.'" *Gravelet-Blondin*, 728 F.3d at 1091 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010)).

In determining the governmental interests at stake, the court looks to the non-exhaustive list of factors in *Graham*. *See Gravelet-Blondin*, 728 F.3d at 1091. These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Beyond these factors, the Ninth Circuit instructs courts to "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan*, 630 F.3d at 826 (internal quotation marks omitted). This analysis allows courts to "determine objectively the amount of force that is necessary in a particular situation." *Id.* (internal quotation marks omitted); *see also Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) ("[I]n assessing the governmental interests at stake under *Graham*, we are free to consider issues outside the three enumerated above when additional facts are necessary to

United States District Court
Northern District of California

account for the totality of circumstances in a given case.").  Finally, "the [Supreme] Court has emphasized that there are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must still slosh [their] way through the factbound morass of "reasonableness."  Whether or not [a defendant's] actions constituted application of "deadly force," all that matters is whether [the defendant's] actions were reasonable.'"  *Mattos*, 661 F.3d at 441 (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

### 2. Ninth Circuit caselaw on tasers and excessive force

*Bryan*, *Mattos*, and *Gravelet-Blondin*, all involve allegations of excessive force by plaintiffs who were tased by police officers.  In all three cases, the Ninth Circuit reversed the district court's grant of summary judgment to the defendants-officers, concluding that a reasonable trier of fact, when viewing the facts in the light most favorable to plaintiffs, could find that the officers' use of the taser constituted excessive force.

### a) *Bryan v. MacPherson*

In *Bryan*, the officer deployed his taser against Bryan during a traffic stop for a seatbelt infraction.  After Bryan complied with the officer's requests to turn down his radio and pull over to the curb, he placed the car in park and stepped out of his car.  There was "no dispute that Bryan was agitated, standing outside his car, yelling gibberish and hitting his thighs, clad only in his boxer shorts and tennis shoes."  *Bryan*, 630 F.3d at 822.  Bryan, however, did not verbally threaten the officer and was standing 20 to 25 feet away and was "not attempting to flee."  *Id.*  The officer testified that he told Bryan to remain in the car, while Bryan testified that he did not hear the order.  The officer also testified that Bryan took "one step" towards him, while Bryan testified he did not take any step.  *Id.*  The physical evidence indicated that Bryan was facing away from the officer when tased.  Without giving any warning, the officer shot Bryan with his taser.  The electrical current immobilized Bryan, causing him to fall face first into the ground and fracturing four teeth and suffering facial contusions.  The district court denied the officer's motion for summary judgment of qualified immunity and the officer appealed.  *Id.* at 823.

Applying the *Graham* factors, the Ninth Circuit affirmed.  The court concluded that "Bryan did not pose an immediate threat to Officer MacPherson or bystanders despite his unusual behavior."

United States District Court
Northern District of California

*Id.* at 826.  The court also determined that the traffic infraction and three suspected misdemeanors—resisting a police officer, failure to comply with a lawful order, and using or being under the influence of a controlled substance—"provide[d] little, if any, basis for [the officer's] use of physical force." *Id.* at 828 (alterations and internal quotation marks omitted).  The court reasoned that none of those offenses were inherently dangerous or violent, and Bryan posed little to no safety threat.  Regarding Bryan's "resistance," the court noted that Bryan complied with every command the officer issued, except the one he claims he did not hear—to remain in the car.  The court concluded, however, that even if Bryan failed to follow this order, "such noncompliance does not constitute 'active resistance' supporting a substantial use of force." *Id.* at 829-30.  The court noted that since *Graham*, "we have drawn a distinction between passive and active resistance," and Bryan's shouting gibberish and hitting himself in the thighs, while not "perfectly passive," was a "far cry from actively struggling with an officer attempting to restrain and arrest an individual." *Id.* at 830.

The court then looked at two additional factors that militated against finding the officer's conduct reasonable.  First, the officer failed to warn Bryan that he would be shot with the taser if he did not comply with the order to remain in the car, even though such a warning was feasible.  Second, the court concluded that "there were clear, reasonable, and less intrusive alternatives" to "effect the arrest." *Id.* at 831.  Specifically, the court concluded that the officer knew additional officers were en route to the scene, which should have made the officer "aware that the arrival of those officers would change the tactical calculus confronting him, likely opening up additional ways to resolve the situation without the need for an intermediate level of force." *Id.*

The court balanced the competing interests—the level of intrusion on Bryan's Fourth Amendment interests and the government's interest in the use of force—and concluded

> that the intermediate level of force employed by Officer MacPherson against Bryan was excessive in light of the governmental interests at stake.  *Bryan never attempted to flee*.  He was clearly unarmed and was standing, without advancing in any direction, next to his vehicle.  Officer MacPherson was standing approximately twenty feet away observing Bryan's stationary, bizarre tantrum with his X26 drawn and charged.  Consequently, the objective facts reveal a tense, but static, situation with Officer MacPherson ready to respond to any developments while awaiting backup. Bryan was neither a *flight risk*, a dangerous felon, nor an immediate threat.  Therefore, there was simply no immediate need to subdue Bryan before Officer MacPherson's fellow officers arrived or less-invasive means were attempted.

