UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY HESTERBERG,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　Defendant. | Case No. 13-cv-01265-JSC<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 71 |

　　　　This Federal Torts Claim Act action arises from National Park Service Ranger Sarah Cavallaro's tasing of Plaintiff Gary Hesterberg after she stopped him for running his dog off leash. Now before the Court is Defendant United States of America's Motion for Partial Summary Judgment. (Dkt. No. 71.) After carefully considering the parties' briefing on the motion, as well as the briefing and argument in connection with previous proceedings, the Court concludes that oral argument is unnecessary. See Civ. L.R. 7-1(b). As Defendant has demonstrated that it is entitled to judgment as a matter of law on Hesterberg's claim that he was unlawfully detained, the Court GRANTS the motion.

**SUMMARY JUDGMENT EVIDENCE[1]**

　　　　In late January of 2012, Plaintiff Gary Hesterberg ("Hesterberg") took an afternoon jog with his two dogs in Rancho Corral de Tierra, an open space area in San Mateo County. One month earlier, this space was incorporated into the Golden Gate National Recreation Area ("GGNRA"), which is managed by the National Park Service ("NPS"). The NPS had recently

---

[1] The following evidence is largely duplicative of the evidence the Court previously examined in ruling on Plaintiff's motion for partial summary judgment. (*See* Dkt. No. 54); *see also Hesterberg v. United States*, 2013 WL 6020776 (N.D. Cal. Nov. 13, 2013).

1    enacted a rule requiring dogs to be on leash while in Rancho Corral de Tierra.  Hesterberg, then

2    50 years old, was jogging with his two small dogs, a leashed Beagle and an unleashed Rat Terrier.

3           As Hesterberg was jogging, he saw NPS Park Ranger Sarah Cavallaro ("Cavallaro"), who

4    was wearing a green uniform, boots, and a utility belt, which contained, among other things, a gun

5    and a taser.  On her jacket was a "patch badge" that said "Park Ranger" in capital letters.

6    Hesterberg stopped running and leashed his Rat Terrier "as soon as" he saw Cavallaro.  (Dkt. No.

7    28-1 (Hesterberg Depo.) at 36:17-19.)  He did so because he recognized Cavallaro as a "park

8    ranger" and had heard "talk circulating the community that this particular open space land was

9    going to become jurisdiction of another entity and the leash laws might change."  (*Id.* at 34:19-

10   35:2.)

11          Cavallaro noticed the leash law violation, and "decided that [she] was going to stop him to

12   talk to him about his dog off leash."  (Dkt. No. 28-2 (Cavallaro Depo.) at 116:21-22.)  Cavallaro's

13   "plan" was to give Hesterberg a verbal warning, rather than a ticket.  (*Id.* at 116:23-25.)

14   Cavallaro understood that there was a "phase-in period" for enforcing leash law violations with

15   citations; that is, the focus was on informing the public of the new NPS rules and issuing warnings

16   rather than citations.  (*Id.* at 62:3-17.)

17          Cavallaro informed Hesterberg that his dog needed to be leashed and that she was going to

18   give him a warning, not a citation.  She then asked for Hesterberg's identifying information: name,

19   address, and date of birth.  As Hesterberg had been jogging, he did not have any photo

20   identification with him; however, he orally provided Cavallaro with the requested information.

21   Cavallaro requested this information for two purposes: 1) to include in the "local database" or

22   "local file" that catalogues records of leash-law contacts for future reference (*see* Dkt. No. 28-2 at

23   115:10-15; *see also* Dkt. No. 45 ¶ 7);[2] and 2) to check for any outstanding warrants.  Although

---

[2] Cavallaro asserts that the database is useful because "[o]ften, dog-walkers at GGNRA claim ignorance about the requirements of the applicable leash laws. The local database is a useful and important tool for Park Rangers because it creates a record of prior contacts and warnings that have been given.  As a result, on future encounters, Park Rangers are able to identify persons who have previously violated the leash requirements and can take appropriate steps to impose additional sanctions, such as issuing citations and imposing an escalating schedule of monetary penalties, for persons who repeatedly violate the law." (Dkt. No. 45 ¶ 7.)

