MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN (State Bar No. 189268)
GENEVIEVE K. GUERTIN (State Bar No. 262479)
T. KENNEDY HELM (State Bar No. 282319)
HADDAD & SHERWIN
505 Seventeenth Street
Oakland, CA 94612
Telephone: (510) 452-5500
Fax: (510) 452-5510

Attorneys for Plaintiff
GARY HESTERBERG

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

GARY HESTERBERG, individually,

            Plaintiff,

vs.

UNITED STATES OF AMERICA,
National Park Service Ranger SARAH
CAVALLARO, and DOES 1-10,
individually, jointly and severally,

            Defendants.

Case No. C13-1265 JSC

**PLAINTIFF'S TRIAL BRIEF**

**Trial Date: August 11, 2014**
**Time: 8:30 a.m.**
**Place:**
**Judge: Hon. Jacqueline Scott Corley**

1

## <u>TABLE OF CONTENTS</u>

2

INTRODUCTION ................................................................................................................. 1

   A.    CHRONOLOGICAL STATEMENT OF FACTS AND EVIDENCE ..................... 1

   B.    LEGAL ISSUES .................................................................................... 13

       1.    FTCA Battery Claim .......................................................... 13

           a.    Ranger Cavallaro Used an Intermediate, Significant Level of Force Against Plaintiff ................................................. 15

           b.    The Governmental Interests at Stake Did Not Support Defendant Cavallaro's Use of Such a High Level of Force Against Plaintiff ................................................................. 17

               i.    Severity of the Crime ........................................ 17

               ii.    Whether or Not Plaintiff Posed an Immediate Threat ........ 19

               iii.    Whether Plaintiff Was Actively Resisting Arrest or Attempting to Evade Arrest by Flight ................................ 21

               iv.    Other Factors Weigh Against the Need for Force .............. 23

               v.    Application of Ninth Circuit Taser Cases ........................... 26

       2.    FTCA Negligence Claim ........................................................ 28

       3.    No Comparative Fault for Intentional Torts ................................ 31

       4.    No Qualified Immunity or State Law Immunity for Any of Plaintiff's Claims ................................................................ 31

       5.    Damages ............................................................................ 32

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Federal Cases

*Acosta v. Hill,*

   504 F.3d 1323 (9th Cir. 2007) ................................................... 32

*Arnsberg v. United States,*

   549 F. Supp. 55 (D. Or. 1982) ................................................... 35

*Avina v. United States,*

   681 F.3d 1127 (9th Cir. 2012) ................................................... 13

*Azevedo v. City of Fresno,*

   No. 1:09-CV-375 AWI DLB, 2011 U.S. Dist. LEXIS 10132 (E.D. Cal. Jan. 25, 2011) ..... 18, 27

*Blankenhorn v. City of Orange,*

   485 F.3d 463 (9th Cir. 2007) ................................................... 35

*Bryan v. MacPherson,*

   630 F.3d 805 (9th Cir. 2010) ................................................... passim

*Champommier v. United States,*

   No. CV11-10538-MWF, 2013 U.S. Dist. LEXIS 119885 (C.D. Cal. Aug. 21, 2013) ............. 32

*Chew v. Gates,*

   27 F.3d 1432 (9th Cir. 1994) ................................................... 23

*Crain v. Krehbiel,*

   443 F. Supp. 202 (N.D. Cal. 1978) ................................................... 35

*Davis v. City of Las Vegas,*

   478 F.3d 1048 (9th Cir. 2007) ................................................... 18, 19

*Deorle v. Rutherford,*

   272 F.3d 1272 (9th Cir. 2001) ................................................... passim

*Glenn v. Washington County,*

   673 F.3d 864 (9th Cir. 2011) ................................................... 25, 26

*Graham v. Connor,*

    490 U.S. 386 (1989) ........................................................................................... 14, 15

*Gravelet-Blondin v. Shelton,*

    728 F.3d 1086 (9th Cir. 2013) ............................................................................... 28, 29

*Hayes v. County of San Diego,*

    736 F.3d 1223 (9th Cir. 2013) ....................................................................................... 32

*Headwaters Forest Def. v. County of Humboldt (Headwaters II),*

    276 F.3d 1125 (9th Cir. 2002) ............................................................................... 15, 22

*Johnson v. Bay Area Rapid Transit District,*

    724 F.3d 1159 (9th Cir. 2013) ....................................................................................... 34

*Lolli v. County of Orange,*

    351 F.3d 410 (9th Cir. 2003) ......................................................................................... 15

*Mattos v. Agarano,*

    661 F.3d 433 (9th Cir. 2011) ................................................................................. passim

*Miller v. Clark County,*

    340 F.3d 959 (9th Cir. 2003) ......................................................................................... 17

*Morrison v. Mahoney,*

    399 F.3d 1042, 1046 (9th Cir. 2005) ............................................................................ 35

*Nelson v. City of Davis,*

    685 F.3d 867 (9th Cir. 2012) ................................................................... 23, 24, 25, 26

*Richards v. United States,*

    369 U.S. 1 (1962) ........................................................................................................... 14

*Robinson v. Solano County,*

    278 F.3d 1007 (9th Cir. 2002) ...................................................................................... 35

*Scott v. Harris,*

    550 U.S. 372 (2007) ...................................................................................................... 32

*Smith v. City of Hemet,*

    394 F.3d 689 (9th Cir 2005) .................................................................................. passim

*Tekle v. United States,*

    511 F.3d 839 (9th Cir. 2007)..................................................................... 15, 21

*Tennessee v. Garner,*

    471 U.S. 1 (1985) .................................................................................. 18, 25

*Ting v. United States,*

    927 F.2d 1504, 1513 (9th Cir. 1991)................................................................. 30

*United States v. Mohr*, 318 F.3d 613 (4th Cir. 2003)............................................ 15

*Winterrowd v. Nelson,*

    480 F.3d 1181 (9th Cir. 2007) ....................................................................... 21

*Young v. County of Los Angeles,*

    655 F.3d 1156 (9th Cir. 2011)........................................................... 15, 18, 19

**State Cases**

*Bartosh v. Banning,*

    251 Cal. App. 2d 378 (1967)........................................................................ 29

*Edson v. City of Anaheim,*

    63 Cal. App. 4th 1269 (1998)....................................................................... 14

*Grudt v. City of Los Angeles,*

    2 Cal. 3d 575 (1970)............................................................................ 27, 28

*Hayes v. County of San Diego ("Hayes II"),*

    57 Cal. 4th 622 (2013)......................................................................... 27, 28

*Heiner v. Kmart Corp.,*

    84 Cal. App. 4th 335 (2000)........................................................................ 29

*Hernandez v. City of Pomona,*

    46 Cal. 4th 501 (2009)............................................................................. 27

*Lugtu v. California Highway Patrol,*

    26 Cal. 4th 703 (2001)............................................................................. 26

*Munoz v. Olin,*

    24 Cal. 3d 629 (1979)............................................................................. 27

*North American Chemical Co. v. Superior Court*,

    59 Cal. App. 4th 764 (1997) ................................................................... 31

*Scruggs v. Haynes*,

    252 Cal. App. 2d 256 (1967) ................................................................... 31

*Thomas v. Duggins Const. Co., Inc.*,

    139 Cal. App. 4th 1105, 1112 (2006) ..................................................... 29

*Venegas v. County of Los Angeles*,

    153 Cal. App. 4th 1230 (2007) ............................................................... 30

*Whitton v. State of California*,

    98 Cal. App. 3d 235 (1979) ..................................................................... 26

*Yount v. City of Sacramento*,

    43 Cal. 4th 902 (2008) ............................................................................. 14

**County Ordinances**

San Mateo County Ordinance § 6.04.070(a) ................................................. 12

**Federal Rules**

Fed. R. Civ. Pro. 8(a) and (c) ....................................................................... 30

**State Statutes**

Cal. Civ. Code § 3333 .................................................................................... 31

Cal. Gov't Code § 820(a) ............................................................................... 26

California Penal Code § 148(a)(1) ........................................................... 11, 16

California Penal Code § 148.9(a) ................................................................... 11

**Other Authorities**

*CACI Nos.* 400, 401 ...................................................................................... 27

Cal. Civil Jury Instructions (CACI) No. 1305 ............................................... 13

Comment, Ninth Cir. Model Civ. Jury Instr. 9.22 ........................................ 28

Daniel E. Morris, "Federal Tort Claims," § 2:18, pp. 2-60-2-61 (Thompson Reuters, 2013) ........ 30

Ninth Cir. Model Civil Jury Instr. 9.22 ......................................................... 22

1

2                                 **INTRODUCTION**

3          Remaining for bench trial are Mr. Hesterberg's FTCA claims for: (1) battery and (2)

4    negligence.  Among other issues, this Court will decide whether Ranger Cavallaro used excessive

5    force when she chose to Tase in the back, without warning, a non-threatening 50-year-old man,

6    whom she knew had a heart condition, because he was leaving the scene of the most minor of

7    "crimes" -- a dog leash infraction.  Ranger Cavallaro deployed this significant, intermediate level of

8    force capable of causing serious injury or death where even Defendant's expert witness, Hunter

9    Bailey, admits that other intermediate force, such as use of a baton, would not have been permitted.

10   Afterward, Ranger Cavallaro's supervisors told her that next time, she should just let such a person

11

12   go.

13         Like the leading Taser cases decided by the Ninth Circuit before this incident, *Bryan v.*

14   *MacPherson*, 630 F.3d 805 (9th Cir. 2010) and *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en

15   banc), this Fourth Amendment violation is clear.  Unlike those cases, Defendant United States is not

16

17   entitled to qualified immunity in this FTCA case.

