UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GARY HESTERBERG,

                        Plaintiff,

        v.

UNITED STATES OF AMERICA,

                        Defendant.

Case No. 13-cv-01265-JSC

**OPINION**

        The adoption of tasers as a law enforcement tool has undoubtedly saved countless lives. Tasers provide law enforcement officers with the opportunity to use intermediate force where they might otherwise have no choice but to utilize deadly force. The advent of tasers, however, has also given law enforcement the opportunity to use a high level of intermediate force where the use of such a level of force would not have otherwise been possible; in other words, tasers also permit the use of more serious force.

        This case asks whether it was objectively reasonable for National Park Service Ranger Sarah Cavallaro to tase Plaintiff Gary Hesterberg, who indisputably posed no danger to Ranger Cavallaro, the public, or himself, but had refused Cavallaro's command not to leave the scene after she had already warned him about walking his dog off leash and he had complied. Defendant the United States of America insists that if a person disobeys a law enforcement officer's order to "stay put," the law enforcement officer has the discretion to tase the person in dart mode if the person might otherwise escape regardless of why the law enforcement officer issued the "stay put" order in the first place. After conducting a four-day bench trial, the Court disagrees and finds that Ranger Cavallaro's use of the taser under the circumstances here was unlawful.

//

# BACKGROUND

## A.    Factual Background

### 1.        The January 29, 2012 tasing incident

In the late afternoon of January 29, 2012, 50-year-old Montara, California resident Gary Hesterberg took a Sunday jog with his two dogs in Rancho Corral de Tierra ("the Rancho"), an open space area in San Mateo County whose border is a half of a mile from Hesterberg's long-time home.  Approximately one month earlier, the Rancho had been incorporated into the Golden Gate National Recreation Area ("GGNRA"), which is managed by the National Park Service ("NPS"), which, in turn, is an agency within the United States Department of the Interior ("DOI"). As part of NPS' takeover of the Rancho, NPS enacted a rule requiring dogs to be on leash while in the Rancho.  While San Mateo County also had a law forbidding off-leash dogs in the Rancho, there is no indication in the record that that law was ever enforced; to the contrary, residents had been running their dogs off leash in the Rancho for many years, if not decades.

NPS Ranger Sarah Cavallaro was assigned to patrol the Rancho on January 29, 2012—the very first day an NPS park ranger ever patrolled the property.  To acclimate the community and Rancho visitors to GGNRA's new enforcement of NPS leash laws, GGNRA Chief Ranger Kevin Cochary instructed his deputies to order park rangers patrolling the Rancho to take an "educational approach or soft enforcement" with regards to violations of the Rancho's new rules.  (Dkt. No. 116 at 590:14-20, 601:3-14.)  In other words, rangers were supposed to educate the community about the transfer of the Rancho to GGNRA and merely warn, rather than cite, persons observed violating rules such as the leash law.  Cavallaro understood that was the approach her supervisors wanted her to employ.

Hesterberg had heard rumors that the property was going to change hands and that the new owner was going to enforce the leash law, but as of January 29, 2012 Hesterberg was unaware that any such changes had occurred.  Hesterberg's two dogs accompanying him on his jog were a leashed Beagle, named Jack, and an unleashed Rat Terrier, named JoJo.  Hesterberg jogged with Jack on a leash because Jack is "not the smartest tool in the shed" and could not be kept under

2

1    voice control.  (Dkt. No. 115 at 373:3-4.)  Not so for JoJo, who Hesterberg could rely on to obey

2    his commands and stay within 10 to 15 feet of him.

3           Hesterberg was about a mile-and-a-half into his jog on one of the Rancho trails—an old

4    single-lane road paved with now-broken asphalt—when he first saw Cavallaro.  Based on an

5    "instinctive reaction" to Cavallaro's green uniform, Hesterberg leashed Jack immediately after he

6    saw Cavallaro.  (*Id.* at 379:10.)  Cavallaro's uniform included a jacket with a fabric NPS patch

7    badge[1] and a duty belt containing Cavallaro's gun, taser, collapsible baton, and other law-

8    enforcement tools.  Hesterberg continued toward Cavallaro and when he arrived within speaking

9    distance to her, Cavallaro told him that she needed to talk with him about his dogs.  Although

10   Cavallaro did not identify herself as a law enforcement officer, Cavallaro "talked about the

11   National Park Service owning the property" (Dkt. No. 114 at 81:11-12), and informed Hesterberg

12   that she was not going to cite him for having his dog off leash; rather, she was merely going to

13   give him a warning because "this is going to be an educational experience for the local residents."

14   (Dkt. No. 115 at 380:4-5.)  Despite Cavllaro's uniform and hefty duty belt, coupled with

15   Cavallaro's disclosure that she had the authority to issue citations, Hesterberg testified that he did

16   not believe Cavallaro was a law enforcement officer; rather, he thought she was, or at least the

17   equivalent of, a state park ranger whose law enforcement authority does not go beyond issuing

18   citations.

19          Cavallaro then asked for Hesterberg's identification.  The reason Cavallaro asked for this

20   information is unclear.  At trial, Cavallaro gave several reasons for collecting Hesterberg's

21   identifying information.  First, Cavallaro testified that, because Hesterberg was not in possession

22   of his driver's license, she requested Hesterberg's identifying information to "confirm his identity

23   as well as perform a warrants check."  (Dkt. No. 114 at 83:13-15.)  Later, she testified that she

24   collected such information from dog-leash violators because "[t]he Park Service at Golden Gate

25   has ongoing litigation with folks over the dog-walking and dog-off-leash regulations.  And so it

26   was told to us in training that this was required, as part of the ongoing litigation, and what the Park

27

28   _____

[1] Cavallaro's medal badge was concealed under her jacket.

*United States District Court*
*Northern District of California*

Service needs for the litigation." (Dkt. No. 117 at 691:21-25.)  Finally, she testified that, in addition to the ongoing litigation, "it's standard practice to identify the person that you're in contact with, regardless of the violation.  It's—again, it goes back towards officer safety." (*Id.* at 733:3-6.)  In her deposition and earlier declaration, Cavallaro testified that she requested identifying information for two purposes: 1) to include in the "local database" or "local file" that catalogues records of leash-law contacts to counter recidivist violators who plead ignorance of the law; and 2) to check for any outstanding warrants.  (*See* Dkt. No. 28-2 at 115:10-15; *see also* Dkt. No. 45 ¶¶ 6, 7.)  Chief Ranger Cochary testified that park rangers may collect identifying information from any violator to 1) run a warrants check, and 2) include the violators name in the local database.  Cochary explained that the warrants check is standard practice and done for purposes of officer safety; including the name in the local database is helpful for later enforcement involving the same individual, but it is not required that park rangers use the database.  The Court finds that Cavallaro asked for Hesterberg's identifying information for the following reasons: 1) to identity him; 2) to run a warrants check; 3) to collect for purposes of NPS ongoing litigation regarding its dog-leash rules; and 4) to include in the database for possible future contact with the violator.

Whatever the reason for the request, Hesterberg provided his correct birthdate, address, and first name, but lied about his last name; he said his last name was Jones.  Hesterberg testified that he lied about his name because

> in a split second in the back of my mind I thought to myself, well, I don't want to be placed on some offending dog walker or, you know, dog walk—man walks dog off-leash.  I didn't want to be placed on that list, and so I made a split-second decision to do that.

(Dkt. No. 115 at 381:12-16.)  Hesterberg further testified that if Cavallaro had identified herself as a law enforcement officer, or if he had known she was a law enforcement officer, he would not have lied about his identity.  Cavallaro radioed Hesterberg's identifying information to her dispatch and waited for dispatch to confirm Hesterberg's identification.

Around the same time that Cavallaro relayed Hesterberg's identifying information, James and Michelle Babcock approached the scene and inquired about what was happening.  The

4

United States District Court
Northern District of California

Babcocks are a young married couple that live in Hesterberg's neighborhood and visit the Rancho several times a month, sometimes with their dogs. Before this incident, they did not know Hesterberg. Mr. Babcock testified that he stopped to talk to Cavallaro and Hesterberg because it was the first time he had seen a ranger at the Rancho and he was curious "why they were there, because it was such an unusual circumstance." (Dkt. No. 115 at 232:5-6.) Hesterberg told the Babcocks that he was stopped because he had his dog off leash. Mr. Babcock then asked Cavallaro some questions along the lines of her activity in the Rancho, whether park rangers were now going to normally patrol the Rancho, and whether the Rancho ownership had changed hands, as Mr. Babcock had heard was going to happen at some point. According to Cavallaro, Mr. Babcock also "started in with questioning of my authority and who I worked for;" specifically, Cavallaro testified that Mr. Babcock questioned her authority when he asked "'What is your authority" or 'What is your authority here?'" (Dkt. No. 114 at 86:19-20, 24-25.) Ms. Babcock also asked at least one question. Cavallaro interpreted their questions as "very pointed, and very challenging. It was not at all inquisitive." (Dkt. No. 117 at 700:13-14.) Cavallaro responded to at least some of the questions; she told the Babcocks that she was patrolling and that the National Park Service had recently acquired the property. But Cavallaro's response was abrupt and she did not take the time to engage with the Babcocks; rather, she viewed their arrival on the scene as "significant" because it, at least potentially, distracted her from her "law enforcement contact":

> I was on a law-enforcement contact with what I believed was Mr. Jones. So, that is my primary focus. I have to have a general awareness of the overall scene. Folks often try to interject themselves into law-enforcement contact. Particularly on a trail setting like that. And, so, it's—it goes back to my divided attention and everything that I need to be focusing on which is, you know, sort of the universe, so to speak, in kind of a broad term, just the— you know, the time of day, who else is on the trail, where my backup is, the radio, Mr. Hesterberg, his body language, the Babcocks, their question, Mr. Babcock—Mr. Hesterberg's questions, all of that was stuff that I was now having to focus on. Instead of just me and Mr. Hesterberg and our general surroundings, it's now three people and me that I'm focusing on.