*Id.* at 832 (emphasis added) (alterations and internal quotation marks omitted).  After concluding that Officer MacPherson had violated Bryan's Fourth Amendment right to be free of excessive force, the court went on to conclude that the officer was nonetheless entitled to qualified immunity because at the time of the use of force the law was not clearly established that the use of a taser in such circumstances was unlawful.  *Id.* at 832-33.

> **b)**     ***Mattos v. Agarano***

In *Mattos*, an en banc panel considered two consolidated cases.  In the first case, plaintiff Malaika Brooks was driving her 11-year-old son to school when she was pulled over for driving 32 miles per hour in a 20-miles-per-hour school zone.  Brooks was seven months pregnant at the time. The officer asked Brooks for her license and told her son to get out of the car and walk to school, which was across the street.  Both Brooks and her son complied.  The officer left, returning a few minutes later to inform her that he was going to cite her for speeding.  Brooks insisted that she had not been speeding and that she refused to sign the citation.  Two other officers eventually arrived at the scene, but none was successful in convincing Brooks that the signature would not constitute an admission of guilt.  One officer told Brooks that if she did not sign the citation, she would go to jail.  That officer also brandished his taser and asked Brooks if she knew what it was.  She said she did not. The officers then conferred amongst themselves.  One of them asked "well, where do you want to do it?"  Brooks heard another respond "well, don't do it in her stomach; do it in her thigh."  One of the officers then opened the driver's side door and twisted Brooks' arm up behind her back.  "Brooks stiffened her body and clutched the steering wheel to frustrate the officers' efforts to remove her from the car."  *Mattos*, 661 F.3d at 437.  While the officer held her arm, another officer, Jones, cycled his taser to show Brooks what it did.  Twenty-seven seconds later,

> Jones applied the taser to Brooks's left thigh in drive-stun mode.  Brooks began to cry and started honking her car horn.  Thirty-six seconds later, Jones applied the taser to Brooks's left arm.  Six seconds later, Jones applied the taser to Brooks's neck as she continued to cry out and honk her car horn.  After this third tase, Brooks fell over in her car and the officers dragged her out, laying her face down on the street and handcuffing her hands behind her back.

*Id.* Brooks was arrested and later convicted by a jury of failing to sign the speeding ticket. Although Brooks was also charged with resisting arrest, the jury could not reach a verdict as to that charge and it was dismissed. Brooks' daughter was born healthy approximately two months after the incident. The district court denied the officers' motion for summary judgment of qualified immunity on the ground that Brooks had proffered evidence sufficient to support a finding that the officers used excessive force and that they were not entitled to qualified immunity. *Id.* at 438. The officers appealed.

In applying the first *Graham* factor, the court had "no difficulty" in deciding that failing to sign a traffic citation and driving 32 miles per hour in a 20-mile-per-hour zone were not "serious offenses." *Id.* at 444. The court also concluded that when the officers tased Brooks, she did not pose an "immediate threat" to the safety of the officers or others, even though she was upset and "proceeded to become increasingly agitated and uncooperative as the incident evolved." *Id.* The court reasoned that Brooks never verbally threatened the officers and, "behind the wheel of her car, she was not physically threatening." *Id.* Regarding the third factor, the court concluded that Brooks "resisted arrest" when she refused to get out of the car and later stiffened her body and clutched the steering wheel to frustrate the officer's efforts to remove her from the car. *Id.* at 445. The court noted, however, that there was no exigent circumstance—such as an "attempt to flee" or another event happening elsewhere—that required the encounter with Brooks to "be resolved as quickly as possible." *Id.*

Looking beyond *Graham*, the court observed three additional specific factors: that Brooks bore "some responsibility" for the escalation of the incident; that the officers knew about and considered Brooks' pregnancy before tasing her; and that the officer tased Brooks three times over the course of less than one minute, "provid[ing] no time for Brooks to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply." *Id.*

The court summarized its conclusions—emphasizing that "Brooks did not evade arrest by flight"—and determined that a reasonable fact-finder, taking the evidence in the light most favorable to Brooks, could find that the officers' action constituted excessive force. *Id.* at 446.

United States District Court
Northern District of California

In the second case, two officers responded to a domestic dispute call involving plaintiff Jayzel Mattos and her husband Troy. While standing in her living room, Jayzel got caught between Troy and one officer trying to arrest him. As the officer moved in to arrest Troy, he pushed up against Jayzel's chest, "at which point she extended her arm to stop her breasts from being smashed against [the officer's] body." *Id.* at 439. The officer then asked Jayzel, "Are you touching an officer?" At the same time, Jayzel was speaking to the other officer, asking why Troy was being arrested, "attempting to defuse the situation by saying that everyone should calm down and go outside, and expressing concern that the commotion not disturb her sleeping children who were in the residence." *Id.* Then, "without warning," the officer she touched shot his taser at Jayzel in dart-mode. *Id.* Jayzel was arrested and charged with harassment and obstructing government operations, both of which were later dropped. The district court denied the officers' motion for summary judgment of qualified immunity, concluding "that there were material questions of fact critical to deciding whether the tasing was constitutionally reasonable, which precluded a pretrial ruling on the issue of qualified immunity." *Id.* at 439. The officers appealed.