United States District Court
Northern District of California

Hesterberg provided Cavallaro with his accurate address and date of birth, he lied to Cavallaro about his name—he said his name was "Gary Jones." He gave a false name because "[he] didn't want [his] real name to be put on some offending, or offender list of people that had been walking their dogs without a leash." (Dkt. No. 28-1 at 44:2-6.) Upon receiving the information from Hesterberg, Cavallaro radioed dispatch for verification, requesting that dispatch "run by a name and DOB verbal." (Dkt. Nos. 28-2 at 123:17-124:12; Dkt. No. 74, Ex. A (audio file).) Ronald Ritter, the dispatcher who received Cavallaro's transmission to, understood Cavallaro's request to mean that she "wanted to verify the identity of someone." (Dkt. No. 74 (Decl. of Ronald Ritter) ¶ 4.) Ritter states that, ordinarily, running a warrants check is subsumed in verifying someone's identity; that is, NPS dispatchers issue a single query of a person's identifying information into the NPS system, which then runs a "simultaneous" search for that person in databases for various law-enforcement agencies and the California Department of Motor Vehicles. (*Id.* at ¶ 6.) While Cavallaro was waiting for a "return" from dispatch, she "verbally warned" Hesterberg about the leash law violation; however, "[she] still ha[d] to identify [him] in order to appropriately warn [him]." (*Id.* at 124:2-12.)

Hesterberg did not overhear Cavallaro's communication to dispatch because he became "distracted" by James and Michelle Babcock who were out walking their dogs, approached Hesterberg and Cavallaro, and began speaking with Hesterberg. (Dkt. No. 28-1 at 47:25-48:11.) The Babcocks engaged or attempted to engage Cavallaro in conversation, but Cavallaro eventually told them something to the effect of "I don't have any business with you right now" and that they must "leave the area" or else Cavallaro "would have business with them." (Dkt. No. 28-2 at 132:8-19.) The Babcocks moved away, but stayed close by and continued to observe.

Hesterberg asked Cavallaro what her authority was to detain him, and asserts that Cavallaro did not respond. He then notified Cavallaro that he was going to leave. Cavallaro responded that he was not free to do so. Hesterberg nevertheless tried to leave. According to Cavallaro, Hesterberg ran 15 to 20 feet before he heeded her verbal commands to stop. (*Id.* at 134:14-135:21.) She ran after Hesterberg and once they both stopped she told him again that "[she] was still waiting for information back from his dispatch and that he was not free to go until

3

1 [she] got that information." (*Id.* at 136:1-10.) Hesterberg disputes that he ran away or made any movement and he does not recall whether Cavallaro told him she was waiting for a dispatch response. (Dkt. No. 28-1 at 51:25-52:4.)

Hesterberg testified that, after being told he was not free to leave, "some tense moments [passed] during which I believe [Cavallaro] was communicating with whoever it was she was communicating with on the radio" and everybody was "essentially standing around waiting." (Dkt. No. 28-1 at 52:15-23.) Around this time, dispatch informed Cavallaro that it had "several returns" and asked for a city or residence, which Cavallaro provided. (Dkt. No. 46, Ex. A, File G.) Several seconds later, dispatch completed its check of Hesterberg's identifying information and relayed its conclusion to Cavallaro: "10-74 not on file for name and D.O.B." (*id.*), meaning that "there is no valid California driver's license associated with the information given and that there are no outstanding warrants for a person with that identifying information." (Dkt. No. 45 ¶ 5; *see also* Dkt. No. 74 (Ritter Decl.) ¶ 11.). In addition, after Hesterberg's first attempt to leave, Cavallaro asked dispatch for a "second unit headed this way" and to "repeat that information." (*Id.*)