18       **A.  CHRONOLOGICAL STATEMENT OF FACTS AND EVIDENCE**

19         **Procedures for Leash Infractions.**  The government acquired the Rancho Corral de Tierra

20   property in December 2011 as part of the Golden Gate National Recreation Area ("GGNRA").

21   (Cavallaro Dep., 52:6–13).  Kevin Cochary was the GGNRA's Chief Ranger, and his duties

22   included supervising the law-enforcement program.  (Cochary Dep., 6:4–7; 10:21–22).  More than a

23   couple of weeks before Hesterberg's tasing, Chief Ranger Cochary directed his subordinate

24   supervisors, probably on multiple occasions, to inform their staff "to do an educational approach or

25   a soft enforcement" in the newly acquired Rancho property.  (Cochary Dep., 28:3–6; 27:15–19;

26   28:10–11).  One of the managers who received this directive was Marybeth McFarland, Acting

27

28

Chief of the Law Enforcement Branch of the GGNRA, who acknowledged in an internal email that she and Chief Ranger Cochary wanted the law-enforcement rangers "to initially take a 'soft' approach when making educational contacts for observed violations of park regulations at the acquired lands at Rancho Corral de Terra [sic]." (TE 57, McFarland email, NPS007342).[1]

Rather than citing or arresting violators, the soft approach directed rangers "[t]o *inform* people that [the GGNRA] had acquired the land, that it was a change in land use, that dogs were required to follow the regulations of the National Park Service now, and that they needed to comply with those regulations." (Cochary Dep., 29:12–17) (emphasis added).

Rangers had "the *option* to detain and record [an] individual's name and address for [the] local file." (Cochary Dep., 36:4–6) (emphasis added). The local file is a database that the GGNRA maintains of law violators. (Cochary Dep., 37:19–24 ) (emphasis added). Rangers were not required to detain leash-law offenders to place their name and address in the database. (Cochary Dep., 30:3–16). Placing their name in a database was not mandatory—it was the ranger's option. (Cochary Dep., 30:24–31:1). Ranger McFarland agreed that a ranger could "choose not to collect that information on a soft contact." (McFarland Dep., 140:18–21).

Ranger Cavallaro understood that since Rancho Corral de Tierra had recently come under NPS management, there would be a "phase-in period" for leash-law violations where the focus would be on warnings rather than citations. (Cavallaro Dep., 61:24-62:8). After the incident, Chief Ranger Cochary and Ranger McFarland told Ranger Cavallaro that she "should have known" that she was "only supposed to make soft educational contacts for dogs off leash and not issue tickets." (Cavallaro Dep., 188:9-14).

**The Initial Contact.** On the afternoon of January 29, 2012, at around 4:30 p.m., 50-year-old Plaintiff Gary Hesterberg went for a run in Rancho Corral de Tierra near his home. (Hesterberg

---

[1] "TE" refers to the parties' joint trial exhibits.

Dep., 13:24-25, 18:4-9).  He wore a t-shirt, shorts, cap, and running shoes.  (Hesterberg Dep., 19:22-24).  Hesterberg was jogging with his two small dogs, a leashed Beagle and an unleashed Rat Terrier, as he did about two or three times per week.  (TE 1; Hesterberg Dep., 22:19-23, 33:21-34:15).  Hesterberg had heard information in the community that the leash rules in the area were going to change, though he had not seen any signs or formal notices informing park users of the change.  (Hesterberg Dep., 42:24-43:4).

As Hesterberg jogged on San Pedro Mountain Road, he saw Defendant NPS Ranger Sarah Cavallaro on the path.  (Hesterberg Dep., 27:4-7).   He leashed his dog because he noticed Cavallaro wore an all green uniform and thought she might be someone who could write him a ticket, though he did not think she was a law enforcement officer.  (Hesterberg Dep., 37:3-8, 38:14-18, 112:24-113:8).

Cavallaro admits her green jacket covered her metal badge and she looked the way she appears in the photo at TE 48.  (Cavallaro Dep., 100:6-11, 101:1-3).  Cavallaro admits she did not identify herself to Hesterberg and cannot recall saying anything to him about the fact that she worked for the NPS.  (Cavallaro Dep., 120:8-120:16).

Cavallaro said to Hesterberg: "Excuse me.  I need to talk to you about your dog." (Cavallaro Dep., 117:15–16).  Her plan was to give him a verbal warning rather than a ticket. (Cavallaro Dep., 116:23–25).  She "began the conversation by saying that this was going to be an educational experience for the people of Montara; that she was not going to issue [him] a citation for having the dog off the leash; and she was just going to issue a warning."  (Hesterberg Dep. 41:22–42:2; Cavallaro Dep., 121:8–11).  Therefore, not only was she not citing him, but Cavallaro specifically told Hesterberg that she was not going to arrest him for the leash-law violation. (Cavallaro Dep., 123:1–3).  Cavallaro explained the purpose of her stop was to educate him about

the leash law, not to enforce it; or, as she put it, that the National Park Service was "in an educational phase."  (Cavallaro Dep., 121:5–7).

Hesterberg "acknowledged the fact that she told [him] that she was not going to issue [him] a citation, and that she was going to let [him] off with a warning[,]" and so he "may have said something to the effect of, 'Okay.  Thank you.'"  (Hesterberg Dep., 42:8–12).

**Cavallaro Runs Hesterberg's Name.**  Next, Cavallaro asked Hesterberg "for his name and date of birth, and . . . for his address[.]"  (Cavallaro Dep., 119:12–14).  Hesterberg provided Cavallaro his correct first name, date of birth, and address, but he gave her a false last name, "Jones."  (Hesterberg Dep., 43:12-44:1).  He gave a false name because "[he] didn't want [his] real name to be put on some offending, or offender list of people that had been walking their dogs without a leash."  (Hesterberg Dep., 44:2-6).  Cavallaro testified that she called in this information to her dispatcher "to perform a wants/warrants check, local check."  (Ex. B, 119:25-120:7).  On the radio recording, Cavallaro can be heard asking the dispatcher to "run a name and DOB, verbal;" not to place Hesterberg's name in the local database.  (Dkt No. 71, at 5 (quoting Ritter Decl. ¶¶ 3–4; Cavallaro Dep.)).

At this point in the encounter, Cavallaro claims she was not only detaining Hesterberg to see if he had any wants and warrants but also because she had not verified his name.  (Cavallaro Dep., 124:20–125:7).  Cavallaro "questioned in [her] mind whether his name was Jones," because Jones is such a common name.  (Cavallaro Dep., 126:7–16).  She admits she lacked "objective particular evidence that Hesterberg had given [her] a false name[.]"  (Cavallaro Dep., 126:21–23).  Nor, as she later admitted, did she have any reasonable suspicion to believe that Hesterberg had any wants or warrants.  (Cavallaro Dep., 122:13–17).

Cavallaro had not arrested Hesterberg at this point, but she was continuing to detain him after warning him.  (Cavallaro Dep., 125:18–23).  Other than the leash-law violation, which she told

Hesterberg she was not going to arrest him for, she had no probable cause to arrest him for any other crime.  (Cavallaro Dep., 123:4–11).

**Continued Detention.**  Around this time, James Babcock and Michelle Babcock, a married couple out walking their dogs, approached Cavallaro and Hesterberg.  (Hesterberg Dep., 47:25-48:2; Cavallaro Dep., 126:24-127:4; TE 8, Declaration of Michelle Babcock, ¶¶ 1-3).  Hesterberg informed the Babcocks that Cavallaro had stopped him for having had one of his dogs off-leash and was detaining him.  (Hesterberg Dep., 48:9-11).  James Babcock asked Cavallaro either what brought her to the area or who she was and for whom she worked.  (Hesterberg Dep., 48:16-17; Babcock Decl. ¶ 4).  Hesterberg and Michelle Babcock agree that Cavallaro did not respond to James Babcock's inquiry at all.  (Hesterberg Dep., 48:18-19; Babcock Decl. ¶ 4).  Then, Michelle Babcock explained that though she and her husband had been walking their dogs in that area for several years, they had not seen anyone in uniform there before.  (Cavallaro Dep., 13:23-25; Babcock Decl. ¶ 4).  Cavallaro responded abruptly that the GGNRA had taken over the area. (Cavallaro Dep., 130:25-131:3; Babcock Decl. ¶ 4).  According to Michelle Babcock, Cavallaro "appeared to be in a bad mood and set the tone of being aggressive.  It was still unclear to me who she was and what type of authority she had."  (Babcock Decl. ¶ 5).

Around this time, according to Hesterberg and Michelle Babcock, Hesterberg told Cavallaro that if she was going to let him go with a warning, then he was going to be on his way and continue with his run.  (Hesterberg Dep., 48:21-25; Babcock Decl. ¶ 6).  In response, Cavallaro informed Hesterberg that he was not free to leave, but she did not explain why she continued to detain him. (Hesterberg Dep., 49:1-5; Babcock Decl. ¶ 6).  Hesterberg and James Babcock asked Cavallaro who she was, for whom she worked, and what authority or jurisdiction she had.  (Hesterberg Dep., 53:6-8; Cavallaro Dep., 133:10-16, 139:12-140:2; Babcock Decl. ¶ 6).  Cavallaro did not respond to these questions, but she told the Babcocks that she did not have any business with them, told them

to leave the area, and said that "if they did not leave, then she would have business with them." (Hesterberg Dep., 53:6-10; Cavallaro Dep., 131:15-132:19).  The Babcocks complied and moved approximately 15 feet away from Hesterberg and Cavallaro.  (Hesterberg Dep., 53:11-14).