(*Id.* at 701:22-702:16.) Unsatisfied with Cavallaro's response to the Babcocks' questions, Hesterberg also started asking Cavallaro questions about who she was, who she worked for, and what she was doing there. Cavallaro did not answer Hesterberg's questions.

5

Hesterberg then told Cavallaro that because she had given him his warning he was going to leave. Cavallaro responded, "'What?' As if in disbelief, not that I didn't hear him." (*Id.* at 703:11-12.) Cavallaro was in disbelief because

> we talk about people are going to telegraph what they're going do. You're watching for their body language. You know, if someone kind of keeps looking in a particular direction, that's typically an indicator that something in that direction is of interest to them, or they might be heading in that direction. If someone drops their shoulder it might mean they're cocking back to maybe swing at you. So, you're—so, you're looking for different things. So when we talk about telegraphing, it's usually minor things, the nuances of people. You're not expecting that telegraph to actually be an announcement that someone is leaving.

(*Id.* at 703:14-704:1.) Hesterberg repeated that he was leaving and Cavallaro told him that he was not free to go. Hesterberg resumed asking questions regarding Cavallaro's authority and whether he was under arrest. Cavallaro did not respond.

Cavallaro testified that Hesterberg's announcement of his intention to leave meant that she needed to dedicate even more of her attention to Hesterberg. She thus told the Babcocks something along the lines of "I don't have any business with you, so leave the area; if you continue to stay, I will have business with you." (*See* Dkt. No. 114 at 90:11-15.) The Babcocks complied with Cavallaro's order and moved south on the trail for a few dozen feet before stopping and resuming their observation of the incident.

Around this same time, and a little over two minutes after Cavallaro relayed Hesterberg's information to dispatch, dispatch informed Cavallaro that he "got several returns" and asked for a "city that Jones is out of." (Trial Ex. 62.) A few seconds later, Cavallaro responded: "He's out of Montara." (*Id.*) Less than ten seconds later, dispatch told Cavallaro: "10-74, not on file for name and DOB." (*Id.*) After 18 seconds, Cavallaro responded: "Can I get a second unit headed this way? And can you repeat that information?" (*Id.*) Dispatch began summoning backup, but did not repeat the information regarding the result of Hesterberg's identification check. When Cavallaro called for backup she knew the closest ranger to her was north in San Francisco, which is about a 25-minute drive away. Dispatch summoned San Mateo County Sheriffs, who were

United States District Court
Northern District of California

6

1    much closer, along with two rangers from San Francisco and one ranger from Marin County, who

2    was even farther away from Cavallaro.

3         Cavallaro testified that she requested backup because

4         [a]bout that time, I'd got the information, that 10-74 not on file, I
         believe. And so it was the managing of the three people instead of

5         two, the barrage of questioning that was, you know, challenging of
         my authority. And, the fact that I'm now getting further information

6         with the 10-74 not on file, which means negative, there are no wants
         or warrants for a Mr. Gary L. Jones with that date of birth. But, that

7         there's no Gary L. Jones on file in the entire California, the CLETS
         system. So, there's no wants or warrants for that person, but this

8         person doesn't exist . . . with that date of birth . . . . So, those are
         some red flags starting to go off.

9

10   (Dkt. No. 117 at 705:10-23.)

11        After Cavallaro requested backup, and after the Babcocks had moved farther away,

12   Hesterberg again announced he was leaving and began to jog away. Hesterberg, however, got

13   only a few steps into his jog when Cavallaro grabbed his arm and told him, "Sir, it is not okay to

14   leave." (Dkt. No. 116 at 445:21-23.) Hesterberg stopped, pulled his arm away from Cavallaro,

15   asked if he was under arrest, and expressed incredulity that Cavallaro would not let him go.

16   Cavallaro did not answer Hesterberg's question.

17        Shortly after Cavallaro stopped Hesterberg from leaving, Cavallaro responded to

18   dispatch's request for her status. She told dispatch she was on the trail behind Ocean View Farms,

19   and informed dispatch that "[t]his guy's tried to run on me twice." (Trial Ex. 62.) She also

20   requested an update on her backup and dispatch replied that one ranger was en route and that he

21   was still trying to connect with San Mateo County Sheriffs.

22        Hesterberg again announced his intention to leave. In response, Cavallaro drew her taser,

23   pointed it at the center of Hesterberg's chest, and ordered him to put his hands behind his back.

24   Hesterberg did not put his hands behind his back and instead asked her sarcastically and in

25   disbelief, "What, you're going to tase me now?" (Dkt. No. 115 at 389:24-390:1.) Hesterberg also

26   told Cavallaro something close to, "Don't tase me, I have a heart condition." Cavallaro

27   responded, "Well, then turn around and put your hands behind your back." (Dkt. No. 100 at

28   114:3-4.) Hesterberg again did not put his hands behind his back. Mr. Babcock, who was with his

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    wife 20 to 30 feet away, commented something along the lines of, "Don't you think this is a little

2    excessive?" (Dkt. No. 115 at 252:15-18.)  Although Cavallaro was not "married" to the plan, if

3    "[Hesterberg] ran again, [she] was going to tase him." (Dkt. No. 117 at 713:9, 12-13.)

4           Hesterberg remained at taser point for approximately the next four minutes.  Cavallaro and

5    Hesterberg were facing each other on opposite sides of the trail—Cavallaro facing west and

6    Hesterberg facing east—and approximately 12 feet apart.  During this time, Cavallaro was on her

7    radio giving directions to her location.  Hesterberg was also repeating his questions to Cavallaro

8    regarding her authority to detain him.  Cavallaro eventually answered that her authority was "the

9    Constitution." (Dkt. No. 115 at 402:4-9.)  Hesterberg responded: "that is no kind of answer.

10   Come on, dogs, we're leaving." (*Id.* at 402:10-11.)

11          Hesterberg turned to his right and began a slow jog south on the trail and got two to three

12   strides into his jog when Cavallaro fired her taser in dart mode, striking Hesterberg in the back and

13   buttock.  Cavallaro did not give any verbal warning just before tasing Hesterberg, though she did

14   order him to stop.  Cavallaro announced over the radio, "Taser deployed!  Taser deployed!" (Trial

15   Ex. 62.)  Besides eliciting a cry of agony, the taser incapacitated Hesterberg, causing him to fall

16   face first on the trail's degraded asphalt.  Hesterberg testified that on a scale of one to ten, the pain

17   from the taser was a ten.  Hesterberg hoped that he would not die.

18          After the taser's five second cycle, Hesterberg was on his back, eyes closed.  Cavallaro

19   checked for signs of extreme distress, including whether Hesterberg was breathing (he was).

20   Cavallaro then ordered Hesterberg to roll onto his stomach so she could handcuff him, but

21   Hesterberg was unable to immediately comply.  Cavallaro, however, believed Hesterberg was

22   intentionally refusing to comply and stated over the radio, less than a minute after she fired her

23   taser, that Hesterberg was "refusing commands to turn around and get on his stomach." (*Id.*)

24   Cavallaro testified that she believed Hesterberg's inaction was willful because he eventually did

25   get up and because "after the five-second burst of the Taser, there would be no further

26   neuromuscular interruption." (Dkt. No. 114 at 118:16-24.)

27          Hesterberg sat up on the ground with the taser probes still embedded in his body.

28   Cavallaro kept him at taser point for the next three minutes until other officers arrived at the scene.

United States District Court
Northern District of California

Cavallaro kept him at taser point because she was prepared to emit another five-second cycle of electricity if Hesterberg attempted to leave again.  Upon arrival at the scene, officers from the San Mateo County Sheriff's Office placed Hesterberg in handcuffs, and Cavallaro, wearing sanitary gloves, removed the probes from Hesterberg's body.  Cavallaro, however, did not forewarn Hesterberg that she was going to remove the probes from his back; Hesterberg testified that the removal of the probes was "certainly painful."  (Dkt. No. 115 at 405:24-25.)  Meanwhile, Hesterberg asked the Babcocks, as well as a third individual, John Bartlett, who had come upon the scene immediately prior to the tasing, to take Jack and JoJo to his home and to tell his wife what had happened.  The Babcocks and Mr. Bartlett agreed to do so.

As Hesterberg was being escorted off the trail and to the area of the patrol cars, he informed the officers that his name was Hesterberg, not Jones.  Hesterberg was then seen by a paramedic whom dispatch called to the scene when Cavallaro announced the deployment of her taser.  The paramedic took Hesterberg's blood pressure and heart rate—which were both elevated—and dressed his wounds, which included the taser-probe punctures as well as an abrasion on his forearm.  Hesterberg also complained of shoulder pain, but the paramedic noted no trauma.  The paramedic advised Hesterberg to visit an emergency room, but Hesterberg declined further treatment.  Hesterberg was taken to jail and released to his wife later that night.