Under the first *Graham* factor, the en banc court concluded that the severity of the crime, "if any," was minimal; Jayzel was simply attempting to prevent the officer from pressing up against her breasts. *Id.* at 449. The court next concluded that Jayzel's defensive raising of her hands posed no threat to the officers. Under the third factor, the court found that "the most that can be said is that she minimally resisted Troy's arrest." *Id.* In particular, the court drew a distinction between failure to facilitate an arrest and active resistance to arrest, finding that Jayzel may have failed to facilitate Troy's arrest by not immediately moving out of the way when the officer stated that Troy was under arrest. The court, however, emphasized that "the crux of this *Graham* factor is compliance with the officers' requests, or refusal to comply," and that Jayzel was attempting to comply with the officer's order when she got caught between the two men. *Id.* at 450. The court also found, outside of the numerated *Graham* factors, that the officer's failure to warn Jayzel before he tased her "pushe[d] this use of force far beyond the pale." *Id.* at 451.

Weighing those factors and examining the totality of the circumstances, the court concluded that "a reasonable fact finder could conclude that the officers' use of force against Jayzel, as alleged,

United States District Court
Northern District of California

1   was constitutionally excessive in violation of the Fourth Amendment." *Id.*  As with Brooks,

2   however, the court concluded that the officers were entitled to qualified immunity.  *Id.* at 452.

3          Judge Schroeder concurred with the en banc panel's majority opinion, writing that while she

4   agreed that Supreme Court caselaw required the court to grant qualified immunity because there was

5   no established caselaw recognizing taser use as excessive in similar circumstances, "[o]ne could

6   argue that the use of painful, permanently scarring weaponry on non-threatening individuals, *who*

7   *were not trying to escape*, should have been known to be excessive by any informed police officer

8   under the long established standards of *Graham*."  *Id.* at 453 (emphasis added) (Schroeder, J.,

9   concurring).

10          **c)**    ***Gravelet-Blondin v. Shelton***

11          In the Ninth Circuit's most recent case, published during the briefing period on Hesterberg's

12   motion, the Ninth Circuit reversed a district court's ruling that concluded that an officer's tasing was

13   unconstitutional.  Unlike its previous cases discussed above, however, the court also concluded that

14   the officer was not entitled to qualified immunity.

15          In *Gravelet-Blondin*, five officers responded to a 911 call of a suicide in progress made by

16   family members of an elderly suspect, Jack.  When the officers arrived at Jack's home, he was sitting

17   in his car parked in the side yard, with a hose running from the exhaust pipe into one of the car's

18   windows.  The officers had been warned that Jack would have a gun with him.  Although Jack

19   eventually complied with the officers' orders to step out of his car, he refused multiple commands to

20   show his hands.  Concerned that Jack might gain access to a gun, an officer tased him and a

21   commotion ensued.

22          Donald and Kristi Blondin, Jack's neighbors, heard the noise coming from Jack's house and

23   went outside to investigate and make sure Jack was alright.  Donald Blondin heard Jack moaning in

24   pain and saw the officers holding Jack on the ground.  Blondin called out, "what are you doing to

25   Jack?"  He was standing approximately 37 feet from Jack and the officers at the time.  At least two of

26   the officers instructed him to "get back," while another told him to "stop."  Blondin either stopped or

27   took one or two steps back and then stopped.  One of the officers, Shelton, ran towards Blondin,

28   pointing a taser at him and telling him to "get back."  "Blondin froze."  *Gravelet-Blondin*, 728 F.3d at

United States District Court
Northern District of California

1090.  Shelton began to warn Blondin that he would be tased if he did not leave, but fired his taser before he finished the warning.  Blondin was knocked down and began to hyperventilate.  Shelton asked Blondin if he "'want[ed] it again' before turning to Ms. Blondin and warning, 'You're next.'"  *Id.*  Blondin was arrested and charged with obstructing a police officer, which was later dropped.  The district court granted summary judgment to the defendants on all claims.  *Id.* at 1090.

Applying *Graham*, the court concluded that even if Blondin committed a crime, that crime—"failing to immediately comply with an officer order to get back from the scene of an arrest, when he was already standing thirty-seven feet away"—was "far from severe."  *Id.* at 1091.  The court further concluded that, based on Blondin's version of the distance between him and the officers and Jack, he was not standing so close to them as to constitute an immediate threat.  Finally, the court concluded that Blondin did not resist arrest or attempt to escape.  The court reasoned that only a brief time of less than 15 seconds passed between the first clear, uncontradicted command to "get back" and the tasing.  Although Blondin did not retreat, "he was perfectly passive, engaged in no resistance, and did nothing that could be deemed 'particularly bellicose.'"  *Id.* at 1092 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc)).

Beyond the *Graham* factors, the court found Shelton's warning "meaningless" since he gave the warning while he fired his taser, leaving Blondin no time to react.  *Id.* The court concluded that summary judgment in favor of the officers on the excessive force issue was improper.