Hesterberg then "took it upon [him]self to advise [Cavallaro] that [he] was going to leave, and [he] made an effort to do so." (Dkt. No. 28-1 at 53:15-21.) According to Hesterberg, he only traveled "one step" before Cavallaro grabbed him on or around his arm or shoulder. (*Id.* at 56:8-10.) Cavallaro contends, however, that Hesterberg ran 50 feet or more before she was able to grab hold of his arm and force him to stop. Both parties agree that Hesterberg "pulled away" when she tried to hold him. (*See* Dkt. Nos. 28-1 at 57:3-4 & 128-2 at 140:20-22.)

As the confrontation escalated, Hesterberg asked Cavallaro questions regarding her authority, what agency she worked for, and whether he was under arrest. Hesterberg asserts that those questions were ignored and that Cavallaro continued to communicate with her radio dispatch. Although the record is not clear on the exact sequence of the events, the parties appear to agree that Cavallaro then ordered Hesterberg to turn around and put his hands behind his back; however, Hesterberg refused to do so and told Cavallaro that she "hadn't given [him] [her] proper authority" and he was going to leave. (Dkt. No. 28-1 at 57:21-58:1.) During this time, Cavallaro

4

also asked dispatch for an update on her request for backup and she was told that a unit was "en route." (Dkt. No. 46, Ex. A (audio file H).)

Following Hesterberg's failure to obey her orders and his statement that he was going to leave for a third time, Cavallaro upholstered her taser and aimed it at Hesterberg. Hesterberg recognized the weapon as a taser and told Cavallaro something to the effect of "you're going to Tase me now? Don't Tase me, because I have a heart condition." (Dkt. No. 28-1 at 62:23-64:3.) Cavallaro recalls that she again ordered Hesterberg to turn around and put his hands behind his back. (Dkt. No. 28-2 at 147:16-17.) Mrs. Babcock states that she saw Cavallaro "pull out her Taser, point it at Mr. Hesterberg and threaten that she would Tase him if he took another step." (Dkt. No. 29 ¶ 9.) Hesterberg testified that he again asked Cavallaro the basis for her authority to detain him, and she responded "the Constitution." (Dkt. No. 28-1 at 66:14-16.) Cavallaro acknowledges that Hesterberg "may have been talking or asking questions" at this time, but she was focused on communicating with dispatch to relay her location information to the incoming officers. (Dkt. No. 28-2 at 147:21-25.) In any event, rather than put his hands behind his back as Cavallaro had ordered, Hesterberg decided again to leave.

According to Cavallaro, Hesterberg turned and started to run away from her and she ran after him in pursuit. Hesterberg, Mrs. Babcock, and another witness, John Bartlett, all assert that Hesterberg walked away from Cavallaro and did not run. Within moments of Hesterberg's attempt to leave, Cavallaro deployed her taser in dart mode,[3] striking Hesterberg with the taser probes in his lower back and buttock. Hesterberg fell forward on the pavement, causing abrasions to his arm and leg. Hesterberg was tased for one five-second cycle. He describes the experience of being tased as "extremely violent," "very, very frightening," and a "ten" on a pain scale of one

---

[3] In "dart mode," a taser:

> uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the [Taser] by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the [Taser] delivers a 1200 volt, low ampere electrical charge . . . The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.

*Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010)).

1 to ten. (Dkt. No. 28-1 at 81:2-8, 168:22-169:3.)