Cavallaro testified that after this first exchange, Hesterberg told her, "I'm leaving," she told him, "No, you're not. You're not free to leave," and then he turned and started to run.  (Cavallaro Dep., 134:14-19).  Hesterberg and Michelle Babcock state that he did not run away or make any movement to leave at this point.  (Ex. A, 51:21-52:4; Babcock Decl. ¶ 6).  Cavallaro did not explain to Hesterberg why he was not free to leave, nor did she say anything about getting information back from dispatch.  (Hesterberg Dep., 49:1–17).  Cavallaro admits Hesterberg was not under arrest at that time.  (Cavallaro Dep., 136:11-12).

Around this time, Cavallaro requested backup, and San Mateo County Sheriff's deputies were dispatched to her location.  (Ex. B, 132:20-133:2, 137:20-138:7, 155:12-15).  Cavallaro did not state any reason for her request for backup, and did not inform anyone that she was seeking backup because a non-threatening man wanted to leave her dog leash infraction detention.  (TE 62, radio recording).  Some more time passed – "less than two minutes" according to Cavallaro and "some minutes" by Hesterberg's estimation – while the dispatcher repeatedly had to ask Cavallaro to identify their location, and they were "essentially standing around waiting."  (TE 62; Hesterberg Dep., 52:15-23; Cavallaro Dep., 138:8-11, 138:23-139:2).

Then, Hesterberg told Cavallaro that, because she had given him a warning and told him he would be allowed to leave without a citation, he was "going to go ahead and be on [his] way." (Hesterberg Dep., 52:25–53:3; Babcock Decl. ¶ 7).  Hesterberg turned and started to walk away but only made it a couple steps before Cavallaro grabbed him by the arm and, in a loud voice, told him that he was not free to leave.  (Hesterberg Dep., 53:15–54:13; Babcock Decl. ¶ 7).  Cavallaro claims that at this point, Hesterberg turned and "ran" away from her and that she ran after him, gave him

verbal commands to stop, grabbed his arm, and stopped him about 50 to 75 feet down the trail. (Cavallaro Dep., 137:15-19, 140:13-16, 141:4-8).  Hesterberg pulled his arm away and asked Cavallaro what she was doing, who she was, and under what authority she was acting—questions that she did not answer.  (Hesterberg Dep., 57:4–11).  He asked her whether he was under arrest, and again who she was, what type of jurisdiction she had, and what agency employed her. (Hesterberg Dep., 57:3–9; Cavallaro Dep., 144:10–15; Babcock Decl., ¶ 7).  But Cavallaro ignored these inquiries and continued to wait for communications on her radio.  (Hesterberg Dep., 57:10–13; Declaration of Michelle Babcock, ¶ 8).

Then Cavallaro commanded Hesterberg to turn around and put his hands behind his back because she was trying to detain him to complete the wants and warrants check and for disobeying her.  (Cavallaro Dep., 142:17-143:12, 144:20-145:2, 145:14-23).  Hesterberg again told Cavallaro that he did not recognize her authority to detain him and said he was going to walk away. (Hesterberg Dep., 62:11-17; Babcock Decl. ¶ 9).  Cavallaro never told Hesterberg he was under arrest, and she never explained she was a law enforcement officer with the authority to arrest someone.  (Cavallaro Dep., 144:16-19; Babcock Decl. ¶ 20).

Then, Cavallaro unholstered her Taser and pointed it at Hesterberg with the laser activated and aimed at the center of his chest.  (Hesterberg Dep., 62:18–22; Cavallaro Dep., 146:2–6; 146:19–22; Michelle Babcock Declaration, ¶ 9).  Hesterberg recognized the weapon as a Taser and told Cavallaro something to the effect of, "you're going to Tase me now?  Don't Tase me because I have a heart condition."  (Hesterberg Dep., 62:23–63:4, 63:16–18; Cavallaro Dep., 146:14–18; Babcock Decl., ¶ 10).  The Babcocks told Cavallaro something like, 'Don't you think this is excessive?' and 'He has a bad heart,' but Cavallaro told them to stay out of it.  (Babcock Decl. ¶ 11).  Cavallaro heard that Hesterberg had a heart condition.  (Cavallaro Dep., 147:4-20).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By the time of this incident, Cavallaro had been trained and understood that a person with a heart condition may be in a high-risk group for suffering a serious injury from being Tased. (Cavallaro Dep., 38:6-23).  Cavallaro knew that Tasing a person with a heart condition could cause him to have a heart attack and even kill him.  (Cavallaro Dep., 39:8-13).  Because of these risks, Cavallaro knew she must consider whether a person has a heart condition before Tasing him. (Cavallaro Dep., 39:16-25).  Cavallaro was trained and understood that another risk of injury for a person being Tased is a secondary injury from falling.  (Cavallaro Dep., 37:8-21).

Both sides' experts, Michael Leonesio and Theodore Chan, M.D., will testify at trial to the well-known, serious medical risks from being Tased.  Many of these risks are set forth in the product warnings and training that TASER International, Inc. distributes to every law enforcement agency that has purchased Tasers, and requires every Taser-equipped law enforcement officer to follow.  Risks of harm from Taser are further addressed in Plaintiff's opposition to Defendants' motion limine re: documents from TASER International.

Despite these risks, Cavallaro held Hesterberg at Taser point for several minutes while she communicated with dispatch, during which time Hesterberg did not put his hands behind his back. (Cavallaro Dep., 151:9-10; Babcock Decl. ¶ 12).  Cavallaro testified that her plan was to Tase Hesterberg if he tried to leave again.  (Cavallaro Dep., 174:17-21).

**Cavallaro Executes Her Plan To Tase Hesterberg.**  According to the NPS dispatch log, Cavallaro held Hesterberg at Taser-point for approximately four minutes.  (TE 70).  Sometime during these events, another witness, John Bartlett, approached the scene.  (Cavallaro Dep., 148:16–20; Declaration of John Bartlett, ¶¶ 1–2).  During this time, Hesterberg again asked Cavallaro what her authority was, and she replied: "[t]he Constitution."  (Hesterberg Dep., 64:14–20).  He told her that was no kind of answer and he was going to leave.  (Hesterberg Dep., 65:6–9).  He said, "Come on, dogs, let's go," turned on his heels, and began to walk away.  (Hesterberg Dep., 65:10–13).  He

1    wanted to get away from her because "[s]he was scaring [him].  She was shaking."  (Hesterberg

2    Dep., 66:22–67:1).

3            Cavallaro describes Hesterberg as running away from her.  (Cavallaro Dep., 147:25–148:1;

4    148:8–22).  But the other witnesses report that Hesterberg only turned and walked away from her.

5    (Hesterberg Dep., 65:12–13; Babcock Decl., ¶ 11; Declaration of John Bartlett, ¶ 4).

6            As Hesterberg and his small dogs walked away from Cavallaro, she fired her Taser at him,

7    striking him in the back with the weapon's sharp probes and delivering a five-second cycle of

8    electricity.  (Hesterberg Dep., 65:14–22; Cavallaro Dep., 148:23–149:11; Babcock Decl., ¶ 12;

9    Bartlett Decl., ¶ 6).

10

11           Cavallaro admits that she did not warn Hesterberg that she was going to Tase him before she

12   did it.  (Cavallaro Dep., 164:16–165:2; Bartlett Decl., ¶ 6).  Cavallaro also admits that the decision

13   to Tase Hesterberg was not a split-second decision because she had been planning to Tase him if he

14   tried to get away from her again.  (Cavallaro Dep., 174:17–175:2).  Cavallaro admits Hesterberg

15   never posed any threat.  (Cavallaro Dep., 156:25–157:3, 157:13–20; 159:5–19).  Cavallaro admits

16   she Tased Hesterberg simply because he disobeyed her order and left the scene of the leash

17   infraction.  (Cavallaro Dep., 161:23–162:17).

18

19           Hesterberg estimates that he was detained for about fifteen minutes before Cavallaro Tased

20   him.  (Hesterberg Dep., 167:23–168:3).

21           The Tasing caused Hesterberg to fall hard to the pavement.  (Hesterberg Dep., 65:19-22,

22   73:2-11; Cavallaro Dep., 149:18-23; Babcock Decl. ¶ 13; Bartlett Decl. ¶ 7).  He yelled in agony as

23   he fell, and the fall caused abrasions to his arm and leg.  (Hesterberg Dep., 73:8-9, 77:5-11, 90:18-

24   25, 91:8-12; Cavallaro Dep., 150:9-12; Babcock Decl. ¶ 13; Bartlett Decl. ¶ 7).  Hesterberg

25   describes the experience of being Tased as "extremely violent," "very, very frightening," and a

26   "ten" on a pain scale of one to ten.  (Hesterberg Dep., 81:2-8, 168:22-169:3).  The Taser shock felt

27

28

1   "like a wave. . . it shuts down all your systems so you are not able to move or respond or – basically

2   it throws your body into a convulsion, like a shaking convulsion, and it's painful."  (Hesterberg

3   Dep., 73:24-74:5).  He has never experienced pain like that at any other time in his life.  (Hesterberg

4   Dep., 169:4-6).

5   Cavallaro admits that throughout this incident, Hesterberg never said anything threatening to

6   her and never physically threatened her or anyone else.  (Cavallaro Dep., 156:25-158:3-9, 159:15-

7   19, 161:9-12).  Hesterberg never swung at her, hit her, punched her, kicked her, moved aggressively

8   toward her, took a fighting stance, or even used any profanity.  (Cavallaro Dep., 158:3-9, 159:5-7,

9   159:9-9-14, 159:20-160:3, 164:9-11).  Hesterberg never had, or appeared to have, any weapons.