Cavallaro cited Hesterberg with three violations, all under state law: 1) failure to obey a lawful order; 2) providing false information; and 3) walking dog off-leash.  The first two violations are misdemeanors, while the off-leash violation is merely an infraction.[2]  The San Mateo County District Attorney declined to pursue any charges against Hesterberg.  This lawsuit followed.

### 2.    DOI and NPS Taser Policy

Both DOI and NPS have overlapping policies that governed Cavallaro's use of her taser on January 29, 2012.  At the time, DOI had two policies covering the use of tasers by DOI law

---

[2] NPS' regulations classify a violation of the dog-leash rules as a misdemeanor.  *See* 36 C.F.R. § 2.15(a)(2).  It is not apparent why Cavallaro did not cite Hesterberg under the Code of Federal Regulations.

United States District Court
Northern District of California

enforcement officers: "446 DM10" and "446 DM 22;" respectively, Chapter 10 and Chapter 22. (*See* Trial Exs. 40 & 41; *see also* Dkt. No. 116 at 645:2-8.)  Chapter 10 governs "Firearms and Other Defensive Equipment," which includes tasers.  (Dkt. No. 116 at 645:24-25.)  It provides that "[o]nly the minimal force necessary to effect and maintain public order, protect human life or property, and/or arrest shall be used."  (Trial Ex. 40 at ¶ 10.3(C).)  Chapter 22 is directed specifically toward tasers and provides parameters for their use:

> (1)    When such force is legally justified and consistent with Department policy, ECDs [Electronic Control Devices, i.e., tasers] may be used on individuals who are actively resisting an LEO [law enforcement officer] or AFSG [armed Federal security guard] and/or to prevent individuals from harming themselves or others.
> . . .
>
> (3)    Unless compelling reasons to do so can be clearly articulated, ECDs should not be used when:
>
>> (a) a subject exhibits passive resistance to an LEO or AFSG;
>>
>> (b) the LEO or AFSG believes the use of deadly force is necessary pursuant to 446 DM 20, "Use of Deadly Force"; or
>>
>> (c) the LEO or AFSG perceives use of an ECD may result in direct or secondary injuries, including but not limited to when:
>>
>>> (i) a subject may fall from a significant height;
>>>
>>> (ii) a subject is operating a moving vehicle or machinery;
>>>
>>> (iii) a subject is in or near a body of water which presents a risk of drowning;
>>>
>>> (iv) a subject is believed to be contaminated by or otherwise near flammable or explosive materials; or
>>>
>>> (v) a subject is believed to be part of a group that may be at high risk for secondary injuries (e.g., the very young, the very old, the infirm, pregnant females, etc.)

(Trial Ex. 41.)

"RM-9" is NPS' use of force policy that covers the entire agency.  RM-9 provides generally that NPS officers may use "less-lethal" or non-deadly "defensive equipment," to, among other things, "effect an arrest or investigatory 'Terry' stop when lesser force is or would be insufficient."  (Trial Ex. 124 at Ch. 10 ¶ 3.2.)  "Defensive equipment" includes tasers.  (Dkt. No.

116 at 620:8-10.)  Specific parameters for taser use are found in Chapter 32 of RM-9, which

provides:

> When such force is legally justified and consistent with Department policy, ECDs may be used on individuals who are actively resisting a commissioned employee or to prevent individuals from harming themselves or others.
> . . .
>
> Unless compelling reasons to do so can be clearly articulated, ECDs will not be used when:
>
> - ▪ a subject exhibits passive resistance to a LEO;
> - ▪ the LEO believes the use of deadly force is necessary pursuant to NPS and DOI policy, or
> - ▪ the LEO perceives use of an ECD may result in direct or secondary injuries.  To include when:
>   - • a subject may fall from a significant height;
>   - • a subject is operating a moving vehicle or machinery;
>   - • a subject is in or near a body of water which presents a risk of drowning; or
>   - • a subject is believed to be contaminated by or otherwise near flammable or explosive materials.
>
> When a subject is believed to be part of a high risk group (e.g., the very young, the very old, the infirm, pregnant females, etc.) the commissioned employee should evaluate other options if possible and provide follow-up medical attention.

(Trial Ex. 124 at Ch. 32 ¶ 4.2.)

National parks and recreation areas, such as GGNRA, are allowed to develop their own

procedures regarding the use of tasers; however, local procedures require review and approval by

the NPS' Deputy Chief of Law Enforcement (the so-called "DCOP") in Washington, D.C.

Although GGNRA has drafted one or two local procedures regarding taser use, no such local

GGNRA procedure has been reviewed and approved by the DCOP.

### B.    Procedural History

Earlier in this litigation, the Court denied Hesterberg's motion for partial summary

judgment on his false arrest and excessive force claims (Dkt. No. 54); the Court granted the

government's subsequent motion for partial summary judgment on Hesterberg's false arrest claim

United States District Court
Northern District of California

and his negligence claim to the extent it relied on the alleged false arrest (Dkt. No. 88). The Court

found in the government's favor since the record at the time compelled the conclusion that

Cavallaro continued Hesterberg's detention, at least in part, so she could verify Hesterberg's

identification and place his name in the database of leash law violators. Because including

Hesterberg's name in the database was part of Cavallaro's warning for the violation, the purpose

of the detention—issuing a warning for the leash law violation—remained in place throughout the

encounter. Hesterberg's continued detention was therefore constitutional.

## DISCUSSION

Hesterberg's lawsuit presently includes two causes of action against Defendant United

States of America, pled under the Federal Tort Claims Act ("FTCA"): battery and negligence.

The FTCA vests federal courts with exclusive jurisdiction over claims against the United States

for certain losses and injuries for which it has waived sovereign immunity. *F.D.I.C. v. Meyer*, 510

U.S. 471, 477 (1994). Substantively, the FTCA provides that the United States may be held liable

for the wrongful acts or omissions of federal employees, including Park Ranger Cavallaro, "under

circumstances where the United States, if a private person, would be liable to the claimant in

accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Because the events in this matter occurred in California, California law applies.

### A.   Battery

#### 1.   Legal Standard

A plaintiff alleging a common law battery cause of action must prove unreasonable force

as an element of the tort. *See Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008); *see also

Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-73 (1998); *see also* BAJI § 7.54 ("A

peace officer who uses unreasonable or excessive force in making [an arrest] [or] [a detention]

commits a battery upon the person being [arrested] [or] [detained] as to the excessive force[.]").

"In California, '[c]laims that police officers used excessive force in the course of an arrest,

investigatory stop or other seizure of a free citizen are analyzed under the reasonableness standard

of the Fourth Amendment to the United States Constitution.'" *Avina v. United States*, 681 F.3d

1127, 1131 (9th Cir. 2012) (quoting *Munoz v. City of Union City*, 120 Cal. App. 4th 1077 (2004)).

United States District Court
Northern District of California

The test for whether force was excessive in violation of the Fourth Amendment is "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 398 (1989); *see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1090 (9th Cir. 2013) ("The Fourth Amendment, which protects against excessive force in the course of an arrest, requires that we examine the objective reasonableness of a particular use of force to determine whether it was indeed excessive."). To assess objective reasonableness, the Court weighs "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted).

In the Ninth Circuit, the discharge of a taser in dart mode—which is what happened in this case—is an intrusion on the individual's Fourth Amendment interests that "involve[s] an intermediate level of force with 'physiological effects, [ ] high levels of pain, and foreseeable risk of physical injury.'" *Gravelet-Blondin*, 728 F.3d at 1091 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010)).

In determining the governmental interests at stake, the court looks to the non-exhaustive list of factors in *Graham*. *See Gravelet-Blondin*, 728 F.3d at 1091. These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Beyond these factors, the Ninth Circuit instructs courts to "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan*, 630 F.3d at 826 (internal quotation marks omitted). This analysis allows courts to "determine objectively the amount of force that is necessary in a particular situation." *Id.* (internal quotation marks omitted); *see also Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) ("[I]n assessing the governmental interests at stake under *Graham*, we are free to consider issues outside the three enumerated above when additional facts are necessary to account for the totality of circumstances in a given case."). Finally, "the [Supreme] Court has emphasized that there are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must still slosh [their] way through the factbound morass of "reasonableness." Whether or not [a defendant's] actions constituted

application of "deadly force," all that matters is whether [the defendant's] actions were reasonable.'"  *Mattos*, 661 F.3d at 441 (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

### 2.   Analysis

#### a)   Governmental interest in the use of force (*Graham*)

##### 1)   Severity of the crimes

Regarding the first *Graham* factor—severity of the crime—no offense here can appropriately be considered "severe."  A violation of the leash law, as the government concedes, is not a serious offense.  It is even less severe where, as here, the violation occurred on the very first day of enforcement after years of government officials allowing dogs to be run off leash and where the governing entity intends to merely "educate" the community about the law and not issue any citations.  Although lying to a police officer is not a trivial offense, it is also not inherently dangerous or violent.  *See* 36 C.F.R. § 2.32(a)(3); *see also* Cal. Penal Code § 148.9(b).  The Court concludes that providing a false last name in connection with a warning about the leash law violation was not a severe crime.  *See Bryan*, 630 F.3d at 828-29 ("While the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others." (internal quotation marks omitted)).  In addition, Hesterberg's alleged violation of California Penal Code Section 148(a)(1)—resisting, delaying, or obstructing a peace officer—and related federal provisions, also does not constitute a serious crime.  *See Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1164-65 (9th Cir. 2011) ("[W]hile disobeying a peace officer's order certainly provides more justification for force than does a minor traffic offense, such conduct still constitutes only a non-violent misdemeanor offense that will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies."); *see also Bryan*, 630 F.3d at 828-29 (concluding that resisting a police officer, failure to comply with a lawful order, and using or being under the influence of any controlled substance are not "inherently dangerous or violent"); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (holding that obstructing a police officer was not a "serious offense"); *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (holding that domestic violence suspect was

14

not "particularly dangerous," and his offense was not "especially egregious").  Moreover, not all "resisting a peace officer" offenses are equal.  Here, the resistance was refusing to "stay put" after Hesterberg had leashed Jo-Jo and after Cavallaro had already issued her verbal warning, making it less serious than perhaps other resistance.