The court further concluded that summary judgment was improper as to the district court's qualified immunity determination.  Because Blondin committed "no act of resistance," the case was distinguishable from *Bryan* and *Mattos*, where the court found some resistance.  *Id.* at 1093.  Finding that it was clearly established at the time of the incident that the application of "non-trivial force" in the face of "mere passive resistance" was unconstitutional, the court concluded that the officers were not entitled to qualified immunity.  *Id.*

### 3.    Analysis

If the government had moved for summary judgment, as the defendants had in the above cases, the Court would have little difficulty in concluding that a reasonable fact-finder could find Cavallaro's tasing of Hesterberg excessive under the Fourth Amendment.  The question on

United States District Court
Northern District of California

1   *Plaintiff's* motion for summary judgment, however, is different; namely, whether viewing the facts

2   in the light most favorable to the government a reasonable trier of fact *must* find that the force

3   used was excessive.  In answering this question, the Court must keep in mind that the Ninth

4   Circuit has cautioned that summary judgment in excessive force cases "should be granted

5   sparingly" "[b]ecause [the excessive force inquiry] nearly always requires [a factfinder] to sift

6   through disputed factual contentions, and to draw inferences therefrom."  *Smith v. City of Hemet*,

7   394 F.3d 689, 701 (9th Cir. 2005).

8       **a)**     **Governmental interest in the use of force (*Graham*)**

9           **1)**     **Severity of the crime**

10         Regarding the first *Graham* factor—severity of the crime—the record does not indicate any

11   offense that can properly be considered "severe."  The government concedes, and the Court agrees,

12   that the initial leash-law violation is not a serious offense.  The government contends, however, that

13   Hesterberg committed additional crimes that were "more serious;" namely, "l[ying] about his

14   identity, physically resisting apprehension, and fle[eing] three times."  (Dkt. No. 44 at 24.)

15         As an initial matter, the parties appear to dispute whether Cavallaro had an articulable

16   suspicion that Hesterberg was lying about his name—or simply had a hunch—before she fired her

17   taser.  Although dispatch radioed Cavallaro and told her there was no match for Hesterberg's

18   proffered information, it is unclear if Cavallaro actually heard this report.  In the audio recording,

19   Cavallaro is heard asking dispatch to "repeat that information," but dispatch does not acknowledge

20   this request.  (*See* Dkt. No. 46, Ex. A, File G.)  Further, it is unclear from Cavallaro's deposition if

21   she knew there was no match before she fired her taser.  (See Dkt. No. 28-2 at 168:22-169:3

22   (recounting that the audiotape reflects that she was told that Hesterberg's proffered name was "not on

23   file," but not indicating whether she actually heard and understood that transmission before firing the

24   taser.)  It appears likely that Cavallaro did not hear the "not on file" transmission, but maintained her

25   suspicion that Hesterberg was lying about his name based on her hunch that "Jones" sounded like a

26   name that someone would use to lie about their identity, (*see id.* at 126:9-23), and dispatch's initial

27   remark that it had "multiple returns" and needed more information.  (Dkt. No. 46, Ex. A, File G.)

28   While the government asserts that the "not on file" transmission provided Cavallaro with reasonable

1   suspicion that Hesterberg was lying about his identity, the government does not address whether

2   reasonable suspicion existed in the absence of Cavallaro's knowledge of that particular transmission.

3   Nonetheless, given the ambiguity in the record, and viewing the facts in the light most favorable to

4   the government, the Court assumes that Cavallaro heard the "not on file" transmission. Further, the

5   Court agrees with the government that the no-match transmission provided Cavallaro with reasonable

6   suspicion that Hesterberg lied to her about his identity.

7   　　　However, even if Cavallaro had reasonable suspicion that Hesterberg lied to her about his

8   name before she fired her taser, lying to a police officer is not inherently dangerous or violent. *See*

9   36 C.F.R. § 2.32(a)(3); *see also* Cal. Penal Code § 148.9(b). Further, "[w]hile the commission of a

10  misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an

11  arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the

12  officers or others." *Bryan*, 630 F.3d at 828-29 (internal quotation marks omitted). As discussed

13  below, while Hesterberg resisted arrest, it is undisputed that he was nonviolent and posed no threat to

14  Cavallaro's safety or others. The government fails to provide any authority or reason for its

15  contention that knowingly providing false information to a police officer is not a nonviolent

16  misdemeanor. While lying to a police officer may be a more serious offense than a leash-law

17  violation, this factor does not examine the severity of a crime based on its seriousness *relative to* the

18  other crimes the plaintiff was suspected of. Thus, the Court concludes that Hesterberg's suspected

19  offense of lying to a police officer was not a serious crime.

20  　　　In addition, Hesterberg's alleged violation of California Penal Code Section 148(a)(1)—

21  resisting, delaying, or obstructing a peace officer—and related federal provisions, also does not

22  constitute a serious crime. *See Young v. County of Los Angeles*, 655 F.3d 1156, 1164-65 (9th Cir.

23  2011) ("[W]hile disobeying a peace officer's order certainly provides more justification for force than

24  does a minor traffic offense, such conduct still constitutes only a non-violent misdemeanor offense

25  that will tend to justify force in far fewer circumstances than more serious offenses, such as violent

26  felonies."); *see also Bryan*, 630 F.3d at 828-29 (concluding that resisting a police officer, failure to

27  comply with a lawful order, and using or being under the influence of any controlled substance are

28  not "inherently dangerous or violent"); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir.

2007) (holding that obstructing a police officer was not a "serious offense"); *Smith*, 394 F.3d at 702 (holding that domestic violence suspect was not "particularly dangerous," and his offense was not "especially egregious").