2 Deputies from the San Mateo County Sherriff's Department arrived minutes later and handcuffed Hesterberg. An ambulance also arrived, but Hesterberg told the paramedics that he "felt that [he] didn't need to go to the hospital." (Dkt. No. 28-1 at 103:11-15.) He was eventually transported to San Mateo County jail in Redwood City, where he was released later that night. Hesterberg was cited for two misdemeanor crimes: California Penal Code § 148(a)(1) (resisting, delaying, or obstructing a peace officer who is engaged in the lawful performance of duties) and California Penal Code § 148.9(a) (giving a false identity to a peace officer for the purpose of avoiding proper identification). Cavallaro also cited Hesterberg for violation of San Mateo County Ordinance § 6.04.070(a) (the leash rule), an infraction. The San Mateo County District Attorney declined to pursue any charges against Hesterberg. This lawsuit followed.

Hesterberg's lawsuit presently includes four causes of action against Defendant United States of America. Those four claims, all pled under the Federal Tort Claims Act ("FTCA"), are based on: 1) assault; 2) battery; 3) false arrest and imprisonment; and 4) negligence.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When, as here, "the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks and citation omitted). "In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.*

If the "moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). If the nonmoving party fails to do so, "the moving party wins the motion for summary judgment." *Id.* "But if the nonmoving party produces enough

6

evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id.* In deciding whether there exist genuine issues of material fact, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

The Ninth Circuit has cautioned that even when, as here, the court will be the ultimate trier of fact, *see* 28 U.S.C. § 2402, "courts must not rush to dispose summarily of cases—especially novel, complex, or otherwise difficult cases of public importance—unless it is clear that more complete factual development could not possibly alter the outcome and that the credibility of the witnesses' statements or testimony is not at issue." *TransWorld Airlines, Inc. v. Am. Coupon Exchange, Inc.*, 913 F.2d 676, 684-85 (9th Cir. 1990) ("Even when the expense of further proceedings is great and the moving party's case seems to the court quite likely to succeed, speculation about the facts must not take the place of investigation, proof, and direct observation."). "Accordingly, under *Trans[W]orld* and *Chevron*, although a court that will ultimately act as the trier of fact may weigh evidence in deciding a summary judgment motion, it should not do so if more complete factual development could alter the outcome or if the credibility of witness statements or testimony at issue." *Brohmer v. United States*, 2006 WL 3300398, at *27 (E.D. Cal. Nov. 14, 2006) (FTCA case).

## DISCUSSION

The government moves for summary judgment on Hesterberg's false arrest/imprisonment claim and on Hesterberg's negligence claim to the extent the claim rests on the theory that Cavallaro unlawfully detained or arrested him. As the moving party, the government must show that drawing all inferences in Hesterberg's favor, it would be entitled to a directed verdict on the claim.

**A.      Legal Standard for False Arrest/Imprisonment**

For a claim to be cognizable under the FTCA, liability must be based on the "law of the State." *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (2004). "Under California law, the elements of a claim for false imprisonment are: '(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief.'" *Young v.*

7

*Cnty. of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011) (quoting *Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000)). The parties agree, however, that the Court should look to federal cases interpreting the Fourth Amendment of the United State Constitution in determining whether a false imprisonment occurred. *See Katzberg v. Regents of the Univ. of Cal.*, 29 Cal. 4th 300, 303 n.1 (2002) (noting that under "established common law tort principles," claims such as false arrest and false imprisonment "may be established by demonstrating a violation of a constitutional provision").

**B.     Whether Cavallaro Falsely Imprisoned/Arrested Hesterberg**

Cavallaro's initial seizure of Hesterberg for having his dog off leash was based on probable cause and concededly lawful. "It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Further, "[a] seizure that is justified solely by the interest in issuing a warning ticket . . . can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.*; *see also United States v. Luckett*, 484 F.2d 89, 90 (9th Cir. 1973) (per curium) ("[T]he Fourth Amendment require[s] that the length and scope of the detention be strictly tied to and justified by the circumstances which rendered its initiation permissible." (internal quotation marks omitted)).