10   (Cavallaro Dep., 118:23-25).  Cavallaro admits that at the time she Tased Hesterberg, he did not

11   pose any immediate threat to her.  (Cavallaro Dep., 161:17-22).  The witnesses agree that

12   Hesterberg never said or did anything threatening to Cavallaro or anyone else.  (Babcock Decl. ¶

13   22; Bartlett Decl. ¶ 4).

14   Cavallaro says she Tased Hesterberg because he violated the leash law (for which she had

15   already informed him he was not under arrest) and "fled" from her after previously disobeying her

16   orders to turn around and put his hands behind his back.  (Cavallaro Dep., 161:25-162:4).  She

17   characterizes what amounts, at most, to fleeing from a non-violent misdemeanor as "actively

18   resisting," though she is unaware of any NPS policy that so defines active resistance.  (Cavallaro

19   Dep., 161:23-162:17, 163:15-164:8, 226:1-4, 227:21-25).  When she Tased him, her "goal was to

20   physically detain him with handcuffs to further [her] investigation."  (Cavallaro Dep., 170:11-12).

21   After the Tasing, Hesterberg ended up on his back unable to move or function for up to

22   several minutes.  (Babcock Decl. ¶ 15; Bartlett Decl. ¶ 8).  Witnesses report that Hesterberg

23   appeared to be dazed, immobile, and incapable of communicating.  (*Id.*).  According to the

24   witnesses, it seemed as if Hesterberg were unconscious for a couple of minutes.  (*Id.*).  As

1    Hesterberg lay on the pavement, Cavallaro repeatedly yelled at him to roll onto his stomach, but he

2    could not comply because he was still incapacitated by the Taser shock.  (Hesterberg Dep., 78:19-

3    79:10, 82:12-13; Cavallaro Dep., 151:25-152:3, 153:20-22; Babcock Decl. ¶ 17; Bartlett Decl. ¶ 8).

4    Cavallaro admits that she continued to hold Hesterberg at Taser-point for several minutes as she

5    yelled orders at him, even though he posed no threat and was not trying to get away.  (Cavallaro

6    Dep., 151:9-10; Babcock Decl. ¶ 17).

7         Cavallaro admits she was still holding Hesterberg at Taser point with the probes still in him

8    when San Mateo County Sheriff's deputies arrived.  (Cavallaro Dep., 156:14-16).  Michelle

9    Babcock estimates that the deputies arrived between five and eight minutes after the Tasing.

10   (Babcock Decl. ¶ 18).  One of the deputies asked Hesterberg to put his hands behind his back, he

11   complied, and she handcuffed him.  (Hesterberg Dep., 83:3-4; Cavallaro Dep., 156:16-24; Babcock

12   Decl. ¶ 18; Bartlett Decl. ¶13).  After the deputy handcuffed Hesterberg, Cavallaro yanked the

13   barbed Taser prongs out of his back.  (Cavallaro Dep., 175:4-16).  Without any notice or warning,

14   Hesterberg "felt a sharp pain in [his] back" and "felt the probes violently being removed from [his]

15   back."  (Hesterberg Dep., 83:22-24, 84:8-17).

16        **The Arrest.**  According to Cavallaro, Hesterberg was not under arrest when she shot him

17   with the Taser and the arrest did not occur until the deputy handcuffed him minutes later.

18   (Cavallaro Dep., 171:4-13).  Cavallaro herself never told Hesterberg he was under arrest at any time

19   during this incident.  (Hesterberg Dep., 168:16-20; Cavallaro Dep., 144:16-19; Babcock Decl. ¶ 21).

20   Cavallaro did not learn that Mr. Hesterberg had initially given her a false last name, Jones, until

21   well after Hesterberg had been handcuffed and arrested.  (Cavallaro Dep., 171:20-23, 181:4-16).

22        Cavallaro caused Hesterberg to be arrested and cited for two misdemeanor crimes:

23   California Penal Code § 148(a)(1) (resisting, delaying, or obstructing a peace officer who is

24   engaged in the lawful performance of duties) and California Penal Code § 148.9(a) (giving a false

identity to a peace officer for the purpose of avoiding proper identification).  Cavallaro also cited

Hesterberg for violation of San Mateo County Ordinance § 6.04.070(a) (the leash rule), an

infraction, even though she had already told him she was not going to cite him for this violation.

(Cavallaro Dep., 171:14-172:23).  The District Attorney declined to pursue any charges against

Hesterberg.  (TE 51 and 52, Email and Letter from Deputy District Attorney Janelle Mosher).

**Response By Ranger Cavallaro's Supervisors.**  After this incident, Cavallaro's

supervisors Chief Ranger Kevin Cochary and Ranger Mary Beth McFarland instructed her that she

should never use a Taser to stop a fleeing misdemeanant, and they explained that if she refused to

accept this direction in the future, she would be disciplined.  (Cavallaro Dep., 204:25-205:18).

**Ranger Cavallaro's Taser Training.**  In her years as a law enforcement officer, Cavallaro

has received training and instruction concerning use of force many times.  (Cavallaro Dep., 26:15-

27:4).   She has been trained and understands that any force she uses must be reasonable force

*necessary* to accomplish her lawful duties, and force that is *unnecessary* under the circumstances

constitutes excessive force.  (Cavallaro Dep., 29:25-30:19, 36:24-37:3).  Per NPS policy, Cavallaro

understands that she may only use "the minimal force necessary to effect and maintain public order,

protect human life or property, and/or arrest."  (Cavallaro Dep., 35:25-36:5; TE 40, Dep't of the

Interior Dep't Manual Part 446 Chapter 10, Bates No. NPS 6993).

Cavallaro has also received training concerning use of Tasers specifically.  (Cavallaro Dep.,

27:5-7).  She has been trained that pointing a Taser at someone is considered a use of the Taser.

(Cavallaro Dep., 35:18-20).  Per Cavallaro's training, a Taser may be used against an individual

who is actively resisting an officer or to prevent an individual from harming himself or others.

(Cavallaro Dep., 47:17-49:6).  An NPS officer may not Tase a person simply because he refuses to

identify himself (Cavallaro Dep., 49:7-11, 221:13-19; TE 119, RM-9 Chapter 22 – Electronic

Control Device (ECD) Programs, Bates No. NPS 316).  The NPS Taser policy specifically prohibits

1    any use of a Taser on a person who is passively resisting.  (TE 41, DM Part 446 Chapter 22 Bates

2    No. NPS 7041).

3         The NPS Taser policy also states, "Unless compelling reasons to do so can be clearly

4    articulated, ECD's [Tasers] should not be used when: … (v) a subject is believed to be part of a

5    group that may be at high risk for secondary injuries (e.g., the very young, the very old, *the infirm*,

6    pregnant females, etc.)."  *Id,* (emphasis added).  There is no dispute that "the infirm" includes

7    persons rangers have reason to believe have a heart condition.

8         **Congressional Complaint.**  A few days after this incident, Congresswoman Jackie Speier

9    sent a letter to Golden Gate National Recreation Area Superintendent Frank Dean expressing

10   concern over Defendant Cavallaro's Tasing of Mr. Hesterberg and calling for an investigation into

11   this incident.  (TE 6, Speier Letter, Bates No. PLF 29).

12   **B.  LEGAL ISSUES**

13        **1.    FTCA Battery Claim**

14        Because Mr. Hesterberg brings his tort claims under the Federal Tort Claims Act, and the

15   events occurred in California, this Court applies California tort law.  *Avina v. United States*, 681

16   F.3d 1127, 1130 (9th Cir. 2012) (citing *Richards v. United States*, 369 U.S. 1, 7 (1962)).  Under

17   California law, to prevail on a claim for battery by a peace officer, Mr. Hesterberg must prove all of

18   the following: (1) that Ranger Cavallaro touched Mr. Hesterberg with the intent to harm or offend

19   him; (2) that Ranger Cavallaro used unreasonable force to prevent his escape; (3) that Mr.

20   Hesterberg did not consent to the use of that force; (4) that Mr. Hesterberg was harmed; and (5) that

21   Ranger Cavallaro's use of unreasonable force was a substantial factor in causing Mr. Hesterberg's

22   harm.  *Judicial Council of Cal., Civil Jury Instructions (CACI) No. 1305* ("Battery by Peace

23   Officer") (2014).  The battery claim boils down to element (2), whether Ranger Cavallaro used

excessive force under the Fourth Amendment.  *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273–74 (1998)).

**Fourth Amendment Analysis.**  Under the Fourth Amendment, law enforcement officers may only use such force as is objectively reasonable under the circumstances.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  "[T]he reasonableness inquiry is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.

"The essence of the *Graham* objective reasonableness analysis is that the *force* which was applied must be balanced against the *need* for that force: it is *the need for force* which is at the *heart* of the *Graham* factors."  *Headwaters Forest Def. v. County of Humboldt (Headwaters II)*, 276 F.3d 1125, 1130 (9th Cir. 2002) (emphasis in original, citations omitted).

Under *Graham*, "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Bryan v. McPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (as amended).  "Stated another way, we must balance the amount of force applied against the need for that force."  *Id.*

"Thus, where there is no need for force, *any* force used is constitutionally unreasonable."  *Lolli v. County of Orange*, 351 F.3d 410, 417 & n.5 (9th Cir. 2003).  "The amount of force used is permissible only when a strong government interest *compels* the employment of such force."  *Tekle v. United States*, 511 F.3d 839, 844 (9th Cir. 2007) (emphasis in original).

Factors to consider in evaluating the need for force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 398.  "The most important single element of the three specific factors" is "whether the suspect poses an

1    immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 701

2    (9th Cir 2005).