The Court accordingly finds that his offenses were non-serious for purposes of the excessive force inquiry.

### 2)      Immediate threat to safety

The second *Graham* factor asks whether the suspect posed an immediate threat to the safety of the officer or others.  This is the "most important" factor.  *Mattos*, 661 F.3d at 441. While Hesterberg became increasingly noncompliant as the encounter wore on, at no time did he verbally or physically threaten Cavallaro or anyone else.  He was in jogging shorts and a T-shirt and Cavallaro did not observe any weapons on him.  Thus, "[a]t most, [Cavallaro] may have found [him] uncooperative," but such noncompliance does not equate to an immediate threat.  *Id.* (concluding that plaintiff did not pose an immediate threat even though plaintiff refused to exit her vehicle and physically resisted the officers' attempts to extract her).  Moreover, Cavallaro specifically testified that at the time she tased Hesterberg he posed no immediate threat to her or anyone else.  (Dkt. No. 114 at 109:25-110:12.)  The Court agrees and finds that this factor weighs against Cavallaro's use of her taser to effect the arrest.

### 3)      Active resistance or attempts to flee

The Ninth Circuit has instructed that resistance "should not be understood as a binary state, with resistance being either completely passive or active.  Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830.  As the Court did at the summary judgment stage, Hesterberg's conduct is evaluated based on this continuum of passive and active resistance.

Hesterberg attempted to flee twice even though Cavallaro previously told him he was not free to go.  Hesterberg also pulled his arm away from Cavallaro when she attempted to physically restrain him the first time he turned to leave.  Finally, Hesterberg refused to turn around and put his hands behind his back so Cavallaro could handcuff him when she had him at taser point.

United States District Court
Northern District of California

15

Given these facts, the Court finds that Hesterberg resisted arrest. In *Mattos*, the court found "some resistance to arrest" where plaintiff "refused to get out of her car when requested to do so and later stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car." 661 F.3d at 445. The court summarized this resistance as "active[] . . . insofar as she refused to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car." *Id.* at 446. Here, Hesterberg's action in pulling his arm away from Cavallaro, though a single instance of physical resistance, is similar to the physical resistance the plaintiff-driver in *Mattos* provided. And his attempt to flee generally weighs in favor of some use of force. *See Miller v. Clark County*, 340 F.3d 959, 965-66 (9th Cir. 2003) (evading arrest by flight favors the government); *see also Azevedo v. City of Fresno*, 2011 WL 284637, at *8 (E.D. Cal. Jan. 25, 2011) (concluding that misdemeanant suspect's active flight favored officer's use of "non-deadly force"). As in *Mattos*, however, Hesterberg's resistance "did not involve any violent actions towards the officers." 661 F.3d at 445. Thus, while Hesterberg engaged in some active resistance, it still did not rise to the level of an "individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830. Nonetheless, the Court finds that this factor weighs in the government's favor.

Further, the Court again rejects Hesterberg's revived argument that his flight cannot be considered because he was not fleeing from a detention, not an arrest. Even if true, Hesterberg cites no authority for his contention that this *Graham* factor must be read literally, such that only an officer's desire to arrest, rather than detain, a suspect is what triggers the analysis. The cases do not support such a rule. *See, e.g.*, *Bryan*, 630 F.3d at 829-30 (evaluating suspect's resistance to the officer's orders to reenter his vehicle so the officer could conduct the traffic stop); *Gravelet-Blondin*, 728 F.3d at 1091-92 (analyzing resistance factor where officers were ordering suspect to retreat, but not attempting to arrest suspect).

### 4)    Other considerations

Beyond the *Graham* factors, the Court examines a few additional factors to take account of the "totality of the circumstances." *Bryan*, 630 F.3d at 826. Specifically, i) whether Cavallaro gave a warning of the imminent use of force; ii) the availability of less intrusive alternatives to

effect arrest; iii) Hesterberg's culpability in escalating the incident; and iv) Hesterberg's warning that he had a heart condition.

### i) Warning

"[T]he absence of a warning of the imminent use of force, when giving such a warning is plausible, weighs in favor of finding a constitutional violation." *Gravelet-Blondin*, 728 F.3d at 1092. Cavallaro prevented Hesterberg's first escape by grabbing his arm and telling him he was not free to leave. Hesterberg nevertheless expressed his intention to leave again, at which point Cavallaro "told him to turn around and put his hands behind [] his back" and drew her taser. (Dkt. No. 117 at 708:13-15.) Hesterberg did not comply with the order to put his hands behind his back, and instead asked her sarcastically and in disbelief, "What, you're going to tase me now?" (Dkt. No. 115 at 389:24-390:1.) Hesterberg also told Cavallaro something close to, "Don't tase me, I have a heart condition." Cavallaro responded, "Well, then turn around and put your hands behind your back." (Dkt. No. 100 at 114:3-4.) Hesterberg again did not comply, and Cavallaro held Hesterberg at taser point for the next four minutes. Cavallaro did not issue any further warning or orders beyond repeatedly instructing Hesterberg to put his hands behind his back. (*See* Dkt. No. 117 at 709:9-12 ("I have my taser pointed, I'm telling him, 'Mr. Jones, turn around, put your hands behind your back.' I'm giving him commands, 'Turn around. Put your hands behind your back.'").)[3] Four minutes after Cavallaro drew her taser, Hesterberg announced, "Come on, dogs, we're leaving" (Dkt. No. 115 at 402:10-11), turned away and started into a jog, and was then tased by Cavallaro after she and Hesterberg had only proceeded a few strides.

The only explicit warning Cavallaro gave was that if Hesterberg did not turn around and put his hands behind his back, she would tase him; Cavallaro never told Hesterberg that if he tried to leave again, she would tase him. It is possible to infer from the sequence of events—*i.e.*,

---

[3] Although Ms. Babcock testified that Cavallaro, after drawing her taser, told Hesterberg, "[i]f you take another step, I'm going to tase you," Cavallaro's own testimony does not support Ms. Babcock's testimony. At no point in her testimony did Cavallaro state that she gave any such verbal warning regarding Hesterberg's attempts to leave the scene; if anything, Cavallaro admitted she did not. (*See* Dkt. No. 114 at 112:20-23 (stating that immediately before tasing Hesterberg she "did not say stop or I will Tase you").)

United States District Court
Northern District of California

1    Cavallaro drawing her taser almost immediately after Hesterberg's first attempt to leave—that, in

2    addition to trying to gain compliance with the order to put his hands behind his back, Cavallaro

3    also hoped drawing the taser would make Hesterberg stay put.  Further, because Cavallaro

4    explicitly warned Hesterberg that he could avoid being tased if he put his hands behind his back,

5    it could also be inferred that Cavallaro would use her taser if Hesterberg tried to leave again, since

6    fleeing the scene would not comply with her order to put his hands behind his back.  Nonetheless,

7    such an unstated, implicit warning does not equate to an unambiguous warning that Cavallaro

8    would use her taser if Hesterberg tried to leave again, particularly where giving an explicit verbal

9    warning stating as much was feasible.  Although Cavallaro was also directing backup to her

10   location while she had Hesterberg at taser point, there was ample time to provide Hesterberg with

11   a clear, unequivocal warning that any further attempts to flee would result in the firing of her

12   taser.  (*See* Trial Ex. 62 (audio of radio communications showing a minute of uninterrupted

13   silence at the beginning of the four minutes during which Cavallaro held Hesterberg at taser

14   point).)  Cavallaro testified that her plan was to tase Hesterberg if he tried to leave again; there is

15   no reason this plan could not have been communicated to Hesterberg.  In sum, the Court finds that

16   Cavallaro provided an implicit warning that further attempts to flee would result in the use of the

17   taser, but did not explicitly warn Hesterberg that such conduct would result in the use of force

18   even though giving a verbal warning was feasible.