The government appears to contend that Hesterberg's offenses were serious because he "physically resisted apprehension" and "fled three times." (Dkt. No. 44 at 24.)  However, Hesterberg's physical resistance—pulling his arm away from Cavallaro—does not constitute a violent act.  At no time did Hesterberg physically or verbally threaten Cavallaro.  In addition, although part of Hesterberg's disobedience included his attempts to flee, because flight is considered as a separate *Graham* factor, the Court gives little, if any, weight to Hesterberg's flight in evaluating whether his offense of disobeying an officer's orders was serious.  Because Hesterberg was nonviolent and his alleged offenses did not pose a threat to anyone's safety, his offenses were nonserious for purposes of the excessive force inquiry.

### 2) Immediate threat to safety

The second *Graham* factor asks whether the suspect posed an immediate threat to the safety of the officers or others.  This is the "most important" factor.  *Mattos*, 661 F.3d at 441.  While Hesterberg became increasingly noncompliant as the encounter wore on, at no time did he verbally or physically threaten Cavallaro or anyone else.  He was in jogging shorts and a T-shirt and Cavallaro did not observe any weapons on him.  (Dkt. No. 28-2 at 118:23-25.)  Thus, "[a]t most, [Cavallaro] may have found [him] uncooperative," but such noncompliance does not equate to an immediate threat.  *Mattos*, 661 F.3d at 441 (concluding that plaintiff did not pose an immediate threat even though plaintiff refused to exit her vehicle and physically resisted the officers' attempts to extract her).  Moreover, Cavallaro specifically testified that at the time she tased Hesterberg—as he was running away—he posed no immediate threat to her.  (Dkt. No. 28-2 at 161:17-22.)  Thus, this factor does not weigh in favor of Cavallaro's use of her taser to effect the arrest.

The government contends that it cannot be said that Hesterberg posed "no danger when he is bigger and stronger than the law enforcement officer, has physically resisted the officer's attempts to restrain him, has repeatedly disobeyed direct orders, and has tried to flee three times." (Dkt. No. 44 at 24.)  This argument misses the point.  As noted above, *Mattos* specifically addressed a situation

where the suspect is physically uncooperative, but unthreatening, and concluded that the suspect did not pose an immediate threat.  While Hesterberg's relative size and strength could arguably pose a *potential* threat to Cavallaro's safety, it is undisputed that Hesterberg never verbally or physically threatened Cavallaro.  Thus, there was no *immediate* threat to Cavallaro's safety.  The government cites no authority for its contention that Hesterberg's actions constitute an immediate threat to officer safety.  While the court in *Smith* found a triable dispute as to whether an unarmed plaintiff who made no threats constituted an immediate danger, the court was reviewing a district court's grant of summary judgment in favor of the *defendant*.  394 F.3d at 702.  Thus, the court was not considering whether *plaintiff* had established as a matter of law that he posed no immediate threat.  Moreover, the police had been called to the plaintiff's house to investigate his physical assault of his wife.  Thus *Smith* does not suggest that based on the present record there is a triable issue as to whether Hesterberg posed an immediate threat.

### 3)      Active resistance or attempts to flee

The parties debate whether Hesterberg's actions constituted "active" or mere "passive" resistance to arrest.  The Court, however, rejects the parties' cramped framing of the issue.  The Ninth Circuit has instructed that resistance "should not be understood as a binary state, with resistance being either completely passive or active.  Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer."  *Bryan*, 630 F.3d at 830.  The Court accordingly evaluates Hesterberg's conduct based on this continuum of passive and active resistance.

Viewing the facts in the light most favorable to the government Hesterberg resisted arrest.  He attempted to flee three times by running away even though Cavallaro ordered him to stay each time, he pulled his arm away from Cavallaro when she attempted to physically restrain him, and he refused to turn around and put his hands behind his back so she could handcuff him.  "In other words, []he resisted arrest."  *Mattos*, 661 F.3d at 445.  In *Mattos*, the court found "some resistance to arrest" where plaintiff "refused to get out of her car when requested to do so and later stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car."  *Id.*  The court summarized this resistance as "active[] . . . insofar as she refused to get out of her car when

United States District Court
Northern District of California

instructed to do so and stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car." *Id.* at 446.  Here, Hesterberg's action in pulling his arm away from Cavallaro, though a single instance of physical resistance, is similar to the physical resistance the plaintiff-driver in *Mattos* provided.  And his attempts to flee from arrest are undisputed and generally weigh in favor of some use of force.  *See Miller v. Clark County*, 340 F.3d 959, 965-66 (9th Cir. 2003) (evading arrest by flight favors the government); *see also Azevedo v. City of Fresno*, 2011 WL 284637, at *8 (E.D. Cal. Jan. 25, 2011) (concluding that misdemeanant suspect's active flight favored officer's use of "non-deadly force").  As in *Mattos*, however, Hesterberg's resistance "did not involve any violent actions towards the officers."  *Id.*  Thus, while Hesterberg engaged in some active resistance, it still did not rise to the level of an "individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830.  Nonetheless, the Court concludes that this factor weighs in the government's favor.