In *Caballes*, the Supreme Court accepted the state court's determination that an officer's traffic stop to issue a warning was not extended by a dog sniff for illegal drugs. In so doing, the Court indicated that an officer's actions that prolong a detention and are unrelated to the stop's purpose violate the Fourth Amendment, even if the initial detention is based on probable cause. *Caballes*, 543 U.S. at 407. In *Muehler v. Mena*, 544 U.S. 93, 101 (2005), the Court applied *Caballes* in analyzing Mena's claim that her Fourth Amendment rights were violated when she was questioned about her immigration status while detained for a lawful search unrelated to her immigration status. Citing *Caballes*, the Court held that Mena had to establish that the immigration questioning prolonged the detention, since "mere police questioning does not constitute a seizure." *Id.* (internal quotation marks omitted). Because "the Court of Appeals did not find that the questioning extended the time Mena was detained[,] . . . no additional Fourth

8

Amendment justification for inquiring about Mena's immigration status was required." *Id.* These cases suggest that if a traffic stop or a similar detention is prolonged for reasons unrelated to the grounds for the original detention, there must be a Fourth Amendment justification to continue the detention. *See Luckett*, 484 F.2d at 90 (finding Fourth Amendment violation where pedestrian stopped for jaywalking continued to be detained for a warrants check after pedestrian was issued a citation, and where no reasonable suspicion supported seizure for check of outstanding warrants); *see also United States v. Figueroa-Espana*, 511 F.3d 696, 702-03 (7th Cir. 2007) (applying *Caballes* and holding that "subsequent questions" and continued detention of driver after officer issued warning ticket and told him he was "free to go" was justified by reasonable suspicion separate from the traffic violation).

The government insists that Hesterberg's false imprisonment theory fails because Cavallaro prolonged Hesterberg's detention for two reasons that were related to the purpose of the stop—to verify Hesterberg's identity to include in the leash-law violator database and to run a warrants check.

As an initial matter, Hesterberg asserts that there is a factual dispute as to whether Cavallaro "detained Hesterber[g] to verify his name or to run a wants-and-warrants check." (Dkt. No. 78 at 17.) Hesterberg contends that his detention was prolonged only to run a warrants check, citing a single line of Cavallaro's deposition testimony where she states that she radioed Hesterberg's identifying information to dispatch "to perform a wants/warrants check, local check." (*Id.* at 19 (quoting Dkt. No. 28-2, 120:4-5).)

The undisputed facts, however, establish that Cavallaro extended the detention to *both* verify Hesterberg's identity to include in a database of leash-law violators and to run a check of outstanding warrants. At Cavallaro's deposition, she testified about her encounter with Hesterberg, as well as her encounter with a "Ms. Abadie," who was stopped just before Hesterberg for having her dog off leash. Cavallaro testified regarding her contact with Ms. Abadie as follows:

> Q. At that time you also called in and requested a computer wants and warrant check on that woman whose name was Ms. Abadie, correct?
>
> A. Yes.

. . .

Q. And what was the reason that you asked her for that identifying information at the time?

A. For it to go in the local database, like I told her.

Q. What was the local database?

A. It's a database that dispatch can check that's for—that's composed of violations that occurred in, sorry, Golden Gate National Recreation Area.

(Dkt. No. 73 at 114:20-115:13.) Cavallaro next testified about her encounter with Hesterberg:

Q: Okay. And what did you do with [Hesterberg's identifying] information?