3              "A simple statement by an officer that he fears for his safety or the safety of others is not

4    enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d

5    1272, 1281 (9th Cir. 2001), *accord*, *Bryan*, 630 F.3d at 826.  Nor is "[a] desire to resolve quickly a

6    potentially dangerous situation . . . the type of governmental interest that, standing alone, justifies

7    the use of force that may cause serious injury." *Deorle*, 272 F.3d at 1281.

8              The court may also consider other factors in evaluating the need for force under the totality

9    of the circumstances.  For instance, the *en banc* Ninth Circuit has held that the availability of less

10   intrusive alternatives should be considered when assessing the reasonableness of a particular use of

11   force.  *Smith*, 394 F.3d at 701.  In addition, "warnings should be given, when feasible, if the use of

12   force may result in serious injury, and [ ] the giving of a warning or the failure to do so is a factor to

13   be considered in applying the *Graham* balancing test." *Deorle*, 272 F.3d at 1284.  "Less than

14   deadly force that may lead to serious injury may be used only when a strong governmental interest

15   warrants its use, and in such circumstances should be preceded by a warning, when feasible." *Id*. at

16   1284-85.

17

18

19                    **a.  Ranger Cavallaro Used an Intermediate, Significant Level of Force Against Plaintiff**

20             "The gravity of the particular intrusion that a given use of force imposes upon an

21   individual's liberty interest is measured with reference to 'the type and amount of force inflicted.'"

22   *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (*quoting Deorle*, at 1279).

23             Here, it is undisputed that Defendant Cavallaro shot Mr. Hesterberg in the back with a Taser

24   X26.  The Ninth Circuit has described this weapon as follows:

25

26             The X26 uses compressed nitrogen to propel a pair of 'probes' – aluminum darts
                tipped with stainless steel barbs connected to the X26 by insulated wires – toward
27              the target at a rate of over 160 feet per second.  Upon striking a person, the X26

28

delivers a 1200 volt, low ampere electrical charge through the wires and probes into his muscles.  The impact is as powerful as it is swift.  The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.  *See Draper v. Reynolds, 369 F.3d 1270, 1273 n.3 (11th  Cir. 2004)*; *Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir. 1993)*.  The tasered person also experiences an excruciating pain that radiates throughout the body.  *See Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009)* ("[O]ne need not have personally endured a taser jolt to know the pain that must accompany it . . . ."); *Hickey, 12 F.3d at 757.*

*Bryan*, 630 F.3d at 824 (footnotes omitted).

The use of a Taser is an "intermediate, significant level of force that must be justified by the governmental interest involved" and is "a greater intrusion than other non-lethal methods of force." *Bryan*, 630 F.3d at 825, 826.  Uses of "intermediate force," though less severe than deadly force, "nonetheless present[s] a significant intrusion upon an individual's liberty interests." *Young*, 655 F.3d at 1161-62 (*citing Smith*, 394 F.3d at 701-02).

In a concurrence with the Ninth Circuit's decision to deny *en banc* review of *Bryan v. MacPherson, supra,* Judges Wardlaw, Pregerson, Reinhardt and Fletcher documented the growing consensus among the federal circuits that Tasers present an intermediate level of force that can cause significant, and sometimes catastrophic, injuries, including from causing a person to fall onto a hard surface.  *Bryan*, 630 F.3d at 810-12, 814 (Wardlaw, concurring).  This concurrence also cited information about the effects of Tasers from the website of TASER International, Inc.  *Id*, at 813.

Pepper spray or a baton strike would also constitute an intermediate level of force.  *Young*, 655 F.3d at 1162.  But unlike other intermediate force options, a Taser blast "intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not." *Bryan*, 630 F.3d at 825.  Tasers cause pain that "is intense, is felt throughout the body, and is administered by effectively commandeering the victim's muscles and nerves." *Bryan*, 630 F.3d at 825.  Beyond causing the victim pain, a Taser blast results in "immobilization, disorientation, loss of balance, and weakness, even after the electrical current has ended." *Bryan*, 630 F.3d at 825

(citation omitted) (internal quotation marks omitted).  "The physiological effects, the high levels of pain, and foreseeable risk of physical injury" associated with Tasers have caused the Ninth Circuit to hold that **Tasers pose "a greater intrusion" to one's Fourth Amendment interests "than other non-lethal methods of force[.]"** *Bryan*, 630 F.3d at 825 (emphasis added).

> **b.**      **The Governmental Interests at Stake Did Not Support Defendant Cavallaro's Use of Such a High Level of Force Against Plaintiff**

> **i.      Severity of the Crime**

Examining all of the possible crimes for which Mr. Hesterberg could be accused, this Court already has explained that Plaintiff's "offenses were nonserious for purposes of the excessive force inquiry." (Doc. 54, p. 22).  As for the leash-law violation, "the government concedes, and this Court agrees, that the initial leash-law violation [wa]s not a serious offense." (Doc. 54, p. 20).  Not only was it not a serious offense, it was not even a misdemeanor: Ranger Cavallaro ultimately cited Mr. Hesterberg for violating San Mateo County Ordinance section 6.04.070(a), an infraction—lower than a misdemeanor. (Cavallaro Dep., 171:14–172:23).  "While 'the commission of a misdemeanor offense is 'not to be taken lightly,' it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and 'posed no threat to the safety of the officers or others.'" *Bryan*, 630 F.3d at 928–29.

In addition to the leash-law infraction, Ranger Cavallaro ultimately cited Mr. Hesterberg for violating California Penal Code section 148.9(a) (giving a false identity to a peace officer for the purpose of avoiding proper identification) and California Penal Code section 148(a)(1) (resisting, delaying, or obstructing a peace officer who is engaged in the lawful performance of duties). Cavallaro Dep., 165:10–166:1.  As for Mr. Hesterberg's supposed violation of California Penal Code section 148.9(a), this Court has already held that "lying to a police officer is not inherently dangerous or violent." (Doc. 54, p. 21).  Moreover, this Court must evaluate the reasonableness of Ranger Cavallaro's use of force "based on h[er] 'contemporaneous knowledge of the facts.'" *Miller*

1    *v. Clark Cnty.*, 340 F.3d 959, 965 (9th Cir. 2003) (quoting *Deorle*, 272 F.3d at 1281).  Here, Ranger

2    Cavallaro has admitted that she had only a hunch that Mr. Hesterberg had lied to her about his

3    identity.  (Cavallaro Dep., 125:18-126:23).  Cavallaro did not learn that Mr. Hesterberg had initially

4    given her a false last name, Jones, until well after Hesterberg had been handcuffed and arrested.

5    (Cavallaro Dep., 171:20-23, 181:4-16)  Therefore, under the facts known to Ranger Cavallaro at the

6    time she Tased Mr. Hesterberg, she did not have probable cause to believe that he had violated

7    California Penal Code section 148.9(a) by lying to her.

8

9           Nor did Mr. Hesterberg's alleged violation of California Penal Code § 148(a)(1)—for

10   resisting, delaying, or obstructing a peace officer—constitute a serious crime, as this Court has also

11   concluded, citing Ninth Circuit precedent.  (Doc. 54, p. 21) (citing *Young v. Cnty. of Los Angeles*,

12   655 F.3d 1156, 1164–65 (9th Cir. 2011) (disobeying a peace officer's order constitutes only a non-

13   violent misdemeanor); *Bryan*, 630 F.3d at 828–29 (resisting a police officer, failure to comply with

14   a lawful order were not inherently dangerous or violent offenses); *Davis v. City of Las Vegas*, 478

15   F.3d 1048, 1055 (9th Cir. 2007) (obstructing a police officer was not a serious offense)).  As this

16   Court has already concluded, "the record does not indicate any offense that can properly be

17   considered 'severe.'"  (Doc. 54, p 20).

18

19           **"[T]he Ninth Circuit has found that misdemeanors, even multiple misdemeanors, that**

20   **are not 'inherently dangerous or violent' do not justify a significant use of force."** [2] *Azevedo v.*

21   *City of Fresno*, No. 1:09-CV-375 AWI DLB, 2011 U.S. Dist. LEXIS 10132, at *28–29 (E.D. Cal.

22   Jan. 25, 2011) (suspected burglary, trespass, squatting violation of Penal Code § 148, and

23   motorcycle theft did not justify use of the Taser in dart mode), (citing *Bryan*, 630 F.3d at 828-29 &

24

25   _____

26   [2] The Ninth Circuit has explained that though the "crime's status as a misdemeanor or felony is not the key
     question" in evaluating the severity of the crime at issue, it "provides a rough proxy for the true object of the
     court's inquiry: whether a given offense indicates a suspect's potential dangerousness, immediate or
27   otherwise, such that there is a heightened social interest in the use of force to apprehend or subdue that
     suspect."  *Young*, 655 F.3d at 1165, n.8 (citing *Tennessee v. Garner*, 471 U.S. 1, 14 (1985)).

28

ns.11-12 (resisting an officer, failing to comply with a lawful order, and being under the influence of a controlled substance are minor misdemeanors that do not justify the use of Taser in dart mode). *See also, Mattos v. Agarano,* 661 F.3d 433, 444 (9th Cir. 2011) (*en banc*) (failing to sign traffic citation or exit car as ordered, and speeding in a school zone are not serious offenses supporting use of Taser in drive-stun mode); *Smith*, 394 F.3d at 702-03 (suspected domestic violence did not "warrant the conclusion that [the plaintiff] was a particularly dangerous criminal or that his offense was especially egregious"); *Davis v. City of Las Vegas*, 478 F.3d at 1055 (trespassing and obstructing a police officer "are by no means such serious offenses as to provide an officer with a reasonable basis for" slamming handcuffed plaintiff into wall); *Young*, 655 F.3d at 1164-65 (failure to wear a seatbelt and disobeying peace officer's order did not justify use of significant force).