19          Even if this inferred warning was adequate when Cavallaro first drew her taser, an

20   explicit, verbal warning was required prior to the firing of the taser to leave no doubt in

21   Hesterberg's mind what would happen if he did not stop jogging away.  First, the inferred

22   warning was no longer adequate by the time Cavallaro fired the taser because Cavallaro failed to

23   follow through on her verbal warning that, essentially, she would tase Hesterberg if he did not

24   turn around and put his hands behind his back.  During the four minutes Cavallaro held

25   Hesterberg at taser point, Hesterberg never complied with Cavallaro's orders to put his hands

26   behind his back yet Cavallaro did not tase him for his non-compliance.  Under these

27   circumstances—unfulfilled verbal threats and the passage of four minutes without further verbal

28   warnings—Cavallaro's unstated intentions became insufficiently ambiguous since it would be

18

1    reasonable, though risky, to believe that Cavallaro's pointing of the taser was an empty threat.

2    Given this ambiguity, a new, explicit warning should have been given when Hesterberg attempted

3    to leave.  Further, an explicit warning after Hesterberg turned to leave and before Cavallaro fired

4    her taser was feasible.  After all, Cavallaro ordered Hesterberg to stop after he turned to leave;

5    Cavallaro could have easily added "or I will tase you" to her command, which would have

6    transformed the command into a warning.

7           The Court accordingly finds that, while Cavallaro issued an inferred non-verbal warning

8    that she would tase Hesterberg if he tried to leave again, it was feasible to issue an explicit verbal

9    warning that would eliminate the ambiguity about Cavallaro's intentions; thus Cavallaro's

10   inferred warning was inadequate.

                          **ii) The availability of less intrusive measures**

12          "[P]olice are required to consider what other tactics if any were available to effect the

13   arrest."  *Bryan*, 630 F.3d at 831 (alterations and internal quotation marks omitted).  This inquiry,

14   however, does not disrupt the "settled principle that police officers need not employ the least

15   intrusive degree of force possible;" rather, it "merely recognize[s] the equally settled principle

16   that officers must *consider* less intrusive methods of effecting the arrest and that the presence of

17   feasible alternatives is a *factor* to include in [the] analysis.  *Id.* at 831 n.15 (internal quotation

18   marks omitted).

19          Hesterberg proposes four feasible, less intrusive alternative methods to effecting his arrest.

20   First, Hesterberg contends that Cavallaro could have used communication skills throughout the

21   encounter to deescalate the situation.  However, that horse had already left the barn by the time

22   Hesterberg began to jog away and Cavallaro fired her taser.  The inquiry looks at what less

23   intrusive methods were available at the time the officer used force against the subject; what

24   Cavallaro could have done minutes before the use of force is irrelevant.  At the time Cavallaro

25   used her taser to stop Hesterberg's flight, the Court is not persuaded that—beyond the issuance of

26   an explicit verbal warning, which the Court just discussed—better communication by Cavallaro

27   would have stopped Hesterberg.  Cavallaro ordered him to stop, but Hesterberg did not comply.

28   It is not clear how Cavallaro could verbally persuade Hesterberg to end his flight as Cavallaro

United States District Court
Northern District of California

                                              19

United States District Court
Northern District of California

attempted to chase after him.  Cavallaro, wearing her duty belt and boots, was in no position to match Hesterberg's pace as he attempted to jog away in his running shoes and athletic clothes.  Further, Cavallaro's taser has an effective range of only 12 to 15 feet, thus leaving only brief moments in which Cavallaro could conceivably expect to keep pace with Hesterberg and stay within range to still use her taser.  The Court accordingly finds that using communication skills was not a viable alternative to effect Hesterberg's arrest at the time Cavallaro fired her taser.

Hesterberg also asserts that Cavallaro could have let him go after giving him the verbal warning for having his dog off leash.  As just explained, proposing alternatives to Cavallaro's course of conduct leading up to the need for the use of force misses the mark.  The Court thus finds that letting Hesterberg go with a verbal warning several minutes before the use of force arose is not a viable alternative to effect Hesterberg's arrest at the time Cavallaro fired her taser.

Next, Hesterberg argues that Cavallaro could have let him go and arrested him at his house.  Again, the Court is not persuaded.  Although Hesterberg gave Cavallaro his real address, Cavallaro at least had a suspicion that the name Hesterberg gave her was not real.  Further, Hesterberg's own police practices expert declined to agree that either arresting Hesterberg at his home or later at the trailhead was feasible.  (*See* Dkt. No. 115 at 330:20-331:2.)  Given the uncertainty surrounding the information Hesterberg provided, the Court finds that arresting Hesterberg at his home was not a viable method to effect Hesterberg's arrest.

Finally, Hesterberg asserts that an alternative option was simply letting Hesterberg go.  While letting Hesterberg flee was certainly a feasible alternative to tasing him, it was not an alternative means to *effect his arrest*, which is the focus of the inquiry on this factor.

The Court finds the absence of viable alternatives to effecting Hesterberg's arrest, and thus this factor weighs in the government's favor.

### iii) The relative culpability for the escalation of the incident

The Ninth Circuit indicated in *Mattos* that a plaintiff's culpability in escalating the incident "influences the totality of these circumstances."  661 F.3d at 445; *see also id.* at 446 n.6 ("Though failure to cooperate may be a relevant consideration, it is not the primary factor that we

are directed to consider.").  The Court finds that Hesterberg bears some culpability for escalation of the incident because he lied to Cavallaro about his last name and failed to correct this untruth throughout the 15-minute encounter before the taser was fired.  If Hesterberg had told the truth about his name, the encounter would have almost certainly ended uneventfully and in a matter of minutes.  Hesterberg testified that his decision to give a false name was "split second" and motivated by a desire to keep his name off of any "list" that catalogued dog-leash violations. (Dkt. No. 115 at 381:11-16.)  Neither explanation for the decision absolves his culpability.  While the initial decision might have been split second, he could have corrected it in the proceeding 15 minutes but chose not to do so.  Further, a desire to keep one's name out of the possession of law enforcement does not justify lying to a law enforcement officer.

To the extent Hesterberg argues that the false name can be justified because Cavallaro failed to identify herself as a law enforcement officer, the Court is not persuaded.  As an initial matter, the Court notes that the salient question is not whether Hesterberg knew that an NPS park ranger has the same authority as a police officer; rather, what matters are the facts relevant to Hesterberg's knowledge of Cavallaro's general authority to enforce the law.  On that measure, Hesterberg testified that had he known Cavallaro was a law enforcement officer, he would not have lied to her and he would have corrected his lie once he found out who she was.  (*See id.* at 382:2-4.)  To Hesterberg, Cavallaro was simply someone in a green uniform.  The Court does not find Hesterberg credible on this issue.  On the day in question (and at trial), Cavallaro wore her green duty uniform, which includes a duty belt that contains a multitude of law enforcement tools, including a gun and, of course, a taser.  A reasonable person who sees this belt would understand that Cavallaro was highly likely to be some kind of law enforcement officer.  The duty belt is also large, rather bulky, and easily visible.  It strains credulity to believe that Hesterberg did not see it at any point in the 15-minute encounter with Cavallaro.  Her uniform that day also included a jacket that had an NPS patch badge and Cavallaro's embroidered name.  Although Cavallaro's medal badge was concealed under the jacket, the patch badge was nevertheless consistent with the signs pointing to Cavallaro's law enforcement role.

The course of conduct between Cavallaro and Hesterberg also undermines Hesterberg's assertion that he was unaware of her authority.  In particular, Hesterberg was likely aware of Cavallaro's authority when Cavallaro took Hesterberg's partially false identifying information, radioed it to her dispatch, and waited several minutes for verification from dispatch.  While Hesterberg admits that he assumed that the ensuing delay was because Cavallaro was waiting for a response from the dispatcher, he denies that he had any inkling why the response was delayed.  The Court, however, finds it difficult to credit Hesterberg's denial.  The reason for the delay should have been obvious to him—he gave a false name to avoid his real name being put into a database, Cavallaro radioed his information to dispatch prior to putting it into the database (which he may not have expected when he lied), and dispatch could not match the partially false identifying information with law enforcement records.  The Court fails to conceive of any other logical reason that could have explained the delay under the circumstances known to Hesterberg.  Hesterberg's efforts to leave the scene in the face of Cavallaro's attempt to verify his identity also strongly suggest that Hesterberg understood she was a law enforcement officer to whom he was not allowed to lie.

Finally, once Cavallaro drew her taser and pointed it at him, Hesterberg should have known that Cavallaro was a law enforcement officer and admitted to his lie.  Given Cavallaro's appearance and actions up to that point, it is not plausible that Hesterberg could have still believed that Cavallaro was not a law enforcement officer.

Notwithstanding Cavallaro's abrupt and incomplete responses to the questions regarding who she was and the basis for her authority, the Court finds that Hesterberg bears some responsibility for the escalation of the incident.  Hesterberg's untruthful statement to Cavallaro and his subsequent efforts to escape his lie contributed to circumstances leading to Cavallaro's use of her taser.  The Court accordingly finds that this factor weighs in favor of the government.

### iv)  Hesterberg's statement that he had a heart condition

An additional factor to consider in this case is Hesterberg's statement to Cavallaro that she should not tase him because of his heart condition.  Cavallaro was trained that a person with a heart condition may be in a "high-risk" group for serious injuries or even death from being tased.