Hesterberg's arguments to the contrary are unpersuasive.  Hesterberg relies on *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994) to argue that a suspect's flight cuts "only slightly" in favor of the government.  (Dkt. No. 48 at 8.)  *Chew*, however, is distinguishable.  In *Chew*, the suspect—who never physically resisted any of the officers—fled from an officer conducting a traffic stop and hid in a scrapyard.  When he was discovered in the yard, he attempted to surrender, but the officer nonetheless released his police dog, which mauled the suspect.  The court concluded that the answer to whether the suspect was evading arrest was "yes and no."  *Chew*, 27 F.3d at 1442.  The court reasoned that "[i]n a general sense he was, but in more precise terms his flight had terminated, at least temporarily, in the scrapyard."  *Id.*  The court nonetheless held that "a slight edge goes to the government on this score."  *Id.*  Given that Hesterberg's flight had not terminated when Cavallaro fired her taser, *Chew* actually indicates that this factor should cut *more* than slightly in the government's favor.

In addition, Hesterberg's reliance on cases where the Ninth Circuit has found less than active resistance where the suspect merely failed to obey the officers' commands—but did not attempt to flee or physically resist arrest—are inapposite.  *See, e.g.*, *Bryan*, 630 F.3d at 829-30 (concluding that non-fleeing suspect's noncompliance in failing to heed officer's verbal order to reenter vehicle does

not constitute "'active resistance' supporting a substantial use of force"). Nor is Hesterberg's citation to *Maxwell v. County of San Diego*, 708 F.3d 1075 (9th Cir. 2013) helpful. In *Maxwell*, the plaintiff was outside his home, which was an active crime scene following the fatal shooting of his daughter, when he was pepper-sprayed by an officer as he was walking—against the officer's orders—up his driveway to a mobile home where his other family members had been isolated. In overturning the district court's grant of summary judgment to the officer, the court summarily concluded that the suspect "did not resist arrest." *Maxwell*, 708 F.3d at 1086. Because of the lack of analysis, this Court can only speculate as to the *Maxwell* court's reasoning for its conclusion. Nonetheless, although the suspect in *Maxwell* was walking away from an officer who was ordering him to stay, the suspect was not running and was not leaving the immediate area of his driveway. Here, on the other hand, the evidence supports a finding that Hesterberg was running away and was attempting to leave the scene of the detention for good.

Further, the Court rejects Hesterberg's argument that his flight cannot be considered because he was simply fleeing from a detention, not an arrest. Hesterberg cites no authority for his contention that this *Graham* factor must be read literally, such that only an officer's desire to arrest, rather than detain, a suspect is what triggers the analysis. The cases do not support such a rule. *See, e.g.*, *Bryan*, 630 F.3d at 829-30 (evaluating suspect's resistance to the officer's orders to reenter his vehicle so the officer could conduct the traffic stop); *Gravelet-Blondin*, 728 F.3d at 1091-92 (analyzing resistance factor where officers were ordering suspect to retreat, but not attempting to arrest suspect).

In his reply, Hesterberg argues that he "had the right to nonviolently resist or flee from Defendant Cavallaro's actions . . . [b]ecause "Cavallaro lacked reasonable suspicion for her continued detention of Hesterberg and lacked probable cause to arrest." (Dkt. No. 48 at 10.) Thus, Hesterberg appears to contend that his flight should not weigh in the government's favor because his escape was appropriate under the circumstances. While the Ninth Circuit has explained that "establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa," *Mattos*, 661 F.3d at 443 n.4 (internal quotation marks omitted), at least one California court has indicated that a person may nonviolently resist an unlawful detention or arrest, *see Evans v. City of Bakersfield*, 22 Cal. App. 4th 321, 331 n.10 (1994). The *Evans* court, in rejecting

United States District Court
Northern District of California

plaintiff's argument that a person could use force in resisting an unlawful arrest, noted that the "opinion neither discusses nor should affect the right of a person to *nonviolently* resist the unlawful action of police officers." *Id.* (citing *In re Michael V.*, 10 Cal. 3d 676, 681 (1974) (holding that if the officer's request for the suspect to empty his pockets constituted the initiation of a search, "then [suspect's] attempt to flee would not have justified the subsequent arrest and search because "it [was] a direct response to unlawful police action")). Even if Hesterberg's reading of the law is correct, as discussed above, he has not shown as a matter of law that the detention or arrest was illegal. Thus, to the extent his excessive force argument relies on his allegation that the detention was illegal, his argument fails and summary judgment is inappropriate.

### 4) Other considerations

Beyond the *Graham* factors, the Court examines a few additional factors to take account of the "totality of the circumstances." *Bryan*, 630 F.3d at 826. Specifically, Cavallaro's giving of a warning before the tasing, the availability of less intrusive alternatives, the relative culpability for the escalation of the incidence, and Hesterberg's warning that he had a heart condition.

Hesterberg has failed to show that Cavallaro's warning was inadequate as a matter of law. The government contends that while Cavallaro "did not say to [Hesterberg], 'stop or I will Tase you' . . . it is undisputed that Plaintiff knew she was pointing a Taser at him." (Dkt. No. 44 at 22.) Hesterberg asserts that this "threat" was not an explicit warning and was not made right before she fired the taser. Hesterberg's argument, however, attempts to elevate form over substance. As Hesterberg acknowledges, he was aware that Cavallaro was "threatening" him with her taser; it is apparent that this threat was because of Hesterberg's repeated attempts to flee. A logical inference from this threat with the taser is that she would fire it at Hesterberg if he ran away; indeed, Cavallaro testified that after Hesterberg acknowledged that she was pointing the taser at his chest and informed her that she should not tase him because he has a heart condition, she said "Well, then, turn around and put your hands behind your back." (Dkt. No. 28-2 at 147:15-20.) Viewing the facts in the light most favorable to the government, Cavallaro's actions constituted a valid warning.