A. I called that in to our dispatch via radio.

Q. Why?

A. Again, to perform a wants/warrants check, local check.

Q. You said a wants and warrants check?

A. Yeah.

(*Id.* at 119:25-120:7.) When pressed as to why Cavallaro believed she needed to detain Hesterberg while dispatch was running Hesterberg's identifying information, Cavallaro testified: "I had not identified him in order to place him in our local database." (*Id.* at 124:10-12.) Cavallaro further testified that "ascertain[ing] [Hesterberg's] identity" and running a warrants check were "all part of the same process." (*Id.* at 124:17, 124:19.) Ronald Ritter, the dispatcher who received Cavallaro's transmission to "run by a name and DOB verbal" (Dkt. No. 74, Ex. A (audio file)), understood Cavallaro's request to mean that she "wanted to verify the identity of someone." (*Id.* (Decl. of Ronald Ritter) ¶ 4.) Ritter goes on to explain that, ordinarily, running a warrants check is subsumed in verifying someone's identity; that is, NPS dispatchers issue a single query of a person's identifying information into the NPS system, which then runs a "simultaneous" search for that person in databases for various law-enforcement agencies and the California Department of Motor Vehicles. (*Id.* at ¶ 6.) From this record, no rational jury could conclude that Cavallaro's continued investigation into the leash-law infraction was limited to only searching for outstanding warrants; rather, the undisputed facts establish that verifying Hesterberg's identity to include in the database of leash-law violators and running a check of

outstanding warrants were separate reasons for continuing to detain Hesterberg, with both inquiries occurring at the same time. Hesterberg's isolation of a single line of deposition testimony ignores the totality of the evidence, set forth above, which shows that the warrants check was a separate additional reason for prolonging Hesterberg's detention—not the sole reason.

Having established the reasons for the prolonged detention, the Court turns to the central question surrounding the false imprisonment claim: whether Cavallaro's detention of Hesterberg to verify his identity and determine if there were any outstanding warrants for his arrest "was part of her investigation of the dog leash violation or whether such verification was unrelated to the initial mission of the stop and thus required some additional and independent reasonable suspicion." (Dkt. No. 54 at 9 (citing *Caballes*, 543 U.S. at 407; *Luckett*, 484 F.2d at 90; *Figueroa-Espana,* 511 F.3d at 702-03).) Because the government concedes that no independent reasonable suspicion existed for either the identification verification or the warrants check, the government is entitled to summary judgment only if the Court concludes as a matter of law that Cavallaro's reasons for extending Hesterberg's detention were related to the initial "mission" of the stop.

The undisputed facts compel a finding that Cavallaro's verification of Hesterberg's identity was part of her initial investigation of the leash law violation; that is, that it was related to the original justification for the detention. As detailed above, one of the reasons Cavallaro requested Hesterberg's name, address, and date of birth was to include the information in the "local database" or "local file" that records leash-law contacts for future reference. (*See* Dkt. No. 73 at 115:10-15; *see also* Dkt. No. 45 ¶ 7.) The goal of the database is to catalogue leash-law violators who have received an oral warning so that if they violate the same law in the future the officer will be aware of the prior warning. Although Cavallaro "verbally warned him" while she was waiting for a "return" from dispatch, "[she] still ha[d] to identify [him] in order to appropriately warn [him]," that is, to place him in [the] local database." (Dkt. No. 73 at 124:2-12.)

While Hesterberg does not dispute either the existence of the database or the NPS Park Rangers' use of it for leash-law violators, Hesterberg asserts that because Cavallaro's use of the database, at least according to her supervisors, was "non-essential" and merely "optional," it cannot be deemed part of her "mission" for the stop under *Caballes*. (Dkt. No. 78 at 13.) The

11

1  Court is not persuaded.  Hesterberg provides no caselaw, or even rationale, for distinguishing
2  between "essential" and "non-essential" conduct in determining when the officer's "mission" was
3  completed and whether its scope was reasonable.  Because it is undisputed that Cavallaro's
4  authority to issue warnings for leash-law violations included the authority to verify a violator's
5  identity and place that violator's name in the database, Cavallaro's "mission" in issuing the
6  warning reasonably included verification of Hesterberg's identity.[4]

Since a reasonable trier of fact would be compelled to find that the "mission" of Cavallaro's stop was not complete while Cavallaro was attempting to verify Hesterberg's identity with dispatch, Cavallaro's continued detention of him pending verification of his identity did not violate the Fourth Amendment.  In other words, Cavallaro did not prolong the detention "beyond the time reasonably required to complete [Cavallaro's] mission" as a matter of law.  *Caballes*, 543 U.S. at 407.