None of Hesterberg's alleged offenses indicated he posed a threat to Cavallaro or anyone else such that there would be a heightened governmental interest to subdue him. Therefore, the "severity of the crime at issue" weighs against a finding that Cavallaro had an interest in the use of significant force.

### ii.      Whether or Not Plaintiff Posed an Immediate Threat

Whether or not the Plaintiff posed an immediate threat to the safety of the officer or others is the most important *Graham* factor. *Smith*, 394 F.3d at 701. Here, it is beyond dispute that Mr. Hesterberg posed no immediate threat to Ranger Cavallaro's (or anyone else's) safety—as this Court already determined in connection with Plaintiff's motion for partial summary judgment. (Doc. 54, pp. 22-23). Ranger Cavallaro admits that Mr. Hesterberg did not pose any immediate threat to her safety or the safety of the witnesses:

> MR. HADDAD:  Q.  At the time that you Tased Mr. Hesterberg, did he pose any immediate threat to you?
>                                              * * *
> THE WITNESS:  No.

1   (Cavallaro Dep., 161:17-18, 161:22).  Cavallaro admits "he didn't swing at me or hit at me or kick

2   me or anything like that."  (Cavallaro Dep., 158:8-19). Cavallaro further admits Hesterberg did not

3   move towards her aggressively to try to do any of those things, never took a fighting stance, never

4   made any verbal threats toward her, and did not threaten the witnesses.  (Cavallaro Dep., 159:9-

5   160:6, 161:9-12).

6        In addition, Hesterberg had no weapons, the alleged crimes of which Cavallaro suspected

7   him were non-violent, he had not assaulted Cavallaro or the witnesses, and he was moving away

8   from Cavallaro with his back to her at the time she Tased him.  There is zero evidence that

9   Hesterberg posed an immediate threat to anyone; he was merely trying to get away, and his attempt

10  to get away was the only reason Cavallaro Tased him.  Thus, it is undisputed that no reasonable

11  safety concern warranted Cavallaro's use of the Taser on Hesterberg, and this factor strongly favors

12  a finding that Cavallaro used excessive force.  *See, e.g., Bryan*, 630 F.3d at 832-33 (plaintiff posed

13  no immediate threat to the officer where "[t]he facts suggest that [the plaintiff] was not even facing

14  [the officer] when he was shot [with a Taser]"); *Mattos*, 661 F.3d at 444 (agitated, uncooperative

15  woman who refused to sign traffic citation and get out of the car did not even pose a potential

16  threat, much less an immediate threat).

17       Defendant previously has argued, without citation to authority, that Hesterberg posed a

18  potential threat to Cavallaro because "he is bigger and stronger" than she.  A potential threat cannot

19  justify Ranger Cavallaro's use of force.  *Deorle*, 272 F.3d at 1281 ("A simple statement by an

20  officer that he fears for his safety or the safety of others is not enough; there must be objective

21  factors to justify such a concern."); *Bryan*, 630 F.3d at 826 ("the objective facts must indicate that

22  the suspect poses an immediate threat to the officer or a member of the public"); *Winterrowd v.*

23  *Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007) (vague suspicions or generalized concerns that a

24  person presents officer safety issues cannot justify a use of force); *Mattos*, 661 F.3d at 444, n.5

(explaining critical distinction between *potential threat* and *immediate threat*; where woman refused order to get out of car during traffic stop, court refused to consider possibility that she could drive away as an immediate threat to justify Tasing her).

"The amount of force used is permissible only when a strong government interest *compels* the employment of such force."  *Tekle v. United States*, 511 F.3d 839, 844 (9th Cir. 2007) (emphasis in original) (quoting *Deorle,* 272 F.3d at 1280).  Nothing *compelled* Defendant Cavallaro to Tase Hesterberg.  She chose to Tase him from a range of alternatives.  The fact that, by Cavallaro's own admission, Hesterberg never posed any threat, weighs strongly in his favor.

### iii.      Whether Plaintiff Was Actively Resisting Arrest or Attempting to Evade Arrest by Flight

Mr. Hesterberg's alleged non-violent flight from a non-serious crime is the *only* factor that conceivably weighs in favor of the defense.  However, here, it is not nearly enough to justify the intermediate, significant force used, especially given the total lack of other factors favoring such force.

Ranger Cavallaro admits she was not attempting to arrest Hesterberg when she Tased him, she Tased him before ever warning him that she could arrest him for any crime, and she never told him he was under arrest before she Tased him, even though he asked her multiple times whether she was arresting him.  Cavallaro never said or did anything that Hesterberg could have understood as an attempt to arrest him, rather than detain him, prior to the Tasing.  Therefore, even though Plaintiff was trying to get away from Cavallaro, he cannot be deemed to have been resisting arrest or attempting to flee from an arrest.

Moreover, the eyewitnesses confirm that Mr. Hesterberg did not run, or "flee," from Ranger Cavallaro just before she Tased him: he simply turned and started to walk away after announcing that he was going to do just that.  (Hesterberg Dep., 65:12–13; Babcock Decl., ¶ 11; Declaration of John Bartlett, ¶ 4).  What witnesses describe can hardly be described as "flight."

Finally, even if Cavallaro were attempting to arrest Hesterberg at the time she Tased him, Hesterberg's walking, or even alleged running, away does not constitute active resistance to justify the use of force.  "Following the Supreme Court's instruction in *Graham*, [the Ninth Circuit] has drawn a distinction between passive and active resistance."  *Bryan*, 630 F.3d at 830 (citing *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994) and *Headwaters II*, 276 F.3d at 1130-31).  Resistance "runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer."  *Bryan*, 630 F.3d at 830.  "[A] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."  *Nelson v. City of Davis*, 685 F.3d 867, 881-82 (9th Cir. 2012) (even if plaintiff heard and refused to comply with officers' orders, "this single act of non-compliance, without any attempt to threaten the officers or place them at risk" would not justify shooting him with pepperball gun).  *See also, Smith*, 394 F.3d at 703 (where person "continually ignored" officer's commands to remove his hands from his pockets and not re-enter his home, and "physically resisted  . . .  for only a brief time," resistance was not "particularly bellicose" and did not support use of significant force (dog bite)).

Previously, Defendant has sought support from *Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994).  In *Chew*, an officer stopped the plaintiff for a traffic violation.  *Id.* at 1436.  After the plaintiff provided his driver's license and talked with the officer, he fled and hid in a scrap yard.  *Id.* at 1436, 1442.  After about two hours, the police released a dog, which found and bit the plaintiff. *Id.*  The Ninth Circuit determined that the plaintiff's flight cut "only slightly" in favor of the defendants, but it did not find that this amounted to active resistance.  *Id.* at 1442.  The Court explained:

> With respect to whether Chew was "actively resisting arrest," it is undisputed that he fled and then hid from the police.  He did not, however, resist arrest to the point of offering any physical resistance to the arresting officers, nor, at the time the officers released the dogs, did they have any particular reason to believe he would do so.

*Id.*[3]

Since *Chew*, the Ninth Circuit has defined active resistance even more narrowly:

> As our prior cases illustrate, active resistance is not to be found simply because of a failure to comply with the full extent of an officer's orders. **To the contrary, where an individual's 'resistance was [not] particularly bellicose," [ ] we have held that various applications of force, including the use of pepper spray [ ] and bean bag projectiles [ ] were not reasonable.** Therefore, even if Nelson heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance.

*Nelson,* 685 F.3d at 882 (emphasis added; citations omitted).

### iv.   Other Factors Weigh Against the Need for Force

The *en banc* Ninth Circuit has determined that **less intrusive alternatives** to the force that was used must be considered as a part of the "totality of the circumstances." *Smith*, 394 F.3d at 701; *Deorle*, 272 F.3d at 1282. *See also*, Ninth Cir. Model Civil Jury Instr. 9.22; *Bryan*, 630 F.3d at 831 & n.15 ("Officer MacPherson knew additional officers were en route to the scene. He was, or should have been, aware that the arrival of those officers would change the tactical calculus confronting him, likely opening up additional ways to resolve the situation without the need for an intermediate level of force."). Cavallaro had various alternatives available to her, including: (1) concluding the detention after she verbally warned Hesterberg and told him she was not going to cite him, (2) explaining to Hesterberg that she was a law enforcement officer with the authority to arrest him in an effort to gain compliance (Leonesio Dep., 86:5–87:1), (3) waiting for her backup to arrive and stop him at the park entrance or trailhead, (4) displaying the Taser "in spark display mode to attempt to gain compliance" (Cavallaro Dep., 108:5–15; Leonesio Dep., 148:18–25), and (5) as her supervisors instructed her to do in the future, let Hesterberg leave the scene of this non-serious crime, rather than use the Taser to stop him. Thus, Cavallaro "could have altered [her]

---

[3] The *Chew* court ultimately denied the officers summary judgment, determining that the plaintiff posed no immediate threat and this was not a situation requiring "split-second judgments." *Id.* at 1443.

1   tactics to bring [her] in compliance with [her] own training, which would have minimized the

2   degree of force applied or eliminated the need for force altogether." *Nelson*, 685 F.3d at 882.

3       "[I]t should be remembered that failure to apprehend at the scene does not necessarily mean

4   that the suspect will never be caught." *Tennessee v. Garner*, 471 U.S. 1, 10 n.8 (1985).  To

5   paraphrase *Garner*, "[i]t is not better that all [misdemeanor] suspects [get tased] than that they

6   escape." *Garner*, 471 U.S. at 9.