United States District Court
Northern District of California

1  (*See* Dkt. No. 114 at 36:17-37:8.)  Cavallaro was also trained that one of the factors that she must

2  consider before tasing a person is whether that person may have a heart condition.  (*See id.* at

3  39:18-21.)  In her encounter with Hesterberg, Cavallaro considered Hesterberg's statement that he

4  had a heart condition,[4] but tased him nonetheless as he began to jog away.  The Court accordingly

5  finds that, consistent with Cavallaro's training and testimony at trial, Hesterberg's statement that

6  he had a heart condition weighed against—but did not preclude—Cavallaro's use of the taser.

7  *See Mattos*, 661 F.3d at 445-46 (concluding that officer's tasing of a pregnant woman in drive-

8  stun mode weighed against the reasonableness of the officer's use of force).

9       The government contends that, regardless of Cavallaro's training, the Court should not

10  find that this factor weighs against the use of a taser because there was no serious risk of death or

11  injury to Hesterberg's heart.  The Court is not persuaded.  At the outset, the Court underscores

12  that the Ninth Circuit has already determined that the use of a taser in dart mode constitutes an

13  intermediate level of force with 'physiological effects, [ ] high levels of pain, and foreseeable risk

14  of physical injury.'"  *Gravelet-Blondin*, 728 F.3d at 1091 (quoting *Bryan*, 630 F.3d at 825).

15  Whether Hesterberg was actually at high risk for injury or death due to his heart condition will not

16  change the taser's intermediate level of force classification.  The Court's consideration of

17  Hesterberg's statement regarding his heart condition merely examines whether the statement

18  influences the totality of the circumstances; it does.

19       The government presented the testimony of Dr. Theodore Chan in support of the

20  proposition that an officer who is told of an individual's "heart condition" may disregard the

21  statement as medically insignificant insofar as the officer does not tase the individual in the chest.

22  Dr. Chan is a professor of emergency medicine and an emergency physician at the University of

23  California San Diego, who has studied the physiological effects of tasers since the mid-2000s.

24  Dr. Chan testified that a taser is a "relatively safe device" that produces metabolic and physiologic

25

26  ───────────────

27  [4] Although not known to Cavallaro at the time, Hesterberg has had three episodes of atrial
fibrillation before this incident that required trips to the emergency room and one overnight stay to
return his heart to a normal beating rhythm.  Hesterberg also has hypertension, which his doctor

28  told him contributes to his risk of atrial fibrillation.  At the time of the incident, and now,
Hesterberg was on medication for his hypertension.

effects "similar to exertion."  (Dkt. No. 116 at 528:1-8.)  Dr. Chan further opined that while studies have shown that a taser is capable of causing a particularly serious condition called "cardiac capture,"[5] such occurrences in the medical literature were confined to instances where the subject was tased in the chest.  Dr. Chan's opinion, however, was based on studies where the individuals tased had no known history of heart disease, including atrial fibrillation.  In particular, none of Dr. Chan's own studies examined an individual that was known to have a heart condition. (See id. at 547:15-548:2.)  In sum, Dr. Chan's opinions boil down to the proposition that, at least for individuals without a preexisting heart condition, a taser used away from the chest area is unlikely to lead to serious injury or death and will merely produce metabolic and physiological effects similar to exertion.  The problem with this opinion is that it says virtually nothing about individuals with preexisting heart conditions, which is the segment of the population relevant to this case.  Thus, contrary to the government's assertion, it has not shown that there is "zero cardiac risk to someone who is tased in the back."  (Dkt. No. 118 at 842:17.)

If anything, the logical deduction from Dr. Chan's opinions is that an individual with a heart condition is at greater risk for injury from a taser than an individual without a heart condition.  Dr. Chan opined that when an individual is tased, it is a "stressful" situation that could lead to an elevated heart rate, elevated blood pressure, and increased respiration.  (*Id.* at 534:24-535:9, 536:8-14.)  This makes sense considering the at-a-minimum five-second incapacitation and severe pain caused by the taser's electrical impulses.  Subjecting an individual with an undefined heart condition to these elevated vital signs—which may already be elevated because of the stressful nature of the situation prior to the taser use or because of the individual's recent exertive activity, such as jogging—would seem to pose a particular risk of triggering that individual's heart condition.  In other words, while the taser may not directly cause injury to the heart, such damage, if it were to occur, may constitute secondary injuries arising from the fear-inducing tasing experience.  As noted above, Hesterberg feared for his life as the taser pulsed electricity

---

[5] Dr. Chan explained that cardiac capture is the notion that the taser's electrical impulses are not only able to stimulate the outer skeletal muscles, but also able to "stimulate your heart and cause capture of the heart because of these rapid fire electrical impulses."  (Dkt. No. 116 at 526:8-12.)

United States District Court
Northern District of California

into his body.  The absence of evidence quantifying the risk of such secondary injuries does not preclude the Court from considering Hesterberg's heart-condition statement in analyzing the totality of the circumstances; rather, the lack of quantifiable risk merely goes to the weight the Court gives this factor.

### b)   Balancing

To determine reasonableness, the Court must balance the government's interest in continuing to detain Hesterberg against the intrusion on Hesterberg's Fourth Amendment interests with an intermediate level of force.  The reasonableness of Cavallaro's use of the taser "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Based on the *Graham* analysis above, whether Cavallaro's use of the taser was excessive turns on whether such use was justified in stopping a fleeing, nonviolent, non-serious misdemeanant, who posed no threat to Cavallaro or the public, who was not sufficiently warned prior to the tasing, and who Cavallaro knew had an undefined heart condition.  For the reasons explained below, the Court finds that Cavallaro's use of the taser under those circumstances was not justified.

Although the government has a clear interest in stopping fleeing suspects, that interest is not absolute.  *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").  Further, the government's interest in apprehending suspects varies depending on what the suspect is fleeing from; for example, the government would have a greater interest in apprehending a residential burglar than a litterer.  If that suspect is violent or poses a threat to the officer or the public, the government's interest in stopping his flight increases still.

The Court finds that this case involves an almost imperceptibly low government interest in apprehending Hesterberg.  The government concedes that Cavallaro had probable cause to arrest

United States District Court
Northern District of California

1    Hesterberg for only the dog-leash violation and disobeying her lawful orders to stay and to put his

2    hands behind his back; Hesterberg, meanwhile, does not challenge that Cavallaro had reasonable

3    suspicion that he had lied about his name and thus was authorized to continue to detain him while

4    she investigated that crime.  As discussed above, however, these are non-serious offenses on their

5    face.  The offenses are particularly inconsequential in the context of this case, given that

6    Cavallaro's duty at the Rancho was to engage leash-law violators in an "educational contact" that

7    would inform the violator of the transfer of ownership to GGNRA.  Cavallaro's mission was to

8    merely warn off-leash dog-walkers that GGNRA's dog leash laws would be enforced against them

9    in the future.[6]  In other words, Cavallaro and her superiors viewed leash-law violations on January

10   29, 2012 as not meriting even a citation.  In light of that previous position, the Court fails to see

11   how the government can now plausibly claim its interest in pursuing such violations was so high

12   as to necessitate Hesterberg's capture with near-maximum non-deadly force.  Further, Hesterberg

13   was nonviolent and posed no threat to Cavallaro or anyone else; thus, the government had no

14   interest in capturing him because of a danger he posed.  The lack of any violent conduct on the

15   part of Hesterberg is crucial; as noted above, the Ninth Circuit has held that the "most important"

16   factor in the *Graham* analysis is whether the suspect posed a threat to safety—not whether the

17   suspect was fleeing—in evaluating the government's interest in the use of force.  *Mattos*, 661 F.3d

18   at 441.

19            Weighed against this minimal interest is the intermediate level of force inflicted on

20   Hesterberg; specifically, the taser's "physiological effects, high levels of pain, and foreseeable risk

21   of physical injury."  *Gravelet–Blondin*, 728 F.3d at 1091 (internal quotation marks and alterations

22   omitted).  The Court finds that the intrusion on Hesterberg's Fourth Amendment interest to be free

23   from being tased greatly outweighs the minimal governmental interest in apprehending him for his

24   violations of the law.  Cavallaro's use of her taser on Hesterberg was therefore unconstitutional.

25

26

27   _____

28   [6] There is no evidence in the record that any leash law enforcement by any government entity had
     *ever* occurred at the Rancho prior to the day in question.  Nor is there any evidence that, as of
     January 29, 2012, GGNRA had posted any sign in the Rancho informing users of the leash law.

26

The Court's ruling is from the perspective of a reasonable officer on the scene.  Although Cavallaro was dealing with a developing situation in that she was trying to direct backup to her location on the trail, the record does not show a situation in which Cavallaro's decision to tase Hesterberg was made in haste or impulsively.  In fact, Cavallaro testified that the situation presented enough time for her to formulate a plan to tase Hesterberg if he attempted to leave at any point during the four minutes she had him at taser point.  The dispatch recordings and radio transcripts verify Cavallaro's testimony; specifically, the verbal exchanges were sparse and there were numerous moments for reflection during the four minutes that she had her taser out. Cavallaro merely made the incorrect constitutional calculation when she chose to tase Hesterberg rather than let him flee.

Cavallaro's failure to adequately warn Hesterberg and her decision to tase him despite his disclosure of a heart condition contributes to the unreasonableness of the use of force.  However, even if Cavallaro had given Hesterberg an explicit verbal warning of the impending use of force, the Court would still find that the tasing was unreasonable.  The government's interest in apprehending Hesterberg is simply too low to justify his tasing even if he willfully disregarded such a warning.  Nor would the absence of the disclosure about his heart condition warrant a different result in light of the government's meager interests.