Hesterberg's reliance on *Bryan* is misplaced, given that the officer there simply ordered Bryan to get back into the car and when he failed to do that, the officer pulled out his taser and fired it.

1    There was no evidence that Bryan knew he would be tased if he didn't follow the order, let alone that

2    the officer was even threatening him with a taser.  *Bryan*, 630 F.3d at 827 n.8.  Further, in *Glenn v.*

3    *Washington County*, 673 F.3d 864, 876 (9th Cir. 2011), the court concluded that a warning prior to

4    the firing of a beanbag gun of "drop the fucking knife or I'm going to kill you" was inadequate

5    because the intoxicated suspect may not have understood or heard the warning in the commotion, as

6    well as because the warning was given before the officer even arrived with the beanbag gun.

7    Contrary to Hesterberg's suggestion, the *Glenn* court did not hold that a further warning necessarily

8    must be given if some time elapses between the initial warning and the use of force.  While

9    Hesterberg contends that "[h]ad Cavallaro warned [him] immediately before she Tased him, he may

10   well have stopped, just as he did when she first drew the weapon and pointed it at him," (Dkt. No. 48

11   at 14), Hesterberg identifies no facts that show that any material part of the encounter changed—

12   beyond the passage of some time—such that another warning was required.  It is undisputed that

13   Cavallaro kept the taser aimed at Hesterberg the entire time she had it out.  That Hesterberg thought it

14   wise to call her bluff does not overcome the facts that support an inference that an adequate warning

15   was issued.

16          Turning to the presence of viable alternatives, the Ninth Circuit has held that "police are

17   required to consider what other tactics if any were available to effect the arrest."  *Bryan*, 630 F.3d at

18   831 (alterations and internal quotation marks omitted).  The court has clarified that this inquiry does

19   not disrupt the "settled principle that police officers need not employ the least intrusive degree of

20   force possible;" rather, it "merely recognize[s] the equally settled principle that officers must

21   *consider* less intrusive methods of effecting the arrest and that the presence of feasible alternatives is

22   a *factor* to include in [the] analysis.  *Id.* at 831 n.15 (internal quotation marks omitted).  Hesterberg

23   contends that Cavallaro, instead of tasing him, could have ended her pursuit of him, waited for

24   backup to arrive, and then initiated a search for him, focusing on the entrance points to the trail

25   system.  However, the record does not support a finding that this was a viable alternative; for

26   instance, it is not apparent that the officers could monitor the trailheads and locate Hesterberg.

27   Accordingly, this is a question best reserved for the trier of fact at a later time.  The evidence that the

28   day following the tasing Cavallaro's supervisors warned her that in the future and under similar

United States District Court
Northern District of California

1   circumstances she should not use her taser certainly supports a finding of viable alternatives, but it is

2   not dispositive.

3          Regarding the third additional factor, the Ninth Circuit indicated in *Mattos* that a plaintiff's

4   culpability in escalating the incident "influences the totality of these circumstances."  661 F.3d at

5   445.  Hesterberg bears at least some responsibility for the escalation of the incident, which began as

6   an effort to educate Hesterberg about the new leash law enforcement but devolved to the point that

7   Cavallaro incapacitated him with a 1200-volt charge of electricity.  Hesterberg does not dispute that

8   he gave Cavallaro a false name; if he had instead provided his real name, the incident would have

9   likely ended in short order.  He did not provide his name because, as he testified, he did not want to

10  be recorded as having his dog off leash, even though he did in fact have his dog off leash.  Taking the

11  facts in the light most favorable to the government, one could imagine that once Hesterberg realized

12  that Cavallaro was actually going to verify his identity, he had an incentive to test the limits of

13  Cavallaro's will to arrest him by continually disobeying her orders and attempting to leave.  Thus, the

14  Court cannot rule as a matter of law that Hesterberg bore no responsibility for escalation of the

15  incident.

16         Finally, it is undisputed that before Cavallaro tased him, Hesterberg warned her not to do so

17  because he had a heart condition.  The government does not contend that Hesterberg's statement

18  regarding his heart condition was incorrect.  As described above, the *Mattos* court took into account

19  the officer's tasing of a visibly pregnant woman, concluding that it weighed against the use of force.

20  The Court here is likewise cognizant of the dangers that tasers pose to persons whose health is

21  somehow potentially compromised, whether it be a heart condition or a pregnancy.  That Cavallaro

22  fired her taser at a fleeing nonviolent misdemeanant who had told her of his heart condition weighs

23  against the government.