Regarding the warrants check, the Ninth Circuit has held that in certain circumstances an officer may not prolong an initially lawful detention to check for outstanding warrants without reasonable suspicion that such warrants exist.  *Luckett*, 484 F.2d at 91.  The Court, however, need not resolve the parties' dispute as to whether the check was reasonably related to the initial mission for the stop since the undisputed facts show that the warrants check alone did not prolong the detention.  As noted above, the warrants check and the identification verification are part of a "simultaneous" process (Dkt. No. 74 at ¶ 7), and, in this case, that simultaneous process was delayed because Hesterberg gave Cavallaro false identifying information.  Because the warrants check was never run separate from Cavallaro's attempt to verify Hesterberg's (false) identification—which, as explained above, was a lawful basis on which to prolong the detention—

---

[4] Hesterberg's reliance on his police practices expert for his opinion that Cavallaro's mission ended when she gave Hesterberg the verbal warning is also inapposite.  Even if the expert's opinion were admissible on the question of when Cavallaro's "mission" was complete, Hesterberg's expert does not even mention the database in his opinion.  Hesterberg's expert simply states his conclusory belief that Cavallaro's "stated mission" was to deliver only a "verbal warning" and concludes that "the force used by Cavallaro beyond that point must be determined to be unlawful." (Dkt. No. 79-9 at 10.)  The lawfulness of the use of the taser is not at issue on this motion.  Moreover, as discussed above, the undisputed facts show that Cavallaro's "mission" went beyond giving a verbal warning.

the constitutionality of the warrants check is not at issue.

Hesterberg's remaining arguments against summary judgment are unpersuasive. Hesterberg asserts that his "detention to investigate a completed misdemeanor" was unlawful under *United States v. Grigg*, 498 F.3d 1070 (9th Cir. 2007). (Dkt. No. 78 at 15.) Not so. *Grigg* held that an officer's initiation of a *Terry*[5] stop to investigate a past misdemeanor committed outside the officer's presence was unreasonable. 498 F.3d at 1083. The analysis in *Grigg* is inapplicable here. As explained above, Cavallaro's initial seizure of Hesterberg was undisputedly lawful: Hesterberg had violated the leash law in Cavallaro's presence. Thus, the question here is whether the detention was prolonged for reasons unrelated to the grounds for the original detention, and if so, whether there was a separate Fourth Amendment justification to continue the detention. *See Caballes*, 543 U.S. at 407; *Luckett*, 484 F.2d at 90; *Figueroa-Espana,* 511 F.3d at 702-03. Because the Court has already concluded that, as a matter of law, the detention was not prolonged for reasons unrelated to Cavallaro's "mission" in issuing the warning, the inquiry ends. No separate Fourth Amendment justification for continuing the stop is required.

Hesterberg's reliance on *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159 (9th Cir. 2013) is similarly misplaced. Cavallaro's stop of Hesterberg was not a mere "investigatory detention" unsupported by probable cause (Dkt. No. 78 at 20); rather, the stop was undisputedly supported by probable cause that Hesterberg had violated the leash law in Cavallaro's presence. Thus, Cavallaro's pointing of her taser at Hesterberg after he tried to flee cannot have "transform[ed] an investigatory stop into a de facto arrest." *Johnson*, 724 F.3d at 1176 (concluding that an officer's brandishing of a taser transformed an investigatory *Terry* stop supported only by reasonable suspicion into an arrest unsupported by probable cause).

## CONCLUSION

For the reasons stated above, the government's motion for partial summary judgment is GRANTED.

This Order disposes of Docket Number 71.

---

[5] *Terry v. Ohio*, 392 U.S. 1 (1968).

**IT IS SO ORDERED.**

Dated: April 18, 2014

_Jacqueline S. Corley_
JACQUELINE SCOTT CORLEY
United States Magistrate Judge