7       The Ninth Circuit has also made clear that "**warnings** should be given, when feasible, if the

8   use of force may result in serious injury." *Deorle*, 272 F.3d at 1284 (emphasis added).  Where

9   officers do not give warnings immediately before a use of force, this supports a finding that the use

10  of force was unreasonable.  *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011)

11  (warning should have been given immediately before use of force; earlier warnings were

12  inadequate).  Cavallaro admits that she did not warn Hesterberg before firing her Taser at his back,

13  so this factor also weighs against her use of force.

14      *Nelson v. City of Davis*, *supra,* provides guidance on what constitutes a sufficient warning.

15  There, the panel applied the *Graham* balancing test and concluded that the police's use of

16  intermediate force—firing a pepper-ball—at a partygoer at U.C. Davis, injuring him, was

17  unreasonable under the Fourth Amendment.  *Nelson*, 685 F.3d at 883.  Crucial to the

18  unreasonableness of the officer's use of intermediate force was the officer's failure to give an

19  explicit, verbal warning before firing.  The panel remarked that "there [wa]s nothing in the record

20  that indicate[d] that the group was told prior to the shooting how they should comply with the

21  dispersal orders . . . or that force would be used against them if they did not behave in a particular

22  manner." *Nelson*, 685 F.3d at 882–83.  Therefore, the panel concluded, "the failure to give

23  sufficient warnings" weighed against the government's decision to use force against a suspect and

his friends.  *Nelson*, at 883.  In *Bryan*, the Court also explained the difference between a command and a warning.  *Bryan*, 630 F.3d at 831.

Thus, the Ninth Circuit instructs that a sufficient warning tells the suspect, (1) immediately preceding the use of force; (2) that the law enforcement officer will use a particular type of force; and (3) what the suspect must do to avoid the use of that force.  *See Glenn, supra, Nelson, supra. See also Bryan*, 630 F.3d at 831 ("Here, it was feasible to give a warning that the use of force was *imminent* if Bryan did not comply.  While a warning to Bryan may or may not have caused him to comply, there was 'ample time to give that order or warning and no reason whatsoever not to do so.'") (emphasis added) (citing *Deorle*, 272 F.3d at 1284)).

It is undisputed that Ranger Cavallaro never gave such a warning before she actually used her Taser.  Ranger Cavallaro conceded that she did not warn Mr. Hesterberg that if he did not stop running she would Tase him.  (Cavallaro Dep., 164:16–165:2).  Mr. Bartlett has declared that Ranger Cavallaro "did not warn Mr. Hesterberg that she was about to fire a weapon or say anything else to him before [he] heard the shot."  (Bartlett Decl., ¶ 6).  Therefore, Ranger Cavallaro's failure to give a proper warning weighs in favor of finding that her use of the Taser was unreasonable.

Another factor to consider is whether the **plaintiff is infirm or susceptible to an increased risk of harm** from the use of force.  *See Mattos,* 661 F.3d at 445 (fact that plaintiff was pregnant when officers Tased her was an appropriate factor to consider and weighed against the use of force). Cavallaro admits that Mr. Hesterberg told her before she Tased him that she should not do so because he has a heart condition, and she admits that whether or not a person has a heart condition is a risk factor she must consider in deciding whether to use the Taser.[4]  In fact, Cavallaro violated her training and NPS policy by deliberately Tasing an "infirm" person with a heart condition, given the substantial risk of serious injury or death she acknowledges.  (Cavallaro Dep., 37:22-39:25; TE

---

[4] Plaintiff has atrial fibrillation, in addition to hypertension.

119, NPS 317).  Thus, as in *Mattos*, Cavallaro's decision to Tase Hesterberg despite her knowledge of his medical condition further supports a finding that she used unreasonable force.

In addition, Cavallaro admits that Hesterberg was moving away from her on a paved trail at the time she Tased him and that secondary injury from falling is a risk of the Taser.  (Ex. B, 37:4-21).  Accepting as true Cavallaro's contention that Hesterberg was running on pavement when she Tased him, the fact that the Tasing caused him to fall onto a hard surface also weighs against the use of force.  *Azevedo*, 2011 U.S. Dist. LEXIS 10132, at *31 ("The risk of injury from an uncontrolled fall on a hard surface is something that a police officer trained in the use of a taser should foresee. . . . It is evident that the risk and nature of a falling injury would be exacerbated by the speed at which the suspect is moving.") (citing *Bryan*, 630 F.3d at 824).

Finally, even with all of these contravening factors, Cavallaro admits her decision to Tase Hesterberg was planned and that she had several minutes to deliberate about her plan to Tase him before doing so.  **This was not a "split-second decision."**  (Cavallaro Dep., 174:17-175:2).

### v.    Application of Ninth Circuit Taser Cases

This Court analyzed the leading Ninth Circuit Taser cases in its order denying Plaintiff's motion for partial summary judgment (Doc. 54, pp. 13-19): *Bryan, supra; Mattos, supra,* (*Mattos* and *Brooks* consolidated *en banc*); and *Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013).  In each of those cases, the Ninth Circuit had no difficulty in finding that the use of a Taser, either in dart mode or probe mode, violated the plaintiff's Fourth Amendment rights.[5]

Like Hesterberg, in each of those four cases, the plaintiff was accused of some crime that the Ninth Circuit determined was non-serious.  Like Hesterberg, in each of those four cases, officers accused the plaintiff of having posed some potential threat, but the Ninth Circuit explained that

---

[5] The Ninth Circuit found qualified immunity in *Bryan, Mattos*, and *Brooks* due to the timing of those events, but denied qualified immunity in the later case, *Gravelet-Blondin*.  As briefed below, Defendant United States is not entitled to qualified immunity under the FTCA.

none of them posed an objective, immediate threat to officers or others.  And, like Hesterberg, each of those four plaintiffs engaged in some level of passive or low-level resistance to officers:

- "Bryan was agitated, standing outside his car, yelling gibberish and hitting his thighs," he disobeyed the officer's command to get back in his car, and he was suspected of crimes of "resisting a police officer, failure to comply with a lawful order, and using or being under the influence of a controlled substance" (*Bryan*, 630 F.3d at 826–828);

- Brooks refused a lawful order to get out of her car, clutching her steering wheel to prevent officers from moving her, and was charged with resisting arrest (*Mattos*, 661 F.3d at 437);

- Mattos refused to move out of the way when an officer announced he was going to arrest her husband during a domestic violence event, and as the officer attempted to arrest her husband "she extended her arm to stop her breasts from being smashed against [the officer's] body," and she physically and verbally delayed officers from their lawful duties (*Mattos*, 661 F.3d at 439);

- Gravelet-Blondin refused officers' orders to get back when officers were dealing with a tense situation involving his resistant, suicidal neighbor who was possibly armed with a gun (*Gravelet-Blondin*, 728 F.3d at 1090); and

- Hesterberg announced he was leaving, turned, and started to walk away from a dog leash infraction while still detained.

All such resistance can be characterized as passive or low-level.  None was "particularly bellicose," and therefore none would justify the use of significant, intermediate force.  *See Nelson*, 685 F.3d at 882; *Smith*, 394 F.3d at 703.

Ranger Cavallaro used excessive force when she chose to Tase in the back, without warning, Gary Hesterberg, a non-threatening 50-year-old man, whom she knew had a heart condition, because he was leaving the scene of the most minor of "crimes" -- a dog leash infraction.  Ranger Cavallaro deployed this significant, intermediate level of force capable of causing serious injury or death where Defendant does not contest that other intermediate force, such as use of a baton, would have been unlawful.

1

2    **2.    FTCA Negligence Claim**

3         Under California law, a peace officer may be held liable for negligence because "'*a public*

4    *employee* is liable for an injury caused by his act or *omission to the same extent as a private*

5    *person*,' except as otherwise specifically provided by statute." *Lugtu v. California Highway Patrol*,

6    26 Cal. 4th 703, 715 (2001) (quoting Cal. Gov't Code § 820(a)).  Officers have "a duty 'to perform

7    their official duties in a reasonable manner,'" and "a law enforcement officer has a duty to exercise

8    reasonable care for the safety of those persons whom the officers stops . . ." *Id.* at 717–18 (citing

9    *Whitton v. State of California*, 98 Cal. App. 3d 235, 241 (1979)).  Finding duty, *Lugtu* approved the

10   determination of the standard of care based on the department's training and policy materials, as

11   well as the plaintiff's expert's testimony.  *Id.* at 720–24.

12        "In order to establish a claim for negligence under California law, [the plaintiff] must show:

13   (1) a legal duty to use due care; (2) a breach of that duty; and (3) that the breach was the proximate

14   or legal cause of the injury." *Ting v. United States*, 927 F.2d 1504, 1513 (9th Cir. 1991).  *See also*

15   Cal. Civil Jury Instructions (CAC) Nos. 400, 401.

16        A peace officer's duty to use reasonable care extends to the officer's use of force; therefore,

17   a plaintiff may hold a peace officer liable in negligence for the officer's use of force, including for

18   the officer's conduct leading up to that use of force.  *See Grudt v. City of Los Angeles*, 2 Cal. 3d

19   575, 587 (1970) (holding that the trial judge erred in not instructing the jury on the plaintiff's

20   negligence theory predicated on the defendant-officers' actions before using deadly force); *Munoz*

21   *v. Olin*, 24 Cal. 3d 629, 634 (1979) (reaffirming *Grudt*, and stating that the "an officer's lack of due

22   care can give rise to negligence liability for the intentional shooting death of a suspect." (citing

23   *Grudt*, 2 Cal. 3d 575 (1970))).