The government's arguments to the contrary are unpersuasive.  The government's primary contention is that, outside of the deadly force context, a law enforcement officer is never required to let a suspect flee and may always use intermediate force to apprehend a fleeing suspect if the officer exhausts her use-of-force options.[7]  But there is no rule that using non-deadly force to capture an unidentified law-breaker is per se reasonable; in fact, "the [Supreme] Court has emphasized that there are *no per se rules* in the Fourth Amendment excessive force context." *Mattos*, 661 F.3d at 441 (emphasis added).  Moreover, the Ninth Circuit rejected a similar assertion over two decades ago.  *See Chew v. Gates*, 27 F.3d 1432, 1443 n.11 (9th Cir. 1994) (rejecting defendant's contention that "anything short of *deadly* force may constitutionally be used

---

[7] The government further contends that no other use of force option was feasible—in terms of effectiveness and officer safety—at the point Cavallaro chose to fire her taser.

United States District Court
Northern District of California

1    to apprehend a felon;" reasoning that this assertion "conflicts with the holding and the reasoning

2    of *Graham* as well as with prior circuit law").  And in *Azevedo v. City of Fresno*, 2011 WL

3    284637 (E.D. Cal. Jan. 25, 2011), the court denied the officer's motion for summary judgment

4    since a reasonable jury could conclude that the officer's use of a taser to apprehend a fleeing

5    misdemeanant was excessive.  The *Azevedo* court rejected the officer's argument (now posed by

6    the government) that flight alone justifies the use of the taser:

> While Azevedo was clearly in flight when Carr deployed the taser,
> the Court cannot say as a matter of law that Azevedo's flight made
> use of the taser reasonable.  The misdemeanors involved were all
> non-violent, and the evidence indicates that Azevedo did not pose an
> immediate threat to the officers.  Importantly, Azevedo and Carr
> were running at full speed on the street. It was understood that the
> taser would immobilize Azevedo. . . .  In the absence of an
> immediate threat posed by Azevedo, a reasonable jury could
> conclude that the nature of the force and the risk of injury were too
> great relative to the offenses at issue.

13    *Id.* at *9.  Other courts have also indicated that it can be unreasonable to use intermediate levels of

14    force to apprehend a fleeing suspect.  *See Cockrell v. City of Cincinnati*, 2010 WL 4918725, at *3-

15    4 (S.D. Ohio Nov. 24, 2010) (denying officer's motion to dismiss since fact that nonviolent,

16    nonthreatening suspect "fled from the minor crime may not well support the use of a taser when

17    reviewed under the totality of the circumstances") *overturned on other grounds by* 468 Fed. Appx.

18    491 (6th Cir. 2012) (unpublished); *see also Mason v. Hamilton Cnty.*, 13 F. Supp. 2d 829, 836

19    (S.D. Ind. 1998) (denying plaintiff's motion for judgment as a matter of law, but emphasizing that

20    the jury could have "easily" ruled that the officer's use of a police dog to stop a fleeing

21    misdemeanant was unreasonable under *Graham*); *see also Marley v. City of Allentown*, 774 F.

22    Supp. 343, 345-46 (E.D. Pa. 1991) (holding that "it was not objectively reasonable for [the officer]

23    to think that unleashing a trained attack dog to apprehend a fleeing misdemeanant comported with

24    [*Garner*]").

25         The government's cited cases are either unpersuasive or distinguishable.  In *Hernandez v.*

26    *City of Pomona*, 46 Cal. 4th 501, 520 (2009), the California Supreme Court held that officers were

27    not "obliged" to cease pursuing a fleeing suspect who "was willing to endanger his own life and

28    the lives of the officers and the public."  As conceded by the government, however, Hesterberg

United States District Court
Northern District of California

28

posed no danger to anyone; *Hernandez* is accordingly not applicable.  For similar reasons, *Beaver v. City of Federal Way* is also distinguishable.  507 F. Supp. 2d 1137, 1145 (W.D. Wash. 2007) (concluding that the first three of five tasings of a fleeing felon—residential burglary—who appeared to be under the influence of controlled substances, did not constitute excessive force). Finally, the Eighth Circuit's decision in *McKenney v. Harrison* is unpersuasive to the extent it holds that use of a taser is per se reasonable to stop a fleeing misdemeanant.  635 F.3d 354, 360 (8th Cir. 2011) ("Although the charges were limited to misdemeanors, the officers executing the warrant were not required to let Barnes run free.").  The *McKenney* court failed to analyze the use of force under *Graham*; that is, it failed to weigh the government's interest in apprehending McKenney pursuant to misdemeanor arrest warrants against McKenney's interest in being free from a taser shot in dart mode.  Rather, the court concluded, without supporting authority, that McKenney's mere attempt to escape justified the use of the taser.  This Court respectfully disagrees.

The government's argument that law enforcement may not be compelled to simply let a non-serious misdemeanant escape is also undermined by the evidence in this case.  Specifically, Hunter Bailey (the government's expert witness on use of force) testified, in response to questioning by the Court, that some law enforcement agencies prohibit their officers from using tasers on nonviolent, fleeing misdemeanants.  (*See* Dkt. No. 116 at 664:24-665:16.)  Bailey further testified that some agencies do not even distribute tasers to their officers in the first place.  (*See id.* at 665:17-22.)  Thus, those officers would not be able to use a taser to prevent escape when all other use-of-force options were unavailable (as Cavallaro contends here); in other words, they would have no option other than letting the non-dangerous, non-serious misdemeanor suspect flee. Bailey's acknowledgment of the contrary practices of other law enforcement agencies supports the Court's conclusion that preventing escape cannot alone justify the use of the taser under the circumstances here.  In addition, Cavallaro's supervisors, Kevin Cochary and Marybeth McFarlane, instructed Cavallaro following the incident with Hesterberg that if a similar situation presented itself again, Cavallaro should simply let the person leave.  (*See* Dkt. No. 114 at 157:5-21.)  Thus, Cavallaro's own supervisors also undercut the government's contention that allowing

1   such low-level violators to escape under similar circumstances is an untenable law-enforcement

2   practice.

3           The government also argues that Hesterberg's status as an unidentified law-breaker is

4   significant; specifically, the government argues that the use of a taser is justified in capturing

5   unidentified, non-serious misdemeanants because we live in a safer world when people who are

6   witnessed committing crimes are identified and checked for outstanding warrants.  (*See* Dkt. No.

7   119 at 848:23-849:2 ("People are stopped for minor violations who have warrants, who are

8   probation violators, and we are all safer, the Court is safer, I am safer, Gary Hesterberg is safer in

9   a world where people who are stopped for conceded and obvious violations of the law are

10  identified.").)  The government contends that Cavallaro's actions in preventing Hesterberg's

11  escape were consistent with this principle because he had yet to be identified and checked for

12  warrants when she tased him.  Even if the government's proposed warrant-check rule would

13  promote overall safety, the rule's constitutionality is questionable.  As this Court previously noted

14  in an earlier ruling, the Ninth Circuit has held that in certain circumstances an officer may not

15  prolong an initially lawful detention to check for outstanding warrants without reasonable

16  suspicion that such warrants exist.  *United States v. Luckett*, 484 F.2d 89, 91 (9th Cir. 1973) (per

17  curium) (finding Fourth Amendment violation where pedestrian stopped for jaywalking continued

18  to be detained for a warrants check after pedestrian was issued a citation, and where no reasonable

19  suspicion supported seizure for check of outstanding warrants).  The government concedes that

20  Cavallaro had no reasonable suspicion that Hesterberg had any outstanding warrants.  Thus, given

21  the questionable constitutionality of continuing to detain Hesterberg for the sole purpose of

22  running a warrants check, the Court is not persuaded that the need to run a warrants check elevates

23  the government's interest in preventing Hesterberg's escape such that Cavallaro's use of force was

24  reasonable.

25          Finally, the government contends that the tasing was justified because of "the paramount

26  interest of law enforcement officers in identifying the persons they are dealing with."  (Dkt. No.

27  98 at 5.)  As an initial matter, the Court notes that Cavallaro failed to actually try to identify

28  Hesterberg after she suspected his name was false but prior to the taser deployment.  As

United States District Court
Northern District of California

30

United States District Court
Northern District of California

Hesterberg's police practices expert testified, a reasonable law enforcement officer is trained to use their words in extracting identifying information from individuals, particularly where the officer believes she has been given false identifying information.  Cavallaro, however, did not even ask Hesterberg if the name he had given her was correct, even though she asserts she had a hunch that the name was false and despite sufficient opportunities to do so.  In any event, the Court is not persuaded that the need to identify Hesterberg for his low-level violations of law justify Cavallaro's use of the taser, even if the taser was the only tool remaining to collect Hesterberg's identifying information.