24        **b)**     **Balancing the competing interests**

25         Based on the *Graham* analysis above, and viewing the facts in the light most favorable to the

26  government, whether Cavallaro's use of the taser was excessive as a matter of law turns on whether

27  such use is justified in stopping a fleeing, nonviolent, nonserious misdemeanant, who posed no threat

28  to an officer or the public, and was warned prior to the tasing.  The parties, and the Court, are aware

United States District Court
Northern District of California

1   of no case holding one way or another.[3]  Two district court cases have addressed the issue under

2   relatively similar factual circumstances, but in neither case did the court rule in plaintiff's favor on

3   the *plaintiff's* motion for summary judgment.  *See Azevedo*, 2011 WL 284637, at *9 (denying

4   officer's motion for summary judgment on fleeing misdemeanant's excessive force claim because

5   "[i]n the absence of an immediate threat posed by Azevedo, a reasonable jury could conclude that the

6   nature of the force and the risk of injury were too great relative to the offenses at issue"); *see also*

7   *Cockrell v. City of Cincinnati*, 2010 WL 4918725, at *3-4 (S.D. Ohio Nov. 24, 2010) (denying

8   officer's motion to dismiss since fact that nonviolent, nonthreatening suspect "fled from the minor

9   crime may not well support the use of a taser when reviewed under the totality of the circumstances")

10  *overturned on other grounds by* 468 Fed. Appx. 491 (6th Cir. 2012) (unpublished).  Thus, it is

11  difficult to read these cases as establishing that the use of a taser on a nonviolent misdemeanant

12  constitutes excessive force as a matter of law.  In addition, these cases are arguably distinguishable

13  because in both cases the courts concluded, at least for purposes of the pending motion, that no

14  warnings were given.  *See Azevedo*, 2011 WL 284637 at *9 (concluding for purposes of officer's

15  motion for summary judgment that no warning was given); *see also Cockrell*, 2010 WL 4918725, at

16  *1, 5-6 (indicating no warning was given); *see also Cockrell*, 468 Fed. Appx. at 498-99 (Cole, J.,

17  concurring) (indicating that officer's failure to warn of the impending use of the taser is given great

18  weight and suggesting that Fourth Amendment violation turns on presence of that fact).

19          In addition, in both *Bryan* and *Mattos* the Ninth Circuit emphasized that the nonviolent

20  misdemeanants did not attempt to flee; this analysis at least arguably indicates that the addition of

21  flight would change the calculus in those case.  In *Bryan*, the court denied the officer's motion for

22  summary judgment, emphasizing in balancing the competing interests that "Bryan never attempted to

---

23

24  [3]  Although the government cites two cases where district courts have ruled as a matter of law that the
    officer's tasing did not violate the Fourth Amendment, both cases are distinguishable as they did not
25  involve nonviolent, nonserious misdemeanants, who posed no threat to the officers or the public.  *See*
    *Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1145 (W.D. Wash. 2007) (concluding that the
26  first three of five tasings of a fleeing felon—residential burglary—who appeared to be under the
    influence of controlled substances, did not constitute excessive force); *see also Sawicki v. City of*
27  *Brunswick Police Dept.*, 2008 WL 5378342, at *12-13 (N.D. Ohio Dec. 19, 2008) (holding that one-
    time tasing of intoxicated suspect who allegedly assaulted and threatened to kill his sister and his
28  sister's boyfriend with a baseball bat, and "intended to flee," was constitutional as a matter of law).

flee" and that since he was not, among other things, a "flight risk," there was no "immediate need to subdue [him]."  630 F.3d at 832.  In *Mattos*, the en banc panel also denied the officer's motion for summary judgment, noting in its summary of its *Graham* analysis that "Brooks did not evade arrest by flight."  661 F.3d at 446.  The court further noted that no exigent circumstance existed—such as an "attempt to flee"—that required the encounter with Brooks to "be resolved as quickly as possible." *Id.* at 445.  In concurrence, Judge Schroeder noted that in both companion cases "[o]ne could argue that the use of painful, permanently scarring weaponry on non-threatening individuals, *who were not trying to escape*, should have been known to be excessive by any informed police officer under the long established standards of *Graham*."  *Id.* at 453 (Schroeder, J., concurring) (emphasis added). While Judge Schroeder's statement is directed to the qualified immunity issue in those cases, the comment is reflective of the law's recognition of the government's heightened interest in subduing fleeing suspects.

Further, as discussed above, Hesterberg's excessive force argument relies, at least in part, on his contention that his attempts to flee were justified as efforts to escape an unlawful detention.  As explained above, however, the detention's unlawfulness has not been established as a matter of law. In addition, as discussed above, whether feasible alternatives to capturing Hesterberg were available is an unresolved factual question.  The Court notes that such alternative means to capture, while not necessarily as prompt as a taser, appear particularly relevant here where the officer is attempting to detain a nonviolent, nonthreatening individual who is accused of committing only nonserious misdemeanor offenses.

The Ninth Circuit has noted that when the court is the trier of fact, and in "unique circumstances," where "the parties agree that all of the underlying material facts are reflected in the written record, a judge may decide factual issues and essentially convert cross-motions for summary judgment into submission of the case for trial on the written record."  *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1038 n.6 (9th Cir. 2000).  The parties here have not agreed to this procedure; accordingly, the Court must decide Plaintiff's motion under the standards for Rule 56 motions in general.  Because the Court cannot conclude as a matter of law—as opposed to making findings of facts—that Hesterberg's interest in being free from an intermediate level of force outweighed the

government's interest in arresting a warned, fleeing, nonviolent, nonserious misdemeanant, who posed no threat to an officer or the public, Hesterberg's motion for summary judgment on his battery claim is DENIED.

## CONCLUSION

For the reasons stated above, Hesterberg's motion for partial summary judgment is DENIED.

IT IS SO ORDERED.

Dated: November 13, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

United States District Court
Northern District of California