24

25

26

27

28

1    The California Supreme Court recently explained that a negligence claim may be based on a

2  use of excessive force (*Hernandez v. City of Pomona*, 46 Cal. 4th 501, 513–14 (2009)), and that

3  additionally, "[l]aw enforcement personnel's tactical conduct and decisions preceding the use of [ ]

4  force are relevant considerations under California law in determining whether the use of [ ] force

5  gives rise to negligence liability."  *Hayes v. County of San Diego ("Hayes II")*, 57 Cal. 4th 622, 639

6  (2013).  The Court explained that considering an officer's tactical conduct and decisions preceding

7  the officer's use of force is appropriate under California law because California "state negligence

8  law, which considers the totality of the circumstances surrounding any use of deadly force . . . is

9  broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment

10  when deadly force is used."  *Hayes*, 57 Cal. 4th at 639 (citations omitted).  The Court explained, "In

11  other words, preshooting circumstances might show that an otherwise reasonable use of deadly

12  force was in fact unreasonable."  *Hayes*, 57 Cal. 4th at 629.

13

14    On remand from the California Supreme Court, the Ninth Circuit wrote:

15

16        The California Supreme Court has responded to our certification order and
       clarified California's negligence doctrine in cases where, as here, a plaintiff attacks
17       peace officers' "tactical conduct and decisions leading up to the use of deadly force."
       *Hayes II, 305 P.3d at 253*. … There is "no sound reason to divide plaintiff's cause of
18       action . . . into a series of decisional moments . . . and then to permit plaintiff to
       litigate each decision in isolation, when each is part of a continuum of circumstances
19       surrounding a single use of deadly force." *Id. at 262, 256*. Instead, under *Grudt [v.
       City of Los Angeles, 2 Cal. 3d 575, 586, 86 Cal. Rptr. 465, 468 P.2d 825 (1970)]*, an
20       officer's preshooting conduct is properly "included in the totality of circumstances
       surrounding [his] use of deadly force, and *therefore the officer's duty to act
21       reasonably when using deadly force extends to preshooting conduct*." *Id. at 257*
       (emphasis in original).
22

23  *Hayes v. County of San Diego*, 736 F.3d 1223, 1236 (9th Cir. 2013).  *See also, Champommier v.

24  United States*, No. CV11-10538- MWF (PJWx), 2013 U.S. Dist. LEXIS 119885 at *57, ¶ 130 (C.D.

25  Cal. Aug. 21, 2013) (FTCA decision applying *Hayes* to negligence claim).

26    While *Hayes* arises from a use of deadly force, its holding applies equally to non-deadly

27  force.  The Ninth Circuit and United States Supreme Court have explained that there is no

28

conceptual legal difference between excessive deadly and non-deadly force. *Acosta v. Hill,* 504 F.3d 1323 (9th Cir. 2007) (following *Scott v. Harris,* 550 U.S. 372 (2007)) *See also,* Comment, Ninth Cir. Model Civ. Jury Instr. 9.22.

Here, then, to determine whether Ranger Cavallaro acted negligently, the Court must examine her conduct leading up to and including her use of the Taser on Mr. Hesterberg. As discussed above in the section on Mr. Hesterberg's Battery claim, Ranger Cavallaro's use of the Taser was unreasonable under traditional Fourth Amendment analysis. But similarly unreasonable were Ranger Cavallaro's tactics and conduct leading up to her use of the Taser, including her failure to identify herself as a law enforcement officer, her poor communication skills, and her decisions to prolong and escalate this situation. Evidence of Ranger Cavallaro's negligent conduct is her supervisors' demand after the incident that she agree in the future to let someone like Hesterberg simply walk away rather than Tase him.

Plaintiff's police practices expert Michael Leonesio testified that the standard of care for effecting an investigatory stop includes the officer: (1) identifying him or herself to the suspect; (2) telling the suspect which law enforcement agency he or she works for; and (3) telling the suspect why the law enforcement officer has stopped the suspect. Leonesio Dep., 61:12–63:20; 86:3–87:1. Here, the record shows that Ranger Cavallaro did none of these things once she issued her warning to Hesterberg. Although she initially explained that she stopped Mr. Hesterberg to warn him about a leash violation, she failed to explain why he was not free to leave after the warning was given. Throughout the incident, Ranger Cavallaro never identified her authority or her jurisdiction, despite Mr. Hesterberg's requests for her to do so. Babcock Decl., ¶19. Similarly, Mr. Bartlett declared that "[d]uring the whole incident, [he] only heard the ranger's voice two times: first, when she shouted at Mr. Hesterberg to turn over after she tased him, and second, when she ordered [Bartlett] to stand back from Mr. Hesterberg." Bartlett Decl., ¶12. All of these "pre-shooting" acts and

omissions needlessly escalated the situation, ultimately leading to Mr. Hesterberg deciding to leave and Ranger Cavallaro deciding to Tase him for leaving.

### 3.    No Comparative Fault for Intentional Torts

California law does not apply contributory or comparative fault to intentional torts such as battery, because an intentional tortfeasor's liability is not subject to apportionment where the plaintiff's injuries resulted in part from the plaintiff's contributory negligence.  *See Thomas v. Duggins Const. Co., Inc.*, 139 Cal. App. 4th 1105, 1112 (2006) (citing *Heiner v. Kmart Corp.*, 84 Cal. App. 4th 335, 348–50 (2000)); *see also Bartosh v. Banning*, 251 Cal. App. 2d 378, 385 (1967) ("[A]ssault and battery are intentional torts. In the perpetration of such crimes negligence is not involved. As between the guilty aggressor and the person attacked the former may not shield himself behind the charge that his victim may have been guilty of contributory negligence, for such a plea is unavailable to him.").

### 4.    No Qualified Immunity or State Law Immunity for Any of Plaintiff's Claims

"Under the Federal Tort Claims Act (FTCA), the United States stands in the same shoes as a private individual and is entitled to the benefit of any defense under state law which would apply to a private individual under similar circumstances."  Daniel E. Morris, "Federal Tort Claims," § 2:18, pp. 2-60–2-61 (Thompson Reuters, 2013).  However, the United States is not entitled to qualified immunity for Defendant Cavallaro's conduct because "the doctrine of qualified immunity does not shield defendants from state law claims."  *Johnson v. Bay Area Rapid Transit District*, 724 F.3d 1159, 1171 (9th Cir. 2013).  *Accord, Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230, 1246 (2007).  Qualified immunity only applies to claims brought pursuant to 42 U.S.C. § 1983, which are not at issue here.  *Venegas*, 153 Cal. App. 4th at 1246.[6]

---

[6] The United States is not entitled to qualified immunity for Cavallaro's violations of California law. *Arnsberg v. United States*, 549 F. Supp. 55, 57 (D. Or. 1982), *aff'd in part, rev'd in part on other grounds*, 757 F.2d 971, 980 n.6 (9th Cir. 1985); *Crain v. Krehbiel*, 443 F. Supp. 202, 216 (N.D. Cal. 1978).

In addition, the United States is not entitled to any state law immunities for Defendant Cavallaro's torts because it failed to raise them in its Answer (*see* Docket No. 25) or in its Motion to Dismiss (*see* Docket No. 13).  Fed. R. Civ. Pro. 8(a) and (c); *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005) ("Under the Federal Rules of Civil Procedure, a party, with limited exceptions, is required to raise every defense in its first responsive pleading, and defenses not so raised are deemed waived.").

The United States would not enjoy any immunity under state law, even if it had timely asserted such immunities.  The Ninth Circuit has reaffirmed the longstanding rule in California that law enforcement officers and their departments do not have immunity for excessive force, assault and battery, false arrest, and related claims.  *Robinson v. Solano County*, 278 F.3d 1007, 1016-17 (9th Cir. 2002) (*en banc*); *Blankenhorn v. City of Orange*, 485 F.3d 463, 487–488 (9th Cir. 2007) (no state law immunity for "claims aris[ing] from … excessive force" including negligence).  *See also Scruggs v. Haynes*, 252 Cal. App. 2d 256, 264 (1967) ("California cases have consistently held that a peace officer making an arrest is liable to the person arrested for using unreasonable force.").

### 5.       Damages

"For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  Cal. Civ. Code § 3333.  "Tort damages are awarded to compensate a plaintiff for *all* of the damages suffered as a legal result of the defendant's wrongful conduct."  *North American Chemical Co. v. Superior Court*, 59 Cal. App. 4th 764, 786 (1997).

Defendant Cavallaro's Tasing caused Mr. Hesterberg to fall hard to the pavement.  He yelled in agony as he fell, and the fall caused abrasions to his arm and leg.  Hesterberg describes the experience of being Tased as "extremely violent," "very, very frightening," and a "ten" on a pain

1  scale of one to ten.  The shock felt "like a wave. . . it shuts down all your systems so you are not

2  able to move or respond or – basically it throws your body into a convulsion, like a shaking

3  convulsion, and it's painful."  He has never experienced such pain at any other time in his life.  The

4  Tasing also left Hesterberg in what he describes as "a general state of confusion, kind of just a

5  foggy feeling, like my brain waves had been scrambled."  This feeling of disorientation persisted for

6  "at least a day, if not two days."  In addition, Cavallaro subjected Hesterberg to additional "sharp

7  pain" in his back when, without any warning, she forcefully yanked out the Taser probes.

8

9       In addition to these injuries, Plaintiff has also sustained long-term emotional stress.  He is

10  immediately reminded of this incident whenever he visits Rancho Corral de Tierra, and he

11  frequently experiences vivid recollections of this traumatic event.

12       Mr. Hesterberg seeks damages for the following injuries: physical injuries, including

13  puncture wounds, contusions, scrapes, burns, and shoulder pain; physical pain and suffering; and

14  emotional and mental distress.

15

16

17                                    Respectfully Submitted,

18  Dated:  July 24, 2014            HADDAD & SHERWIN

19                                    /s/ Michael J. Haddad_____
                                      MICHAEL J. HADDAD
20

21

22

23

24

25

26

27

28