The Court is aware that its ruling is counter to the conclusion drawn by Hunter Bailey, NPS' Deputy Chief of Law Enforcement ("DCOP"), *i.e.*, the point person for the agency's use of force policy.  However, Bailey's testimony at trial revealed a startling lack of awareness of the law and its application to use of force scenarios.  Specifically, Bailey testified that Cavallaro's tasing of Hesterberg was appropriate under various sections of both DOI and NPS policies.  First, Bailey concluded that Cavallaro's actions were consistent with the provision in DOI's Chapter 22 and NPS' RM-9 that states:  "When such force is legally justified and consistent with Department policy, ECDs may be used on individuals who are actively resisting a commissioned employee or to prevent individuals from harming themselves or others."  (Trial Ex. 124 at Ch. 32 ¶ 4.2.)  To interpret and enforce this policy, Bailey is required to know, among other things, when force is "legally justified" and when an individual is "actively resisting" arrest.  Bailey is further required to know how United States Courts of Appeal have interpreted those specific legal terms; for this case, he would need to know under what circumstances the Ninth Circuit has deemed the use of intermediate force, and specifically a taser, "legally justified" as well as the Ninth Circuit's rule governing "active resistance."  Bailey, however, was ignorant of any such holdings:

> Q. You don't even know what the legal standard was for the use of a taser at the time of this incident, do you?
>
> A. The legal standard in the Ninth Circuit?
>
> Q. Right.
>
> A. No, not specifically.

31

(Dkt. No. 116 at 655:15-19.)  At the time of Bailey's deposition in this case in April 2014, Bailey had "never heard of" the Ninth Circuit's en banc opinion in *Mattos* nor its decision in *Bryan*.  (*Id.* at 653:13-25.)  *Mattos* and *Bryan* are fundamental to understanding some of the circumstances under which the use of a taser would be unconstitutional under Ninth Circuit precedent.[8]  Bailey's lack of knowledge was reflected in his testimony (introduced as impeachment) that a baton strike—also an intermediate level of force in the Ninth Circuit—would *not* have been justified under the same circumstances present here because a baton strike is a "higher level of force" with "more significant" potential injuries than a taser in dart mode.  (*Id.* at 658:8-659:19.)  There is no such distinction in the Ninth Circuit.

The Court fails to see how Bailey could competently opine on whether an NPS officer's use of a taser was "legally justified" when he is unaware of what the law justifies.  Nor could he competently say whether an individual was "actively resisting" since he has no knowledge of what that term means in the Ninth Circuit.  Thus, contrary to Bailey's belief, he has no basis to assert whether any NPS officer's use of a taser in the Ninth Circuit (Cavallaro's included) complied with DOI and NPS policy.

Bailey further testified regarding the paragraph in RM-9 that states:

> When a subject is believed to be part of a high risk group (e.g., the very young, the very old, the infirm, pregnant females, etc.) the commissioned employee should *evaluate other options* if possible and provide follow-up medical attention.

(Trial Ex. 124 at Ch. 32 ¶ 4.2 (emphasis added).)  Bailey opined that Cavallaro's tasing in this case would have also been justified pursuant to RM-9, "[u]nder all the same facts that applied to Mr. Hesterberg," if used against a nine-year-old girl or an eight-month pregnant woman, rather than Hesterberg, so long as Cavallaro "evaluated other options."[9]  (Dkt. No. 116 at 660:10-20.)

---

[8] National parks and recreation areas within the Ninth Circuit accounted for nearly 26% of total NPS park visitors in 2013.  *See* NAT'L PARK SERV., U.S. DEP'T OF THE INTERIOR, NPS/NRSS/EQD/NRDS—2014/635, STATISTICAL ABSTRACT 2013 (2014).  In particular, the GGNRA had the highest number of visitors in 2013 out of all the national parks and recreation areas in the country.  *See id.*  It is thus surprising, if not disturbing, that the NPS official responsible for NPS taser policy was not familiar with Ninth Circuit law regarding taser use.
[9] On redirect, counsel for the government attempted to rehabilitate Bailey's testimony by suggesting that a nine-year-old girl and an eight-month pregnant woman were not likely

While Bailey's opinion may reflect a literal reading of NPS policy, it is nevertheless unacceptable. The Court cannot imagine a rational fact-finder that would find it reasonable to tase a nonviolent and nonthreatening nine-year-old or eight-month-pregnant woman fleeing from non-serious misdemeanors.

The Court accordingly gives no weight to Bailey's opinions regarding the reasonableness of Cavallaro's use of force. Further, the DOI and NPS policies on their face provide no guidance for the Court—not to mention DOI and NPS officers—since they are, essentially, standardless policies devoid of any rules for dealing with fleeing subjects.

For the reasons stated above, the Court finds that Cavallaro's use of her taser against Hesterberg was objectively unreasonable under the totality of the circumstances. The Court accordingly rules in favor of Hesterberg, and against the government, on Hesterberg's state-law battery claim.

### B.    Negligence

"Except when otherwise provided by law, public employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 628-29 (2013). "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 292 (1988).

The government does not dispute that Cavallaro had a duty under California law to act reasonably when using her taser against Hesterberg. The government also does not challenge Hesterberg's contention that the California Supreme Court's decision in *Hayes*, a case involving the use of deadly force, applies to a case such as this where the use of force was less than deadly.

candidates to be able to flee from Cavallaro. (*See id.* at 672:8-18.) However, the hypothetical posed to Bailey on cross-examination involved a scenario where the nine-year-old and the eight-month pregnant woman were actually fleeing. In any event, government counsel's altered hypotheticals do little to help Bailey's testimony since they merely go to the likelihood of flight—not what force Cavallaro would be authorized to use if the high-risk individual actually flees. On that latter point, Bailey's testimony remained unchanged.

United States District Court
Northern District of California

The *Hayes* court held that, under California negligence law, liability can arise from "tactical conduct and decisions employed by law enforcement preceding the use of deadly force" if such tactical conduct and decisions "show, as part of the totality of circumstances, that the use of deadly force was unreasonable."  57 Cal. 4th at 626.

Hesterberg claims that, in addition to the tasing itself, Cavallaro breached her duty of care by failing to identify herself as a law enforcement officer, her poor communication skills, and her "decisions to prolong and escalate th[e] situation."  (Dkt. No. 90 at 30.)  The Court finds that—even if Cavallaro's pre-tasing conduct was reasonable—Cavallaro breached her duty of care to Hesterberg when she tased him, which, for the reasons explained above, was unreasonable under the totality of the circumstances.   The Court further finds that Cavallaro's tasing of Hesterberg was the proximate cause of his injuries.

Because Hesterberg has established the elements for his negligence cause of action, the Court finds in favor of Hesterberg, and against the government, on the negligence claim.

**C.      Damages**

 "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  Cal. Civ. Code § 3333.  Hesterberg seeks damages for the following injuries: physical injuries, including puncture wounds, contusions, scrapes, and shoulder pain;[10] physical pain and suffering; and emotional and mental distress.

Although Hesterberg's physical injuries were minor (they all healed within a week or so), the physical pain and suffering Hesterberg suffered during the five-second tasing, and as he crashed face-first onto the pavement, was intensely overwhelming.  Hesterberg, who has experienced a broken collar bone and dual hip surgeries, testified that he has never experienced such pain in his life.  The sudden pain was so intense that Hesterberg feared he would die.

---

[10] Hesterberg does not claim any damage to his heart.

United States District Court
Northern District of California

The Court also finds that Hesterberg suffered some emotional and mental distress as a result of the tasing.  Cavallaro's tasing of Hesterberg garnered substantial media attention; one of Cavallaro's supervisors, Marybeth MacFarlane, described the incident as "basically becoming a shit storm in the media." (Dkt. No. 111-1 at 96:2.)  United States Congresswoman Jackie Speier wrote a public letter to GGNRA Superintendent Frank Dean a few days after the incident inquiring into GGNRA's use-of-force policies and practices as well as GGNRA's handling of the transition of the Rancho property.  (*See* Trial Ex. 6.)  The Hesterbergs' answering machine became full with messages from reporters and the media even showed up at the Hesterbergs' home.  As a result of the media attention, which Hesterberg has not materially supported or indulged in, Hesterberg's friends and acquaintances often ask him about the incident.  Even people who meet Hesterberg for the first time have recognized him as the man tased at the Rancho and have asked him about the incident, thus serving as a "nasty reminder" of the tasing.  (Dkt. No. 115 at 423:18.)  Hesterberg also testified that the incident "replays" in his mind every time he jogs by the part of the trail where the tasing occurred.  (*Id.* at 422:13-423:7.)  Although he now jogs in the Rancho as often as he did before the incident, it took about a month after the incident before Hesterberg felt comfortable returning to the Rancho.  The Court accordingly finds that Hesterberg suffered compensable emotional and mental distress.  The Court notes, however, that while Hesterberg has some emotional and mental distress as the result of Cavallaro's decision to tase him, that distress is likely tempered by Hesterberg's acknowledgment of his own role leading to the tasing; namely, lying to Cavallaro and never correcting his lie.  In other words, Hesterberg's self-reflection of his behavior leading up to the tasing should lessen the level of distress that he feels was unjustly put upon him.

## CONCLUSION

For the reasons stated above, the Court finds in favor of Gary Hesterberg, and against the government, on Hesterberg's battery and negligence claims and awards $50,000.00 in damages.  The Opinion constitutes the findings of facts and conclusions of law required by Federal Rule of Civil Procedure 52(a)(1).  A separate judgment will follow.

//

**IT IS SO ORDERED.**

Dated: October 9, 2014

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California